**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHARLES H.,<br>1901 E Street, SE<br>Washington, DC 20003, and<br><br>ISRAEL F.,<br>1901 E Street, SE<br>Washington, DC 20003<br><br>on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>          v.<br><br>THE DISTRICT OF COLUMBIA,<br>a municipal corporation<br>1350 Pennsylvania Avenue, NW<br>Washington, DC 20004,<br><br>DISTRICT OF COLUMBIA PUBLIC SCHOOLS<br>1200 First Street, NE<br>Washington, DC 20002, and<br><br>OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION,<br>1050 First Street, NE<br>Washington, DC 20002,<br><br>             Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CLASS ACTION COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF**

**INTRODUCTION**

1.      This is a case about the District of Columbia's unconscionable failure to provide special education to students with disabilities who are incarcerated during the COVID-19

pandemic.  For over a year, students have received work packets in lieu of classes, effectively requiring that these students with disabilities teach themselves all of their subjects.

2.      Plaintiffs are high school students with disabilities and special education needs who are detained in the District of Columbia's Central Detention Facility and the Correctional Treatment Facility (collectively, "the DC Jail complex").  While detained in the DC Jail complex, plaintiffs are enrolled in its on-site school called the Inspiring Youth Program (IYP), run by District of Columbia Public Schools (DCPS).  At the beginning of the COVID-19 pandemic, defendants DCPS, the District of Columbia Office of the State Superintendent of Education (OSSE), and the District of Columbia ("the District") eliminated these students' classes and have since effectively abandoned efforts to teach them.

3.      On March 13, 2020, DCPS stopped in-person classes for all of its students and committed to begin distance learning for its students on March 24, 2020.  For students learning from home, DCPS provided class materials and direct instruction by teachers through an online platform with two-way videoconference classes.  However, for the approximately 40 students enrolled in DCPS at the DC Jail complex, all of whom have disabilities and special education needs, DCPS never resumed classes in any format.

4.      While other students resumed virtual (and later in-person) classes the students at IYP only received work packets.  These work packets are inaccessible for students with disabilities, many of whom, are functioning below grade level in reading comprehension and writing skills.  DCPS has the work packets sporadically dropped off at the students' cells or uploaded to tablets and expects the students to complete the work on their own with no teacher instruction.  Then, after the work is collected, the students never see their assignments again and receive little to no feedback except for generalized progress reports or final grades at the end of

each term.  Students are also not receiving mental health counseling or their other required services.  The lack of these critical services, like counseling, leaves these vulnerable students to cope on their own.

5.      The Individuals with Disabilities Education Act (IDEA), the Rehabilitation Act, federal implementing regulations, and District of Columbia law require that defendants provide or otherwise ensure the provision of a "free appropriate public education" (FAPE) to IYP students. Each student has a comprehensive plan tailored to the student's educational needs called an Individualized Education Program (IEP).  An IEP details, among other things, the amount of specialized instruction and related services that each student needs to ensure that the student can make progress towards his or her educational goals and access the general curriculum.  Specialized instruction is teacher instruction designed to meet the unique needs of the student by adapting the content, methodology, or delivery.  Related services are those that assist the student in accessing the instruction, such as speech-language pathology and behavioral support services.  In order to provide FAPE, special education and related services must be provided in conformity with each student's IEP.  Schools must continue to provide FAPE to students with disabilities during distance learning.

6.      For its students in the DC Jail complex, all of whom are eligible for special education under the IDEA, DCPS has systemically failed to implement the IEPs of the students by halting class instruction and related services.  This is the most extreme of implementation failures: plaintiffs have not received regular teacher instruction—let alone their required specialized instruction from qualified special education providers—or regular related services in conformity with their IEPs since March 13, 2020.  The work packets cannot provide these students with the specialized instruction and support that they need and do not replace their classes or counseling

sessions.  For example, instead of two weeks of instruction in Probability and Statistics, students are asked to complete just 10 questions.  These students need direct instruction, which means teacher-student interaction either in-person or virtually that provides opportunities for teachers to explain new skills and information, for students to practice skills with teacher guidance, and for students to receive ongoing teacher correction and feedback.  Similarly, the students need in-person or virtual related services, such as counseling and other therapies (*i.e.*, behavior counseling, speech therapy), in conformity with their IEPs.

7.     Defendants have failed to implement policies, procedures, and practices to provide or otherwise ensure that plaintiffs receive the special education and related services they are entitled to pursuant to the IDEA, the Rehabilitation Act, and District of Columbia law.  In order for plaintiffs to access and benefit from their education, they need specialized instruction and related services in conformity with their IEPs.  Without this Court's swift intervention, plaintiffs will continue to languish without education and the critical supports they need, causing irreparable educational and social-emotional harm.

8.     The violations set forth in this Complaint are not the result of an error or mistake, but a deliberate decision to abandon the educational welfare and needs of students detained in the DC Jail complex.  For more than a year, defendants have knowingly and systemically failed to ensure that this student population receives its federally mandated special education and related services.  Defendants' egregious conduct violates plaintiffs' right to a free, appropriate, public education under the IDEA, the Rehabilitation Act, and their corresponding federal and local municipal regulations, and discriminates against them in violation of the Rehabilitation Act, the Americans with Disabilities Act (ADA), and the District of Columbia Human Rights Act (DCHRA).

9.      As detailed below, defendants' actions and inactions are causing severe and irreparable harm to plaintiffs.  As a result of defendants' failure to implement these students' IEPs, plaintiffs are denied their education and are at risk of being unable to obtain a high school diploma.

10.     Plaintiffs are members of a vulnerable student population.  These detained students must grapple with the challenges caused by their disabilities while being entirely dependent on the District government.  Unlike students in the community who are learning at home, they cannot enroll in another school or district.  They cannot avail themselves of family to assist in obtaining alternative educational services or help securing the services of a private tutor.  They rely solely on defendants, and defendants have left them to languish.

11.     Accordingly, named plaintiffs Charles H. and Israel F., students with disabilities who have been deprived of their education at IYP, bring this action for declaratory, injunctive, and other equitable relief against DCPS, OSSE, and the District, on behalf of themselves and others similarly situated, to challenge this systemic failure to comply with the IDEA, 20 U.S.C. § 1400, *et seq*., its federal and local regulations, 34 C.F.R. § 300, *et seq*., 5-E D.C.M.R. § 3000, *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), its federal regulations, 34 C.F.R. § 104, *et seq*., the Americans with Disabilities Act, 42 U.S.C. § 12132, its implementing regulations, and the DC Human Rights Act, DC Code § 2-1401, *et seq.*

12.     Plaintiffs seek a declaration that defendants have violated and are violating the IDEA, the Rehabilitation Act, the ADA, and local laws, an injunction requiring defendants to immediately provide FAPE to plaintiffs and those similarly situated, compensatory education to attempt to rectify the harm done, and other relief described below.

## JURISDICTION AND VENUE

13.     This action is brought under the IDEA, 20 U.S.C. § 1400, *et seq.*, under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and under the ADA, 42 U.S.C. § 12101, *et seq.*

5

The Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343, and 20 U.S.C. § 1415(i)(2). This action is also brought under the DC Human Rights Act (DCHRA), DC Code § 2-1401.01, *et seq*. This Court has jurisdiction over the DCHRA claims pursuant to 28 U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391.

## PARTIES

### Plaintiffs

14.     Plaintiff Charles H. is a twenty-year-old student with a disability. Charles is currently detained in the DC Jail complex and has been there since February 7, 2019. He is enrolled in IYP and he has an IEP which mandates specialized instruction and related services. He has not received specialized instruction in conformity with the requirements of his IEP since March 24, 2020. Charles has exhausted his administrative remedies. An administrative hearing officer found that DCPS failed to meet its IDEA obligations and that OSSE failed to meet its supervisory and monitoring duties, and the hearing officer ordered some injunctive and compensatory relief. However, Charles still is not receiving the specialized instruction or necessary related services mandated by his IEP.

15.     Plaintiff Israel F. is an eighteen-year-old student with a disability. Israel is currently detained in the DC Jail complex and has been there since November 5, 2020. He is enrolled in IYP and has an IEP which mandates specialized instruction and related services. He has not received any specialized instruction or his related services while at the DC Jail complex. On February 4, 2021, Israel filed an administrative due process complaint alleging that DCPS failed to meet its IDEA obligations and that OSSE failed to meet its supervisory and monitoring duties. A hearing has been scheduled for May 19-20, 2021.

**Defendants**

16.      Defendant District of Columbia is a "state" within the meaning of the IDEA and the Rehabilitation Act.  20 U.S.C. § 1401(31).  The District receives federal funds under the IDEA and must therefore comply with the requirements of the IDEA and Section 504 of the Rehabilitation Act.  20 U.S.C. § 1412(a); 34 C.F.R. § 300.2.  Through its designated agency, DCPS, the District is required to make available FAPE for all students with disabilities residing in the District aged three through the semester in which they turn age 22.  5-E D.C.M.R. § 3002.1(a). Through its designated agency, OSSE, the District is required to ensure FAPE is available to all children with disabilities residing in the District aged three through the semester in which they turn to 22.  20 U.S.C. § 1412(a); 34 C.F.R. § 300.101; 5-E D.C.M.R. § 3002.1(a).   Furthermore, the Department of Corrections (DOC), a subordinate executive agency of the District of Columbia, runs the DC Jail complex, the correctional facility at which IYP students are detained, and is party to a Memorandum of Agreement with DCPS and OSSE to ensure that general and special education services are provided for eligible students detained in the DC Jail complex.  The District is also prohibited under the Rehabilitation Act, the ADA, and the DCHRA from discriminating against any student because of his or her disability.

17.      Defendant DCPS is a public school district and the Local Educational Agency (LEA) for IYP.  DCPS receives federal funds under the IDEA and must therefore comply with the requirements of the IDEA and Section 504 of the Rehabilitation Act.  20 U.S.C. § 1412(a); 34 C.F.R. § 300.2.  DCPS is required, pursuant to the IDEA, its federal implementing regulations, and District of Columbia law, to provide special education and related services to all eligible District residents, including students with disabilities aged three through the semester in which they turn age 22.  *See* 5-E D.C.M.R. § 3002.1.  DCPS is also prohibited under the Rehabilitation

Act, the ADA, and the DCHRA from discriminating against any student because of his or her disability.

18.     Defendant OSSE is the State Educational Agency (SEA) for IYP.  OSSE receives federal funds under the IDEA and must therefore comply with the requirements of the IDEA and Section 504 of the Rehabilitation Act.  20 U.S.C. § 1412(a); 34 C.F.R. § 300.2.  OSSE, among other functions, oversees all federal education programs and related grants administered in the District.  Under the IDEA, OSSE is responsible for ensuring that FAPE is made available to all eligible District residents with disabilities and that all programs administered by District agencies meet District educational standards.  *See* 20 U.S.C. § 1412(a)(11).  OSSE is also prohibited under the Rehabilitation Act, the ADA, and the DCHRA from discriminating against any student because of his or her disability.

## CLASS ACTION ALLEGATIONS

19.     Named plaintiffs Charles H. and Israel F. bring this action on behalf of themselves and all others similarly situated.  The plaintiff class consists of all persons who (1) were, as of or after March 24, 2020, are, or will be in the future entitled to receive special education and/or related services pursuant to an IEP issued under the IDEA and its federal and local implementing regulations, (2) were, as of or after March 24, 2020, are, or will be in the future, detained in the DC Jail complex, and (3) did not, do not, or will not, receive direct instruction and/or direct related services in conformity with the specialized instruction and/or related services mandated by their IEPs while in the DC Jail complex.

20.     The requirements of Rules 23(a)(1)-(4), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure are met as to the class for the following reasons:

> (a)     The class is so numerous that joinder of all members of the class is impracticable.  There are currently around 40 students detained in the DC Jail complex who are entitled to receive special education and/or related services

pursuant to an IEP issued under the IDEA and its federal and local implementing regulations and are not receiving the direct instruction and/or related services in conformity with the specialized instruction and/or related services mandated by their IEPs.  In addition, there is an unknown number of future class members, as the jail population is transient.

(b)    There are questions of law and fact common to the class, namely whether defendants have systemically deprived FAPE to special education students detained in the DC Jail complex by, as a policy and/or practice, failing to implement the students' IEPs by failing to provide direct instruction and/or related services in conformity with the specialized instruction and/or related services mandated by their IEPs.

(c)    The claims of the named plaintiffs are typical of the claims of the class in that each of the named plaintiffs has an IEP that requires specialized instruction and/or related services, but has not received direct instruction and/or related services in conformity with the specialized instruction and/or related services mandated by their IEPs.

(d)    The named plaintiffs will fairly and adequately represent and protect the interests of the class.  They have no interests that are antagonistic to the class and seek relief that will benefit all members of the class. They are represented by counsel with significant experience with this type of litigation.

(e)    Defendants have acted and continue to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

(f)    The common facts and questions of law shared by the class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## STATUTORY BACKGROUND

21.    In 1975, Congress enacted the Education for All Handicapped Children Act, now known as the Individuals with Disabilities Education Act (IDEA), "to ensure that the rights of children with disabilities . . . are protected."  20 U.S.C. § 1400(d)(1)(B).

22.    Its primary mandate is the guarantee that "all children with disabilities have available to them a free appropriate public education that emphasizes special education and related

services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

23.     The IDEA is a federal grant program administered by the U.S. Department of Education.  20 U.S.C. § 1400, *et seq.*  Under the IDEA, the Secretary of Education provides funding to States and certain other entities for the provision of special education and related services.  20 U.S.C. § 1411(a)(1).  A State becomes eligible for this funding by submitting to the Secretary a plan showing that it "has in effect" certain "policies and procedures" to fulfill the aims of the statute.  20 U.S.C. § 1412(a).  A State that accepts this funding then must comply with the mandates contained in the IDEA and its implementing regulations.  34 C.F.R. § 300.2.  The District of Columbia is a "State" for the purposes of the IDEA.  20 U.S.C. § 1401(31).

24.     Pursuant to the IDEA, a State receiving funding must provide "a free appropriate public education to all children with disabilities residing in the State between the ages of 3 and 21." 20 U.S.C. § 1412(a)(1)(A).  This is known as the duty to provide FAPE.  District of Columbia regulations extend this provision to students through the end of the semester in which they turn 22 years old.  5-E D.C.M.R. § 3002.1(a)-(b).

25.     A State, including the District, is responsible for ensuring that all students with disabilities in the District of Columbia receive FAPE in accordance with the IDEA.  *See* 34 C.F.R. § 300.600.  "[A] State must ensure that when it identifies noncompliance with the requirements . . . . by LEAs, the noncompliance is corrected as soon as possible . . . ."  34 C.F.R. § 300.600.

26.     Furthermore, the IDEA expressly applies "to all political subdivisions of the State that are involved in the education of children with disabilities, including . . . [t]he State educational agency (SEA) . . . [l]ocal educational agencies (LEAs). . . [and] State and local juvenile and adult correctional facilities . . . ."  34 C.F.R. § 300.2(b)(1)(i), (ii), (iv).

10

27.     The SEA is responsible for ensuring that the requirements of the IDEA are met.  20 U.S.C. § 1412(a)(11)(A); 34 C.F.R. § 300.149.

28.     If the SEA determines that the LEA "is unable to establish and maintain programs of free appropriate public education that meet the requirements of [the IDEA]," then OSSE, as the SEA, must provide "special education and related services directly to children with disabilities residing in the area served by that local educational agency, or for whom that State agency is responsible." 20 U.S.C. § 1413(g)(1)(B).

29.     Each LEA is responsible for making FAPE available for all children with disabilities. 20 U.S.C. § 1413(a)(1).  In particular, school districts must develop a comprehensive plan, known as an Individualized Education Program (IEP), for meeting the special education needs of each student with a disability.  *See* 20 U.S.C. § 1414(d)(2)(A).  As defined by the IDEA, the duty to provide FAPE means the provision of "special education and related services" that, in relevant part, "are provided in conformity with the individualized education program required[.]" 20 U.S.C. § 1401(9)(D).

30.     A student's IEP is developed by the student's IEP team, a multidisciplinary group consisting of the student's parents, teachers, and other qualified educational professionals.  *See* 20 U.S.C. § 1414(d)(1)(B) (outlining the membership of the IEP team).  The IDEA requires IEPs to include a written statement of evaluation and plan of action that sets forth the student's present functional/educational performance, measurable annual goals, how the goals will be measured, including benchmarks or short-term objectives, and "the special education and related services and supplementary aids and services . . . to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child." 20 U.S.C. § 1414(d)(1)(A)(i).

31.     The "related services" contained in an IEP include "such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education."  20 U.S.C. § 1401(26)(A).  For example, in the case of a child whose behavior impedes his or her learning or that of others, the IEP may include "positive behavioral interventions and supports, and other strategies, to address that behavior[.]" 20 U.S.C. § 1414(d)(3)(B)(i).

32.     The LEA must implement an IEP "as soon as possible," 34 C.F.R. § 300.323(c)(2), 5 D.C.M.R. § 3010.2, and must propose an appropriate placement for the student that can provide the special education and related services listed in the IEP.  *See* 34 C.F.R. § 300.350(a); 5 D.C.M.R. § 3013.1.

33.     The regulations also require the LEA to develop and implement interagency agreements with other state and local agencies that provide or pay for services required by the IDEA for students with disabilities.  34 C.F.R. §§ 300.103(a), 300.154(a).

34.     These FAPE obligations extend to all eligible students in any potential setting, including those detained in the DC Jail complex.  The IDEA, along with federal and local regulations, mandates FAPE for all students who are residents of the District of Columbia and makes clear that States are not exempt from providing FAPE to those held in correctional facilities. *See* 20 U.S.C. § 1412(a)(1)(B)(ii); 34 C.F.R. §§ 300.102(a)(2)(i), 300.713(b); 5-E D.C.M.R. § 3002.2.

35.     In March 2020, the U.S. Department of Education issued guidance to States, including the District, on providing services to students with disabilities during the COVID-19 pandemic.  Questions and Answers on Providing Services to Children with Disabilities During a COVID-19 Outbreak, "DOE March 2020 COVID-19 Guidance."  In relevant part, it states (p. 2):

If an LEA continues to provide educational opportunities to the general student population during a school closure, the school must ensure that students with disabilities also have equal access to the same opportunities, including the provision of FAPE.  (34 CFR §§ 104.4, 104.33 (Section 504) and 28 CFR § 35.130 (Title II of the ADA)).  SEAs, LEAs, and schools must ensure that, to the greatest extent possible, each student with a disability can be provided the special education and related services identified in the student's IEP developed under IDEA, or a plan developed under Section 504.  (34 CFR §§ 300.101 and 300.201 (IDEA), and 34 CFR § 104.33 (Section 504))

36.     In July 2020, OSSE issued guidance to all LEAs in the District concerning the provision of FAPE for students with disabilities during the COVID-19 pandemic.  OSSE, Part B Provision of FAPE: Guidance Related to Remote and Blended Learning ("OSSE 2020 Guidance"). In relevant part, it states (p. 4):

An LEA continues to have the obligation to provide FAPE to a student with a disability during extended closures resulting in distance or blended-learning models arising from a local or national emergency.  LEAs should continue to provide, to the greatest extent possible, the special education and related services identified in students' individualized education programs (IEPs) and any needed modifications or alternatives to make the curriculum and services accessible to students with disabilities.  LEAs should continue to consider the availability of remote learning materials through multiple modalities[.]

37.     OSSE's and the U.S. Department of Education's requirements also clarify that defendants have an ongoing obligation under the IDEA to provide FAPE to students with disabilities detained in the DC Jail complex.

38.     Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and its implementing regulations, 34 C.F.R. § 104, *et seq*., forbid defendants from discriminating against or excluding an otherwise qualified person from participation in a federally funded program or activity because of the person's disability.  Section 504 further states that, "[f]or the purposes of this section, the term 'program or activity' means all of the operations of . . . a local educational agency . . . or other school system[.]"  29 U.S.C. § 794(b)(2)(B).  The regulations relating to Section 504 of the Rehabilitation Act provide that "a recipient that operates a public elementary or secondary

education program or activity shall provide a free appropriate public education to each qualified handicapped" student in its jurisdiction.  34 C.F.R. § 104.33.  Implementation of an IEP developed in accordance with the IDEA is one means of meeting Section 504's requirement.  *See* 34 C.F.R. § 104.33(b)(2).

39.    The ADA, 42 U.S.C. § 12132, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

40.    The DCHRA, DC Code § 2–1402.41, makes its an unlawful discriminatory practice for defendants to "to deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the actual or perceived . . . disability of any individual."

### FACTUAL BACKGROUND

41.    As set forth in this Complaint, since the beginning of the COVID-19 pandemic, defendants have failed to comply with their obligations under federal and local law to provide or otherwise ensure the provision of special education and related services to named plaintiffs and all students enrolled in IYP at the DC Jail complex.  Defendant DCPS has failed to implement the IEPs of IYP students and therefore failed to provide these students with FAPE.  Defendant OSSE has failed to monitor and oversee DCPS and correct its failure to provide these students with FAPE.  Defendant District of Columbia has failed to ensure the provision of FAPE to IYP students.  Defendants' conduct discriminates against plaintiffs and demonstrates bad faith and gross misjudgment because of their complete failure to provide FAPE and their departure from their own educational policies, accepted professional standards, FAPE standards, and those of the federal

government.  Defendants' failures are systemic and can be rectified only with declaratory, injunctive, and other relief from this Court.

### Charles H.'s Due Process Complaint

42.     On January 11, 2021, OSSE Office of Dispute Resolution Administrative Hearing Officer Terry Banks issued a decision based on a due process complaint brought by plaintiff Charles H.  He found that, *inter alia*, Charles had carried his burden of proving that defendant DCPS had failed to implement his IEP since March 2020.  Specifically, Hearing Officer Banks found that "[t]he record is clear that [Charles] has not received specialized instruction or related services since the inception of COVID-19 restrictions."  Hearing Officer Banks also cited the sworn testimony of IYP's former Principal, Dr. Tanya Roane, that related services, such as behavioral support services, had not been provided.

43.     Defendant DCPS conceded the central fact underlying plaintiffs' claims.  DCPS admitted in its closing statement in Charles' administrative case that "[u]nder the current circumstances in the facility the staff members are not able to provide the supports and services outlined in student IEPs."

44.     Hearing Officer Banks also found that Charles carried his burden of proving that defendant OSSE failed to meet its obligation to ensure the compliance of DCPS with the IDEA at IYP "by failing to exert its authority to monitor and supervise DCPS' compliance with IDEA within [IYP], and by failing to intervene upon notice of an alleged failure of DCPS to provide appropriate special education services within [IYP]."  In particular, Hearing Officer Banks explained that "OSSE offered no evidence that it performed even the minimal monitoring and supervising functions that it concedes are its responsibility."

45.     Although deciding the facts in favor of Charles, Hearing Officer Banks did not order, as Charles had requested, that DCPS and OSSE provide Charles with the special education

and related services mandated by his IEP.  Rather, Hearing Officer Banks ordered, *inter alia*, that DCPS and OSSE initiate negotiations with the DOC to facilitate virtual instruction for Charles but, in the event they failed to find a "satisfactory resolution," DCPS need only determine appropriate compensatory education services "for the continuing failure to provide the specialize[d] instruction prescribed in Student's IEP."  This is ineffectual relief and has permitted defendants to continue their violations of the IDEA.  Furthermore, Hearing Officer Banks denied Charles' Rehabilitation Act claim and Charles' systemic claims along with their related requests for relief on the grounds that he did not have the authority to adjudicate those claims.

46.     Through this process, Charles has exhausted the administrative remedies provided by the IDEA, 20 U.S.C. § 1400 *et seq.*  Charles is aggrieved by the decision of the Hearing Officer. This Court has express appellate jurisdiction over the administrative ruling issued pursuant to the IDEA.  *Id.* at § 1415(i)(2).

47.     Therefore, Charles brings the present suit as defendants continue to deprive him of the special education and related services prescribed by his IEP.  He has not received FAPE since March 24, 2020.  Charles now brings the present suit, along with named plaintiff Israel F., on behalf of all similarly situated students.

**The Inspiring Youth Program at the DC Jail Complex**

48.     There are approximately 40 high school students who are enrolled in IYP.  These students are between the ages of 18 and 22 years old.  They all have disabilities, qualify for special education and/or related services under the IDEA, and have IEPs detailing, among other things, the amount of specialized instruction and related services that each student needs to ensure that the student can access the curriculum.  IYP provides education year-round.

49.     IYP is located inside the DC Jail complex, which is run by the DOC.  The DOC is responsible for housing these students and others who are detained awaiting trial and incarcerated after conviction.

50.     While IYP has approximately 40 students enrolled at any given time, the student population is fluid and transient.  New students continue to enroll on a rolling basis in the school when they are detained awaiting trial or upon transfer to the DC Jail complex, and students disenroll when they are released or upon transfer to another facility.  Some students, like Charles H., have been there for over a year.  Others, like Israel F., have been there for only a few months.

51.     The implementation of the IYP students' IEPs relies on extensive coordination among OSSE, DCPS, and the DOC, as set forth under an interagency Memorandum of Agreement (MOA) first entered into on March 5, 2019.  Pursuant to this MOA, these three District agencies agree to ensure that special education and related services are provided to IYP students pursuant to the IDEA.  The MOA was reauthorized by DCPS, OSSE, and the DOC during the COVID-19 pandemic on September 11, 2020, and remains in effect until September 30, 2021.

52.     Under this MOA, the DOC provides "designated classrooms for . . . special education instruction" and "space for DPCS staff to conduct re-evaluations, assessments, and deliver related services [set forth in the students' IEP]" such as counseling and speech therapy services to ensure that disabled students at the DC Jail complex have access to FAPE.  Pursuant to its own policy, the DOC also "implement[s] operational procedures so that youth and adults up to the age of twenty-two (22) years of age receive general and special education pursuant with [District special education regulations]."

53.     In addition, according to the MOA, OSSE must "[t]ake appropriate action, as needed, when issues arise with regard to special education service delivery at [the DC Jail complex], if a matter is not resolved by DCPS and DOC."

54.     Prior to the COVID-19 pandemic, IYP students in the general population left their living units on Monday through Friday to attend in-person classes that ran from 8:45 a.m. to 11:10 a.m. and 12:15 p.m. to 2:30 p.m.  These classes were held in a separate school area with classrooms within the DC Jail complex.  These classes were taught by IYP special education and general education teachers.  Students were also provided with in-person related services, such as mental health counseling, if mandated by their IEPs.  Students in restrictive housing units did not join the students in the classrooms, but instead IYP teachers and staff met with them in their living units, sometimes at their cell doors and other times within a separate space on the unit, to provide them with special education and related services.

**The COVID-19 Pandemic and the Creation of DCPS's Work Packet Policy and Practice**

55.     On March 11, 2020, as a result of the COVID-19 pandemic, District Mayor Muriel Bowser declared a state of emergency and a public health emergency, and the District began taking steps towards a citywide stay-at-home order to control the spread of COVID-19.

56.     On March 13, 2020, DCPS held its last in-person classes and issued a notice to students, parents, staff, and school community members that it would be modifying its operations and that teachers and staff were expected to begin planning for distance learning.

57.     In response to the notice from DCPS on March 13, 2020, the DOC offered DCPS the use of its own educational computer tablets, manufactured by American Prison Data Systems (APDS), to use with IYP students to provide virtual education.  DCPS declined the DOC's offer and informed the DOC that they would be providing IYP students with paper-based work packets.

18

58.     DCPS began providing paper-based work packets on or around March 25.  The work packets provided by DCPS are rife with issues.  Students receive work packets that are supposed to contain two weeks' worth of work, but instead have brief tasks that would only take an hour or two.  Furthermore, the material in the work packets is inaccessible to students with learning disabilities and/or deficits in reading and writing.  Many IYP students who have diagnosed learning disabilities and/or severe deficits in reading and writing have difficulty reading and responding to the work packets.  Without direct instruction and guidance from teachers, students cannot read and comprehend the material, and they cannot complete the writing tasks.  The work packets do not contain helpful instruction, guidance, or accommodations for students to understand and use the work packets.  The work packets cannot provide FAPE.

59.     DCPS made a deliberate decision to eliminate direct instruction for IYP students and provide them only with assigned work packets.  IYP special education coordinator Ms. Tarisai Lumumba-Umoja testified at Charles' due process hearing that when DCPS shifted to distance learning in March 2020, "we . . . developed a plan that included . . . work via paper and pen . . . ."

60.     DCPS knew when it made this decision that IYP students would not be receiving the specialized education and related services set forth in their IEPs, and therefore, would not be receiving FAPE.

61.     At this time, OSSE, as the SEA, had the obligation to monitor the provision of FAPE through meetings and other methods, and should have been on notice by virtue of these obligations that DCPS would not be providing IYP students with FAPE.  In addition, as described further below, OSSE was provided actual notice through correspondence from a coalition of education advocates and lawyers, including undersigned counsel, and through the administrative petitions filed by Charles and Israel.

**Defendants Fail to Provide FAPE Throughout the Spring and Summer of 2020**

62.     On March 24, 2020, DCPS began distance learning for all of its students.  For students learning at home, DCPS provided class materials and direct instruction from teachers through an online platform with two-way videoconference classes.

63.     However, DCPS did not resume direct instruction or related services, either in-person or virtual, for IYP students.

64.     Instead, on or about March 25, 2020, then-Assistant Principal Dr. Raymond Cummings and IYP Technology Coordinator Eric Curry delivered the first set of paper-based work packets to the DC Jail complex.  DCPS informed the students that these packets covered two weeks' worth of assignments and that they were required to complete them on their own and then turn them in.

65.     Then, on April 4, 2020, the DOC imposed a "lockdown" at the DC Jail complex wherein everyone detained, including IYP students, was confined to their cells for 23 hours per day, on the basis that it was to control the spread of COVID-19 in the facility.  This lockdown, which is still in effect, permits one hour of out-of-cell time during which the students can make telephone calls, take showers, and have their cells disinfected by cleaning staff.  This one hour of time out of the cell can be at any time of the day or night.

66.     While the DOC permitted IYP staff and teachers, who are DOC contractors, to enter the DC Jail complex during the lockdown, IYP staff did not come back into the DC Jail complex for many months.  Instead, DCPS staff dropped off the paper-based work packets with DOC staff, who were responsible for handing the packets out to IYP students.  Students also received work packets for their related services, such as counseling work packets in place of counseling sessions.

67.     In April 24, 2020, DOC Education Administrator Tabitha Burnett provided a letter to IYP students that stated that she would "provide you with your IYP paper based learning, collect

20

the work, and answer any questions you may have."  The letter further stated that "[i]f you have any specific questions about your work, I want you to make a star next to it.  This will let your teacher know you need assistance."  Ms. Burnett did not explain how IYP teachers would provide any requested assistance.

68.     On the occasions when the plaintiffs requested assistance, they never heard back from their teachers.  DOC Associate Director Amy Lopez testified in Charles' administrative due process hearing that "when I visited with Ms. [Tabitha Burnett], one of the issues that she had is when students did ask for help, they didn't receive responses [from IYP]."

69.     DCPS only provided the paper-based work packets sporadically. At Charles' administrative hearing,  Ms. Lopez testified that from March 23, 2020 until October 23, 2020, there were only five instances of work packet delivery by the DOC staff to Charles.

70.     Meanwhile, throughout the spring and summer of 2020, DCPS undertook a systemic push to deliver technology and internet connectivity—tens of thousands of laptops and/or Wi-Fi hot spots—to students learning at home who were in need to ensure access to education, including access to special education and related services by qualified providers for students with IEPs.

71.     Nevertheless, DCPS maintained their work packet policy and practice for the students at IYP, whose school year continues through the summer.

**Defendants Fail to Provide FAPE During the 2020-2021 School Year**

72.     On August 20, 2020, a coalition of education advocates and lawyers, including undersigned counsel, notified OSSE and DCPS that the IYP students' IEPs were not being implemented and in particular that "[t]he detained students did not interact, virtually, telephonically, or in person, with educational staff, therapists, or other trained professionals to

assist them in accessing their education."  They requested that OSSE and DCPS take immediate action to provide FAPE at IYP.

73.     On August 31, 2020, the first day of school for IYP, DCPS Chancellor Lewis Ferebee responded that he could "confirm that . . . IYP [is] fully equipped with technology needed to serve students in the 2020-21 school year . . . .  In addition, DCPS is specifically supporting students with IEPs during this time through the development of individual distance learning plans. Student [sic] with IEPs at  . . . IYP will have the same supports articulated through these plans as all other students with IEPs in DCPS."

74.     On this same day, former IYP Principal Dr. Roane provided IYP students with a letter and a handbook containing information about the upcoming 2020-2021 school year.  The letter informed IYP students that they would be receiving "virtual instruction" and the handbook stated that at IYP, "[a]ll Students will have access to a DOC-provided tablet when available for virtual instruction.  Students will use these tablets to participate in virtual instruction with their teachers via the Microsoft Teams platform. . . ."

75.     After months of providing only paper-based work packets to students, DCPS had agreed to use the DOC-issued ADPS electronic tablets for IYP students.  However, in August 2020, when DCPS staff began training on the use of the ADPS tablets, DCPS reported that it determined that synchronous direct instruction could not take place.

76.     Despite promises by Chancellor Ferebee and former Principal Dr. Roane, the 2020-2021 school year has been a continuation of the same deprivation of education for IYP students. Defendants continue to fail to provide or ensure the provision of FAPE for IYP students.  IYP students' IEPs are not being implemented.  Students have not been provided the promised direct instruction via synchronous virtual instruction that includes accommodations and modifications.

There is no two-way feedback with teachers, and no regular, synchronous virtual mental health counseling sessions or other related services.  IYP students have not been invited to participate in the creation of their individualized distance learning plans.  As a result, IYP students are still languishing without their necessary special education and related services.

77.     At the administrative hearing for Charles, Dr. Roane testified that when she drafted the letter and handbook described above, promising IYP students that they would be receiving "virtual instruction," her "idea of what virtual instruction was going to be at the time was that it was going to be synchronous learning. . . . [and s]ynchronous means that students were actually sitting there in front of the computer and the teacher and the students are able to go back and forth and interact with each other in real time."

78.     However, Dr. Roane also testified that by the time the IYP students were provided with her letter and handbook in late August 2020, she knew that the students would not be receiving synchronous instruction.  Dr. Roane admitted that she knew in July or early August 2020 that IYP would not use the Microsoft Teams virtual platform that was cited in the IYP Student Handbook and that "asynchronous instruction would have to take place," but she "just didn't go back and revise[] the handbook."  To date, neither DCPS nor OSSE have provided IYP students with any information to correct Dr. Roane's error.

**Defendants Provide Work Packets Via DOC Tablets**

79.     In addition to distributing paper-based work packets, beginning in November 2020, DCPS began providing the assignments from the work packets on the DOC's APDS tablets.  This was eight months after the DOC originally offered the use of its tablets to DCPS.

80.     The DOC's APDS tablets have the same content as the paper-based work packets but provide this content preloaded in a digital format.  This format can be cumbersome or confusing to IYP students.  The tablets also offer IYP students a limited selection of pre-recorded,

generic videos.   None of the features on the tablet provide these students with any direct instruction, let alone their prescribed specialized instruction.

81.     The tablets have a messaging feature, which is supposed to allow students to send a message to a teacher to request assistance.   But there is no way for the students to record themselves on the tablet to ask a question and there is no option to send or receive feedback in verbal format.   This is particularly challenging for the many IYP students who have diagnosed learning disabilities and/or severe deficits in reading and writing.   Students are unable to receive the help they need because they are unable to send messages to their teachers.

82.     On many occasions, IYP students have been unable to even access the preloaded materials or message their teachers on the APDS tablets because the tablets are not functioning correctly.   Many of the students' cells have an insufficient connection to the DC Jail complex's intranet, the closed on-site computer network, and this prevents them from being able to use their tablets to access the assigned work, videos, or the written messaging system.   Students have also been provided with incorrect login information to access the content on the tablet.

83.     IYP students are not permitted access to the tablets if sent to the restrictive housing unit for disciplinary infractions, but instead are required to do their work using the paper-based work packets.

**IYP Staff Return to DC Jail Complex, But Provide No Direct Instruction, Special Education, or Related Services**

84.     Starting in the fall of 2020, two IYP teachers began volunteering to visit IYP students in person periodically to drop off the paper-based work packets in their living units.   As former IYP Principal Dr. Roane conceded in Charles' administrative hearing, it is challenging to provide any education services in the living units, because of the lack of privacy and confidentiality and the noise and other conditions that are not conducive for learning.   She offered that one of

these teachers who was checking in "could pass a note or information to [another teacher] that a particular student had questions about his math assignment" but that was the extent of their capabilities.

85.    Emmanuel Eppie, a general education science teacher, began visiting the students twice a month on the days of work packet delivery and pickup.  His interactions with the students were limited to the handling of the work packets.  Mr. Eppie stopped visiting the students after only a few months.

86.    Ryan Alexander, a special education English teacher, began visiting the students throughout the week and continues to visit them.  Up until February 2021, his visits were limited to briefly checking in with the students through their cell doors.

87.    This includes the students in the restrictive unit; IYP staff does not provide instruction and does not answer questions about the students' work packets, but only check in on the students' general wellness.

88.    Recently, Mr. Alexander, who goes to the DC Jail complex on a volunteer basis, has met with only three IYP students who are all housed on the same unit.  The meetings last for around one hour, three days a week.  Mr. Alexander offers to answer these students' questions when they meet.  These meetings with Mr. Alexander do not provide these students specialized instruction in conformity with their IEPs and do not provide these students with FAPE.

89.    A few times over the winter, an IYP social worker visited the DC Jail complex in person but did not meet with students in conformity with the related services required by their IEPs.

90.    On January 11, 2020, Hearing Officer Banks found that "three weeks before the hearing [December 1, 2020], . . . was the only time [Ms. Allen] provided [counseling sessions to

Charles] since the imposition of COVID restrictions."  Since the conclusion of the hearing on December 1, 2020, she has provided only a single one-hour session to Charles.  She has also only provided a single one-hour session to Israel, who has been detained in the DC Jail complex since November 2020.

91.     As of March 2021, Charles is supposed to attend live virtual counseling sessions, but he is unable to access these because the DOC staff do not ensure a private room is readily available to him.  On the single occasion that he participated in a live virtual counseling session with the school's social worker, the session focused on reviewing a counseling work packet.

**Defendants Failed to Implement IYP Students' IEPs and Provide Direct Instruction and Related Services in Accordance with Defendants' Own Policies**

92.     While defendants have abdicated their responsibilities to IYP students, by the start of the 2020-2021 school year, DCPS had delivered technology and internet connectivity to many of its tens of thousands of students learning at home to ensure access to education and special education and related services.  DCPS is providing direct instruction virtually and in-person to these students.

93.     Furthermore, the District has represented that DCPS IEP teams have created an Individualized Distance Learning Plan (IDLP) for each student with an IEP.  An IDLP details how the following components of supports and services will be delivered through DCPS distance learning to students: (1) the provision of specialized instruction; (2) the provision of related services; and (3) a virtual communication plan.  Specifically, an IDLP includes goals, resources, strategies and how often students will receive specialized instruction and services during distance learning.  Furthermore, the virtual communication plan describes the frequency and manner in which parents and/or adult students can expect to receive updates on the student's progress.

94.     The District has represented that IDLP discussions with parents of students in the community learning at home were completed by September 30, 2020, and IDLPs remain in effect for all these students.

95.     DCPS, by its own admission, has failed to implement its own educational policies and standards at the DC Jail complex.  DCPS is not providing direct instruction virtually and/or in-person to students at IYP.  Furthermore, IYP students have not received any communication that describes how components of student supports and services will be delivered through DCPS distance learning in accordance with their IEPs.  Charles and Israel have no reason to believe that they have IDLPs created for them, have not seen them, and were not involved in any discussions surrounding them.

**Defendants' Failure to Coordinate the Implementation of IYP Student IEPs**

96.     The implementation of the IEPs of IYP students relies on coordination among OSSE, DCPS and the DOC, as set forth under an interagency agreement.  OSSE, DCPS and the DOC have a Memorandum of Agreement (MOA) under which they agree to ensure that special education, and related services are provided to IYP students pursuant to the IDEA.  Under the MOA, the DOC "implement[s] operational procedures so that youth and adults up to the age of twenty-two (22) years of age receive general and special education pursuant [to District of Columbia special education laws and regulations]."  The DOC provides "designated classrooms for special education instruction" and "space for DPCS staff to conduct re-evaluations, assessment testing and related services [set forth in the students' IEP]" such as counseling and speech therapy services to ensure that disabled students at the DC Jail complex have access to FAPE.

97.     The MOA provides a process to resolve issues in the event of a dispute, which requires that the parties alert each other to disputes, work cooperatively to resolve them, and, in the event that no resolution can be reached, bring the dispute before the City Administrator.  OSSE,

as the SEA, is ultimately responsible for ensuring that FAPE is made available to IYP students and that all programs administered by District agencies meet OSSE's educational standards. *See* 20 U.S.C. § 1412(a)(11); 34 C.F.R. § 300.101(c)(1); 34 C.F.R. § 300.149(a).

98.     At the administrative hearing for Charles, DCPS contended that the DOC prevented them from providing the intended synchronous direct instruction and from implementing Charles' IEP as written because a DOC policy prohibits those who are detained from accessing the Internet. Hearing Officer Banks concluded that this defense lacked merit because "the opportunity existed for OSSE and DCPS to negotiate an exception to the DOC's rules to facilitate DCPS' obligation to provide education to eligible inmates and detainees."

99.     Hearing Officer Banks found that "DOC's policy regarding internet access appears to be totally unrelated to the issues of unsafe conditions in the inmate population due to COVID-19 . . . . [a]s such, under the MOA, the opportunity existed for OSSE and DCPS to negotiate an exception to DOC's rules to facilitate DCPS' obligation to provide education to eligible inmates and detainees."  But "there is no evidence that DCPS ever sought an exception to the no-internet policy."

100.     DCPS could have resumed IYP classes through a two-way videoconference platform.  For example, DCPS provided tablets to other special education students detained in the Youth Services Center (YSC), another detention center, and worked to enable access to two-way videoconferenced classes utilizing Microsoft Teams software for the 2020-2021 school year. Since February 2021, YSC has been using a hybrid model, and continued using two-way videoconferenced classes along with some in-person classes.  At the administrative hearing for Charles, Ms. Lopez testified that the DOC would have allowed DCPS to provide its own tablets

or computers "as long as [DCPS's tablets or computers] passed [DOC's] security." On information and belief, DCPS has not attempted to provide its own computers to IYP students.

101.    Defendants could adopt technological solutions that would allow virtual, direct instruction at IYP over a secure Internet connection that complies with DOC security. Defendants could create a closed system where computing devices are connected to the Internet and in which there are proper configurations, polices, and solutions in place to stop unauthorized use or communication. Defendants could do this using Microsoft Teams, WebEx, or Google for Education Suite and Chromebooks.

102.    Defendants could also use any commercially available videoconferencing platform connected to a smartboard to allow students to receive virtual, direct instruction while doing work on DOC tablets, but while also preventing students from having access to the Internet.

103.    In the alternative, or in conjunction with these technological solutions, DCPS could have resumed in-person classes for IYP students.

104.    Defendants are aware that the physical space has existed at the DC Jail complex to provide IYP students with in-person direct instruction while complying with CDC guidelines. For example, on or around October 23, 2020, DCPS Office of the Chief Operating Officer drafted a reopening school plan for IYP that provided for in-person learning to begin at the DC Jail complex at the start of Term 2 on November 9, 2020. The draft overview of the plan noted that it had been "developed in alignment with CDC, DC Health, and OSSE guidance and with DCPS central office support." The plan further noted that eight classrooms, two offices, and four shared spaces for teachers and staff were available and all would be in use for the reopening plan. In addition, former IYP Principal Dr. Roane testified that "the last conversation that the Chancellor held with principals, the desire is or the push is for us to return in-person for term three, which . . . [is the]

end of January, beginning of February, approximately." Although many students in the community returned to school in person during term three, in-person classes have still not resumed for IYP students.

105. On information and belief, around February 2021, Mr. Alexander began volunteering to meet with IYP students in classrooms, described in para. 87, demonstrating in person instruction can be provided.

106. None of these possible technological or in-person direct instruction solutions have been implemented.

**Effects of Defendants' Actions and Inactions on Named Plaintiffs**

**<u>Charles H.</u>**

107. Charles H. is a twenty-year-old 11th grader currently enrolled in IYP and detained in the DC Jail complex.

108. Charles qualifies for special education and related services under the IDEA as a student with Multiple Disabilities, encompassing Specific Learning Disability and Other Health Impairment.

109. He first qualified for special education and related services in 2007. Over the years, he has participated in numerous evaluations to assess his neurological, cognitive, and academic functioning.

110. Charles' most recent comprehensive evaluation, conducted in September 2017, was a neuropsychological evaluation that provided an in-depth assessment of how his brain functions and affects his skills and abilities. His scores in the evaluation's tests for verbal comprehension, perceptual reasoning, working memory, and processing speed all fell in the borderline range for intellectual functioning. He also obtained a Full-Scale IQ score of 70, placing him in the borderline range of intellectual functioning and in the second percentile relative to his same age peers.

111.    According to the evaluator, Charles scored in the extremely low to borderline ranges of nearly every assessment analyzing his cognitive abilities, the two lowest scoring ranges of the assessment. These scores are standardized nationwide and compare the student being evaluated with their same aged peers who have also taken the assessments.  The evaluator also noted Charles' poor performance in his academic achievement, namely in reading and mathematics. The evaluator stated, "[t]aken together, [Charles] should be considered to possess wide ranging and significant neurocognitive impairments."

112.    The evaluation noted that Charles met the Diagnostic and Statistical Manual of Mental Disorders – Fifth Edition (DSM-5) diagnostic criteria for Unspecified Neurodevelopmental Disorder; Unspecified Disruptive, Impulse-Control, and Conduct Disorder; Major Depressive Disorder, Recurrent Episode, Mild; and Adjustment Disorder with anxiety.

113.    In September 2017, Charles was administered select subtests of the Wechsler Individual Achievement Test-Third Edition.  His results on a measure of math problem solving fell in the extremely low range and in the first percentile relative to chronological age peers.  His results on a measure of word reading also fell in the extremely low range and in or below the first percentile relative to chronological age peers.

114.    In August 2018, Charles was administered the Woodcock-Johnson Test of Academic Achievement-Fourth Edition to measure his present level of academic performance. For the mathematics portion, he scored in the Low to Very Low ranges in all elements including Broad Math, Mathematical Operations, and Applied Problems.  For the reading portion, he scored in the Very Low range for all elements including Broad Reading, Reading Identification, and Reading Comprehension.  He was unable to complete the Written Expression portion of this exam and all written subtests.

115.    Charles' October 2020 IEP, developed by a multidisciplinary team on behalf of DCPS, notes that his disability and his behavioral needs affect his progress in the general education curriculum.  In the IEP, DCPS notes that "[Charles'] disability affects his progress in the general education curriculum.  His behavior is impacting his learning process.  Charles requires frequent intervention to deter off task behavior."

116.    These evaluations explain that Charles needs specialized instruction and related services in order to access the general education curriculum.

117.    Beginning on or about October 2, 2018, Charles was detained in New Beginnings Youth Development Center ("New Beginnings").  While there, he was a student at Maya Angelou Public Charter School ("Maya Angelou Academy").  At that time, his IEP prescribed 23.25 hours per week of specialized instruction outside of the general education setting, 180 minutes per month of behavioral support services, and 30 minutes per month of speech-language pathology consultation services.

118.    On February 7, 2019, Charles was transferred to the DC Jail complex.  He was enrolled in DCPS's IYP on February 26, 2019.  IYP held Charles' IEP meeting on June 12, 2019, issued an IEP, and then further amended the IEP on September 10, 2019.

119.    Charles' IEP developed by IYP in September 2019 prescribes 10 hours per week of specialized instruction outside of the general education setting.  His IYP IEP also includes three hours per month of behavior support services outside of the general education setting and 30 minutes per month of speech-language pathology consultation services.

120.    Before the COVID-19 pandemic, at IYP Charles typically had in-person classes with a teacher providing him and other students with direct instruction Monday through Friday from 8:45 a.m. to 11:10 a.m. and 12:15 p.m. to 2:30 p.m.

121.    Charles had his last in-person class at IYP on or around March 13, 2020.

122.    In March 2020, Charles received his first work packets from DOC staff. These work packets were collected by DOC staff on or around April 1, 2020. Hearing Officer Banks found that from this date until October 23, 2020, IYP provided Charles with work packets on only four more occasions: May 6, July 15, August 31, and October 9.

123.    At times, Charles has been given the same work packet twice in a row. For example, he received the same Spanish packet after already completing it.

124.    Charles had no contact with any teachers from March 2020 until October 2020, when two IYP teachers and an instructional aide began to deliver the work packets to IYP students. These two teachers were Ryan Alexander, Charles' assigned teacher for his English courses in IYP, and Emmanuel Eppie, Charles' assigned science teacher. From October 2020 until February 2021, Charles ordinarily saw Mr. Alexander for a few minutes each visit. Charles only saw Mr. Eppie a few times.

125.    Charles has had trouble understanding what he is supposed to do to complete the assignments in his work packets because of his difficulties in reading and understanding the directions. He has sent messages to his teachers asking for help, but the teachers have not answered his questions. After Charles completes a packet, he receives no feedback and no instruction as to how he can improve.

126.    On October 22, 2020, IYP conducted the annual review of Charles' IEP via video conference. The Mathematics section of that IEP states that "[h]is current setting and the pandemic has made it difficult for him to get the support he needs to successfully complete distance learning packets. [Thus] far he has turned in one packet that was only half complete." His IEP also states that, for English IV, "[Charles'] current setting has made it difficult for him to get the support he

needs to complete distance learning expectations. Thus far he has not been able to successfully complete a packet."

127.    On or around November 9, 2020, Charles was first provided with a DOC APDS tablet.  Then he did not receive the tablet again until January 2021, because he was sent to a restrictive housing unit for an alleged disciplinary infraction.

128.    When Charles was provided with a tablet in January 2021, he received no training on how to use the tablet to complete assignments or how to seek assistance or feedback.  Although there are some videos loaded to the tablet, there are no videos of his teachers or instructional videos.  He found the tablet very difficult to use because he had to scroll to the bottom to answer each question and then scroll back up the beginning to see the next question.  He stopped using the tablet soon after and began again requesting the paper-based work packets.

129.    IYP did not provide any behavioral support services to Charles from mid-March 2020 until November 2020.  From November 2020 through December 2020, IYP's social worker Ms. Tina Allen provided counseling to Charles two times.  IYP did not provide counseling to Charles in January or February 2021.  Beginning in March 2021, Charles was taken to meet with Ms. Allen one time per week for a virtual session.  However, only one of these sessions has happened; the other times, another student was in the room and Ms. Allen was occupied.  Charles also has sporadically received counseling work packets with the rest of his assignments.  Per Charles' IEP, he should receive three hours of behavioral support services per month.

130.    IYP did not provide any speech-language services to Charles after March 24, 2020. Per Charles' IEP, he should receive thirty minutes of speech-language consultation services per month.

131.    Charles has exhausted his administrative remedies.  On October 16, 2020, Charles filed a Due Process Complaint in OSSE's Office of Dispute Resolution alleging that (1) DCPS failed to implement his IEP after the inception of COVID-19 restrictions on March 24, 2020 by utilizing work packets instead of providing specialized instruction to students enrolled in IYP within the DC Jail complex, and by not providing him with devices to access virtual instruction and services or in-person instruction or services, (2) OSSE failed to adequately monitor and provide appropriate oversight of DCPS' provision of special education services at IYP, (3) DCPS denied all special education students attending school at IYP FAPE by failing to implement their IEPs and by not providing them electronic devices adequate to access virtual instruction and services or in-person instruction and services, and (4) DCPS and OSSE violated the Rehabilitation Act by failing to provide specialized instruction to him after March 24, 2020.

132.    Charles requested individual relief including, *inter alia*, the following: "that [DCPS and OSSE] be ordered to provide access to in-person or live virtual specialized instruction, specific to [Charles]'s IEP, that includes daily instruction from certified special education teachers and opportunities for [Charles] to interact with and receive individualized instruction and feedback from his teachers."  Charles also requested systemic relief including, *inter alia*, the following: "[t]hat [DCPS and OSSE] be ordered to provide access to in-person or live virtual specialized instruction, specific to the students' IEPs, that includes daily instruction from certified special education teachers and opportunities for students to interact with and receive individualized instruction and feedback from their teachers[.]"

133.    An administrative hearing was conducted from November 30 to December 1, 2020. At the beginning of this hearing, Hearing Officer Banks found that he did not have the authority to adjudicate Charles' claims under the Rehabilitation Act or any of his systemic claims.  He denied

the related systemic requests for relief.  The administrative hearing proceeded on Charles' claims on behalf of himself.

134.    Charles submitted the testimony of three experts—Dr. Sara Boyd, a clinical psychologist; Professor Joseph Calvin Brojomohun-Gagnon, Ph.D., a correctional special education expert; and Jay Michney, a compensatory education expert—who all testified that Charles had been denied access to his special education and related services since March 2020.

135.    On January 11, 2021, Hearing Officer Banks issued his decision and found, *inter alia*, that "[t]he record is clear that [Charles] has not received specialized instruction or related services since the inception of COVID-19 restrictions."  Specifically, Hearing Officer Banks found that "[w]ork packets, delivered every other week, with no scheduled interaction with any teacher, do not constitute specialized instruction or virtual instruction."  He concluded that DCPS had denied Charles FAPE since March 2020.

136.    Hearing Officer Banks ordered that DCPS fund 200 hours of independent tutoring in mathematics, reading, and/or written expression and 15 hours of independent Behavioral Support Services; that Charles' eligibility for special education services under the IDEA be extended by one year beyond the statutory limitation; and that within fifteen days of the issuance of the Order, DCPS and OSSE initiate negotiations with the DOC pursuant to the MOA to facilitate virtual instruction for Charles within IYP.  In the event that DCPS and OSSE were unable to reach "a satisfactory resolution with DOC" within 60 days of the issuance of the Order, Hearing Officer Banks ordered that DCPS shall convene a Multidisciplinary Team meeting within 30 days thereafter to determine appropriate compensatory education services, in addition to those otherwise awarded, for the continuing failure to provide the specialized instruction prescribed in Charles' IEP.

137.    Hearing Officer Banks did not order, as Charles had requested, that DCPS and OSSE provide Charles in-person or live virtual specialized instruction, specific to the requirements of his IEP, that includes daily instruction from certified special education teachers and opportunities for Charles to interact with and receive individualized instruction and feedback from his teachers.

138.    Charles is aggrieved by the Hearing Officer's denials of his claims of systemic violations of the IDEA and the Rehabilitation Act and his requests for relief.

139.    Defendants are not implementing Charles' IEP or providing him with direct instruction, special education, and related services in conformity with his IEP.  He has not received FAPE since March 24, 2020.

140.    Charles has a limited amount of time left to earn his high school diploma before aging out of special education services and potentially leaving the District for a Federal Bureau of Prisons (BOP) facility.  Under District of Columbia law, Charles remains eligible for special education services until January 25, 2023.  The Hearing Officer extended his eligibility for one year, namely, until January 25, 2024.

141.    Upon information and belief, Charles has not meaningfully progressed on the IEP goals set out for him in his October 2020 IEP or improved his levels of academic achievement and functional performance.  Charles does not feel like he has learned in most of his classes since defendants implemented their work packet policy and practice in March 2020.

142.    Charles wants to earn his high school diploma and gain the skills needed to obtain a job.  Because of defendants' failure to implement his IEP, Charles has been placed at risk of not obtaining his high school diploma and suffering irreparable educational, psychosocial, emotional, and personal harm.

143.    If Charles does not satisfactorily complete the 11th grade, he cannot be promoted to the next grade, and is at risk of not having enough time to earn his high diploma before his eligibility under the IDEA ends.  Additionally, if Charles is sentenced in his pending court case, then he would likely be transferred from the District to a BOP facility where he will not have access to specialized instruction or high school diploma programming.  Therefore, he has limited time at IYP to earn the credits necessary to receive his high school diploma either before he ages out or before he is transferred to a BOP facility.  He has no time to spare and must begin receiving services as soon as possible to not be placed at greater risk of being denied the opportunity to earn his high school diploma.

### Israel F.

144.    Israel F. is an eighteen-year-old 12th grader currently enrolled in IYP and detained in the DC Jail complex.

145.    Israel is seeking his high school diploma.  He has earned a total of 18 credits and only needs 6.5 more credits to graduate.

146.    Israel qualifies for special education and related services under the IDEA as a student with an Emotional Disturbance.

147.    Israel has been diagnosed in prior evaluations as having, among other diagnoses, Major Depressive Disorder; Persistent, Depressive Disorder with anxious distress, early onset, moderate; Conduct Disorder; Oppositional Defiant Disorder; Attention Deficit Hyperactivity Disorder, combined type; Learning Disability with impairment in Written expression, moderate; and Learning Disability with impairment in Reading Comprehension, moderate.

148.    On December 12, 2019, Israel was administered the Woodcock-Johnson Test of Academic Achievement-Fourth Edition to measure his present level of academic performance. According to this assessment, Israel was reading at a fourth-grade level.

149.    In September 2019, Israel was detained in New Beginnings and enrolled in its school, Maya Angelou Academy.

150.    In December 2019, Maya Angelou Academy held an IEP team meeting for Israel. The resulting IEP mandated 26.5 hours per week of specialized instruction in the general education setting and four hours per month of Behavioral Support Services outside of the general education setting.

151.    Maya Angelou, along with his previous community schools, instituted co-teaching arrangements in which Israel was taught by a general education teacher assisted by a special education teacher.  These teachers implemented behavioral intervention strategies and provided Israel with, among other things, extra visual and verbal cues and prompts, hands-on activities, immediate feedback, and actively managed workloads.

152.    After the COVID-19 pandemic began in March 2020, Maya Angelou stopped in-person classes, and started two-way videoconference classes.  For these classes, the students would gather in a classroom but adhere to CDC guidelines by wearing masks and staying six feet apart at all times.  Once gathered in the classroom, the students would use a smartboard to interact with their teacher over the Zoom virtual platform.  Maya Angelou Academy continued its provision of in-person related services for Israel and his classmates by ensuring that its counselors and students adhered to CDC guidelines.

153.    On or around August 25, 2020, the Department of Youth Rehabilitative Services moved Israel from New Beginnings to YSC.  He was unenrolled in Maya Angelou Academy and enrolled in DCPS.

154.    While at YSC, Israel was supposed to attend videoconferenced DCPS classes utilizing Microsoft Teams software.  However, Israel had difficulty logging into his classes, and he was unable to access his education or related services.

155.    On or around November 5, 2020, Israel was transferred to the DC Jail complex.

156.    The DC Jail complex has been on a lockdown for the entirety of Israel's detention. This means that Israel has had to remain in his cell for 23 hours a day.  He has one hour per day to leave his cell and during this time he takes care of his personal needs such as bathing.

157.    When Israel arrived at the DC Jail complex, Israel and his educational attorneys immediately and repeatedly requested that IYP enroll him in school.  IYP did not enroll him until December 1, 2020.  Before being enrolled in IYP, he had no access to any education from DCPS. He was not given any class materials at all.  He did not receive any work packets or a tablet.

158.    On December 1, 2020, IYP enrolled Israel in the following courses: District of Columbia History & Government, English IV, Spanish II, Financial Literacy, and Probability & Statistics.

159.    Around mid-December 2020, Israel received his first paper-based work packets, handed to him by correctional staff.  This was an envelope with around three work packets.  Since December 2020, he has been given a few envelopes with three work packets each.

160.    Israel has not handed in any of the work packets because he has not been able to complete a single one.  He cannot understand the material without a teacher.  He has been unable to stay motivated and focused.  It is also very loud in his cell, which makes it difficult for him to concentrate on the work packets.

161.    Around mid-December 2020, DOC provided an APDS tablet to Israel for the first time.  Someone else who is detained in the jail who has a work assignment hands him the tablet

every day after lunchtime, which is around 11 a.m., and then takes it from him every night around 10 p.m.

162.    On this tablet, Israel is supposed to be able to access the paper-based work packets in a digital format.  The tablets have nearly the same content as the paper-based work packets, except in a digital format.  Instead of writing his answers in a paper-based work packet, he must type them into the tablet.

163.    Israel has never received any training or instruction on how to use the tablet.

164.    Israel can log onto the tablet and see that there is schoolwork and videos, but he cannot access the materials.  Israel's cell is out of range of the DOC's intranet.  To access the materials, he must hold the tablet outside of the small slot in his cell door.  He cannot type to complete his assignments with his arms holding the tablet outside of the cell door; he can only download the materials.

165.    The tablet also has some videos uploaded for some of Israel's classes.  Because of the poor intranet connection, Israel has not been able to watch the videos.  When he tries to play a video, the video stops after a few minutes and Israel has to start watching from the beginning to try again.  He tries to connect to the intranet by holding the tablet through his cell door slot, but in order for the video to play, he has to hold the tablet outside his cell door slot for the entirety of the video.  If he puts the tablet down on the cell door slot tray, the tablet falls over and out of his cell where he cannot reach it.  He then has to wait for a correctional officer to come by and hand the tablet back to him.  It is also hard for Israel to hear the videos because his living unit is loud.

166.    Israel has not been able to watch a full video on the tablet because of his inability to access the intranet.  From the little that he has seen of the videos, Israel does not believe that

41

they would be helpful for him to access the materials.  The videos are just slideshows of materials, without any teachers appearing in them.

167.    On the tablet, there is also a messaging system that is supposed to provide Israel with the capability to message his teachers.  However, Israel needs the intranet to message his teachers.  Because he cannot access the intranet from his cell, he has not been able to message his teachers.

168.    In addition, Israel does not know most of his teachers' names because of the lack of interactions with them.  Therefore, he does not know who to message.

169.    Israel has not been able to complete any of his assignments on the tablet.  Instead, Israel asked, and IYP has provided, paper-based work packets.

170.    Since Israel enrolled in IYP in December 2020, he has received no direct instruction from a teacher.  His only interaction with a teacher is when his English teacher, Mr. Alexander, has dropped off work packets to his cell.

171.    IYP has not provide behavioral support services to Israel, although his IEP requires two hours of such services per month.  Since November 2020, Israel has had one hour-long session with a counselor.  He has received only one counseling work packet.

172.    On January 21, 2021, IYP held an IEP team meeting for Israel. The resulting IEP mandates 26.5 hours per week of specialized instruction outside of the general education setting and two hours per month of Behavioral Support Services per month outside of the general education setting.

173.    Defendants are not implementing Israel's IEP.  He has not received FAPE since November 5, 2020.

174.    Israel has been unable to understand any of the materials given to him because he has not received the services mandated by his IEP.  Upon information and belief, he has not made any progress in meeting his IEP goal or improved his levels of academic achievement and functional performance.

175.    Israel wants to earn his high school diploma and gain skills to get a job.  Because of defendants' failure to implement his IEP, Israel has been placed at risk of not obtaining his high school diploma and suffering irreparable educational, psychosocial, emotional, and personal harm.

176.    On February 4, 2021, Israel filed a Due Process Complaint in OSSE's Office of Dispute Resolution alleging that (1) DCPS failed to implement his IEP after his transfer to the DC Jail complex following the inception of COVID-19 restrictions, because it utilized work packets instead of providing specialized instruction, and it did not provide him with devices to access virtual instruction and services or in-person instruction or services, (2)  OSSE  failed to adequately monitor and provide appropriate oversight of DCPS' provision of special education services at IYP, (3) DCPS denied all IYP students FAPE by failing to implement their IEPs and by not providing them electronic devices adequate to access virtual instruction and services or in-person instruction and services, and (4) DCPS and OSSE violated the Rehabilitation Act by failing to provide specialized instruction to Israel.

177.    Israel's petition seeks individual relief and the same systemic relief sought in Charles' petition as described in paragraph 132.

**Effects of Defendants' Actions and Inactions on Class**

178.    Defendant DCPS policies, practices, and procedures since March 24, 2020 have been to provide IYP students with materials, such as paper-based and tablet-delivered work packets, in lieu of direct instruction; to provide IYP students with paper-based work packets in lieu of related services; and to not provide education in conformity with students' IEPs.

179.    DCPS has conceded the central facts underlying the numerous failures explained above (paras. 41-106) and their application to the plaintiff class.  For example, former IYP Principal Dr. Roane, stated in sworn testimony on December 1, 2020, in connection with the administrative hearing for named plaintiff Charles H., that IYP students have not received direct instruction since the beginning of the COVID-19 pandemic.  In addition, Dr. Roane testified that IYP was not providing its students with their necessary support services during lockdown conditions at the DC Jail complex.  DCPS admitted in its closing statement that "[u]nder the current circumstances in the facility the staff members are not able to provide the supports and services outlined in student IEPs."

180.    Defendants' actions have harmed IYP students by adversely affecting their educational opportunities, learning, and well-being.  Many IYP students received incompletes for their work in at least one class at the end of the 2019-2020 school year, despite their attempts to participate in school.  Plaintiffs rely on the educational instruction provided by IYP to help them to meet their graduation goals while they are detained in the DC Jail complex pending the outcome of their court matter or before being transferred to a BOP facility.  For all the students at IYP, time is of the essence as some will reach the statutory end of their eligibility to receive special education supports while detained.  Those students who fail to earn their diploma while at IYP and continue to the BOP after the conclusion of their court matter are then unable to continue their coursework as the BOP does not offer access to earn a diploma.  If plaintiffs do not receive the education to which they are entitled while at IYP, they may not ever receive the chance to earn a diploma.  Defendants' failures harm their future educational, professional, and personal opportunities.

181.    IYP students are experiencing educational harm due to the lack of academic and behavioral monitoring, without which, there is no way to know if students are making progress on their IEP goals and objectives.

182.    IYP students are suffering educational, social, psychosocial, emotional, and personal harm by not receiving the positive behavioral intervention and supports and other related services mandated in their IEPs and needed for them to access the general education curriculum. The lack of behavioral supports may result in inappropriate behavior that ultimately leads to IYP students being placed in restrictive housing, further compounding their isolation and lack of access to special education and related services.

183.    Defendants' failure to provide the positive behavioral interventions and supports and other related services exacerbates the pre-existing mental and emotional disorders and traumas prevalent among incarcerated students.   Defendants' failures may also exacerbate students' behavioral issues because IYP students are restricted to their cells up to 23 hours per day due to the DC Jail complex's public health restrictions.

184.    Defendants' actions and inactions are gross misjudgments and gross departures from accepted professional standards.  Defendants' provision of paper-based and tablet-delivered work packets, in lieu of direct instruction and related services, and failure to provide education in conformity with students' IEPs, is a gross departure from DCPS and OSSE standards of education during the COVID-19 pandemic; U.S. Department of Education guidance during the COVID-19 pandemic; professional standards for the provision of special education and related services; and from the standards set by the IDEA.

185.    Defendants' actions and inactions violate federal and local law and show deliberate indifference to plaintiffs' rights under the IDEA, its local implementing regulation, the Rehabilitation Act, ADA, and DCHRA.

## CLAIMS

## FIRST CLAIM

### VIOLATION OF THE INDIVIDUALS WITH DISABILITIES IN EDUCATION ACT

### (AGAINST ALL DEFENDANTS)

186.    The IDEA and its implementing regulations require that "[a] free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive . . . ." 20 U.S.C. § 1412(a)(1)(A). *See also* 20 U.S.C. § 1400(d)(1)(A); 5-E D.C.M.R. § 3002.1(a).

187.    In order to provide FAPE, the provision of special education and related services must be made in conformity with each student's IEP. 20 U.S.C. § 1401(9)(D).

188.    As set forth in paragraphs 6, 19, 140, 146 above, since March 24, 2020, plaintiffs and the putative class members are students with disabilities and have been found eligible for special education under the IDEA.

189.    As set forth in paragraphs 41-177 above, since March 24, 2020, defendants have failed to implement plaintiffs' and the putative class members' IEPs by failing to provide them their mandated specialized instruction and related services. Defendants denied FAPE to plaintiffs and the putative class members. Defendants' failures are numerous and systemic.

190.    Defendants' actions violate 20 U.S.C. § 1412(a)(1)(A), 20 U.S.C. § 1412(a)(3)(A), 20 U.S.C. § 1415(j), 20 U.S.C. § 1400(d)(1)(A), and the implementing regulations.

## SECOND CLAIM

VIOLATION OF THE INDIVIDUALS WITH DISABILITIES IN EDUCATION ACT

(AGAINST DEFENDANT OSSE)

191.    Defendant OSSE is the State Educational Agency (SEA) for IYP.

192.    As the SEA, defendant OSSE is responsible under the IDEA for ensuring that FAPE is made available to all eligible District residents with disabilities and that all programs administered by District agencies meet District educational standards.   *See* 20 U.S.C. § 1412(a)(11).

193.    As set forth in paragraphs 6, 19, 140, 146 above, since March 24, 2020, plaintiffs and the putative class members are students with disabilities and have been found eligible for special education under the IDEA.

194.    As set forth in paragraphs 41, 44, 96-106 above, since March 24, 2020, Defendant OSSE has failed to ensure that FAPE was made available to plaintiffs and the putative class members.

195.    Had OSSE sufficiently monitored DCPS at the start of distance learning, or at any point since, OSSE would have known that students at IYP were not being provided with necessary technology and/or other supports to access special education or related services and were being denied  FAPE.

196.    Defendant OSSE has failed to monitor and enforce defendant DCPS's LEA requirements.  Defendant OSSE's failure has resulted in a substantive denial of FAPE to plaintiffs and the putative class members.

**THIRD CLAIM**

VIOLATION OF THE REHABILITATION ACT

(AGAINST ALL DEFENDANTS)

197.    Section 504 of the Rehabilitation Act, and its implementing regulations, forbid defendants from discriminating against or excluding an otherwise qualified person from participation in the federally funded program or activity solely because of the person's disability. 29 U.S.C. § 794(a).

198.    Section 504 of the Rehabilitation Act states that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).

199.    The implementing regulations state that "a recipient that operates a public elementary or secondary education program or activity shall provide a free appropriate public education to each qualified handicapped" student in its jurisdiction.  34 C.F.R. § 104.33.

200.    Defendants are recipients of federal funding and operate a public secondary education program.  They are thus required to provide FAPE to plaintiffs and the putative class members.  34 C.F.R. § 104.33.

201.    As set forth in paragraphs 6, 19, 140, 146 above, plaintiffs and the putative class members are qualifying individuals under the Rehabilitation Act because, as students with disabilities eligible for FAPE under the IDEA who are, will be, or were enrolled in defendants' educational program, plaintiffs and the putative class members meet the eligibility requirements for receipt of educational services provided by defendants.

202.    As set forth in paragraphs 41-177 above, since the beginning of the COVID-19 pandemic, defendants have failed to provide direct specialized instruction and related services to

plaintiffs and the putative class members, and thereby deprived them of FAPE in violation of both 34 C.F.R. § 104.33 and the IDEA.

203.   Defendants have and continue to discriminate against plaintiffs and the putative class members solely because of their disabilities by failing, over multiple academic years, to provide them effective special and general education and the opportunity to participate in or benefit from such education, that is equal to the opportunity and education defendants have afforded and continue to afford to others.  34 C.F.R. § 104.4.  Defendants systemically denied and continue to systemically deny plaintiffs and the putative class members the special education and related services to which they were entitled.

204.   Defendants have and continue to discriminate against plaintiffs and the putative class members solely because of their disabilities by denying them special education and related services in conformity with what is required by their IEPs and that are designed to meet their needs as adequately as the needs of non-disabled students.

205.   Plaintiffs brought these issues to defendants' attention on August 20, 2021, and, yet, defendants continued to deny plaintiffs and the putative class members FAPE.  Defendants adopted policies and practices that systemically exclude plaintiffs and the putative class members from receiving FAPE.

206.   Defendants' actions have departed grossly from accepted IDEA standards, U.S. Department of Education guidance on the provision of FAPE during the pandemic, and their own standards as set forth in OSSE and DCPS guidance on the provision of FAPE during the COVID-19 pandemic.

207.   Defendants have exercised gross misjudgment and/or gross departure from acceptable standards among educational professionals.

208.     Defendants have intentionally discriminated against plaintiffs and the putative class members by failing to offer them FAPE since the beginning of the COVID-19 pandemic.

209.     For all of these reasons, defendants' actions and inactions violate Section 504 of the Rehabilitation Act and its implementing regulations.

## FOURTH CLAIM

### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

### (AGAINST ALL DEFENDANTS)

210.     Title II of the ADA prohibits defendants from denying plaintiffs and the putative class the benefits of or prohibiting plaintiffs and the putative class from participating in defendants' service, program, or activities.  42 U.S.C. § 12132.

211.     Defendants are public entities responsible for providing education to plaintiffs and the putative class.  42 U.S.C. § 12131(1).

212.     As set forth in paragraphs 6, 19, 140, 146 above, plaintiffs and the putative class members are otherwise qualified individuals under Title II of the ADA because they have a physical or mental impairment that substantially limits one or more major life activities including learning, concentrating, and thinking and are, will be, or were enrolled, and meet the essential eligibility requirements to be enrolled, in defendants' educational program.  42 U.S.C. § 12131(2) (defining "qualified individual with a disability"); 42 U.S.C. § 12102(1) (defining "disability").

213.     For all of the reasons described above with regard to the Rehabilitation Act claim, Defendants' actions and inactions violate the ADA and its implementing regulations.

**FIFTH CLAIM**

VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT

(AGAINST ALL DEFENDANTS)

214.    The DCHRA makes it an "unlawful discriminatory practice . . . for an educational institution" to "deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the actual or perceived: . . . disability of any individual."  DC Code § 2-1402.41.

215.    Defendants operate and/or oversee IYP, an educational institution as defined in DC Code § 2-1401.02(8), through which they are responsible for providing education to plaintiffs and the putative class.

216.    Plaintiffs and the putative class members are persons otherwise qualified to use or access the facilities, services, programs, or benefits of any program or activity of the educational institution operated by defendants.

217.    For all the reasons described above with regard to the Rehabilitation Act and ADA claims, defendants' actions and inactions violate the DCHRA.

**SIXTH CLAIM**

VIOLATION OF DISTRICT OF COLUMBIA REGULATIONS

(AGAINST ALL DEFENDANTS)

218.    District of Columbia regulations require that defendants make available "a free appropriate public education (FAPE) . . . to each child with a disability, ages three to twenty-two," who is a resident or ward of the District of Columbia.  5-E D.C.M.R. § 3002.1(a).

219.    As set forth in paragraphs 6, 19, 140, 146 above, since March 24, 2020, plaintiffs and the putative class members are students within the meaning of 5-E D.C.M.R. § 3002.1(a).

220.    The plaintiffs and the putative class members are residents and wards of the District of Columbia.

221.    As set forth in paragraphs 41-177 above, defendants have failed to implement plaintiffs' and the putative class members' IEPs, failed to provide related services, and failed to provide FAPE to plaintiffs and putative class members.  Defendants' failures are numerous and systemic.

222.    Defendants' actions and inactions violate 5-E D.C.M.R. § 3002.1(a).

**RELIEF**

Plaintiffs, on behalf of themselves and all other persons similarly situated, request that this Court grant the following relief:

(1)   Hybrid certification of this action, as a class action, pursuant to Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure;

(2)   A declaratory judgment pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure that defendants have violated the named plaintiffs' and the plaintiff class's rights under the following statutes and regulations:

(a) The IDEA, 20 U.S.C. § 1400, *et seq*, namely, 20 U.S.C. § 1412(a)(3)(A), 20 U.S.C. § 1400(d)(1)(A), 20 U.S.C. § 1412(a)(1)(A) and its implementing regulations by failing to provide a free appropriate public education to plaintiffs in accordance with the IDEA and its implementing regulations;

(b) Section 504 or the Rehabilitation Act, 29 U.S.C. § 794(a), and its implementing regulations, 34 C.F.R. § 104.32 and 34 C.F.R. § 104.33, by exercising gross misjudgment in failing to provide plaintiffs a free appropriate public education;

(c) Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and its implementing regulations, by denying plaintiffs the benefits of or prohibiting plaintiffs from participating in defendants' services, programs, or activities with regard to provision of a free and appropriate public education;

(d) The DC Human Rights Act, DC Code § 2-1402.41, by denying plaintiffs the use of or access to defendants' services, programs, or facilities with regard to provision of a free and appropriate public education; and

(e) 5-E D.C.M.R. § 3002.1(a), (d), and (e) by failing to provide a free appropriate public education to plaintiffs.

(3)   A preliminary and permanent injunction ordering defendants to:

(a) develop and implement adequate and effective policies and procedures to provide plaintiffs appropriate special education and/or related services;

(b) provide plaintiffs' special education and/or related services in conformity with their IEPs through the provision of direct instruction via in-person or live videoconference classes or sessions;

(c) report to the Court at regular intervals on the implementation of special education and related services for the plaintiffs;

(4)   A preliminary and permanent injunction ordering defendants to develop and implement adequate and effective policies and procedures to provide plaintiffs special education and/or related services in conformity with their IEPs until plaintiffs earn their high school diplomas or are no longer eligible to receive FAPE from the District of Columbia;

(5)   An order enjoining defendants to take appropriate affirmative actions to ensure that the violations of federal and District of Columbia law complained of above do not continue to be engaged in by defendants, their agents, successors, employees, subordinates, attorneys and those acting at their direction;

(6)   An order enjoining defendants to provide compensatory education to plaintiffs and the putative class members for whom defendants failed to provide special education and/or related services, including but not limited to, an extension of IDEA eligibility commensurate with the period over which defendants denied FAPE;

(7)   An order requiring defendants to reimburse plaintiffs for the funds expended to obtain experts, evaluations, and special education and related services as a result of defendants' violations of law;

(8)   An order appointing a Special Master whose duties shall include, but not be limited to, monitoring, and reporting to the Court regarding:

(a)  defendants' compliance with the Court's Order;

(b)  remedies necessary to bring about full compliance with the Court's Order;

(9)   Retention of jurisdiction over this action to ensure defendants' compliance with the mandates of the Court's orders;

(10) An award of reasonable attorneys' fees, expenses, and costs pursuant to 20 U.S.C. § 1415(i)(3)(B) and 29 U.S.C. § 794a(b); and

(11) Such other relief as may be deemed proper by the Court.

Respectfully submitted,

/s/ *Stephanie A. Madison*

Kathleen L. Millian, DC Bar No. 412350
Zenia Sanchez Fuentes, DC Bar No. 500036
Stephanie A. Madison, DC Bar No. 1025581
TERRIS, PRAVLIK & MILLIAN, LLP
1816 12th Street, NW, Suite 303
Washington, DC  20009-4422
Phone: (202) 682-2100, ext. 8478
kmillian@tpmlaw.com; zsanchez@tpmlaw.com;
smadison@tpmlaw.com

Ifetayo Belle, DC Bar No. 1601686
Sarah Comeau, DC Bar No. 1012980
SCHOOL JUSTICE PROJECT
1805 7th Street, NW, 7th Floor
Washington, DC 20001-3186
Phone: (202) 630-9969
tbelle@sjpdc.org; scomeau@sjpdc.org

Kaitlin R. Banner, DC Bar No. 1000436
Margaret F. Hart, DC Bar No. 1030528
Jonathan Smith, DC Bar No. 396578
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL
RIGHTS AND URBAN AFFAIRS
700 14th Street, N.W., Suite 400
Washington, DC 20005
Phone: (202) 319-1000
Fax: (203) 319-1010
kaitlin_banner@washlaw.org; margaret_hart@washlaw.org;
jonathan_smith@washlaw.org

*Counsel for Plaintiffs*

April 9, 2021