**Plaintiffs' Exhibit 1**
Civ. No. 21-00997 (CJN)

# District of Columbia
# Office of the State Superintendent of Education
## Office of Dispute Resolution
**1050 - First Street, N.E.; Washington, D.C. 20002**
**(202) 698-3819  www.osse.dc.gov**

## Confidential

| | | |
|---|---|---|
| **Parent on behalf of Student[1]** | ) | **Case No. 2020-0184** |
| | ) | |
| **Petitioner**, | ) | **Hearing Dates: November 30, 2020 and** |
| | ) | **December 1, 2020** |
| **v.** | ) | |
| he | | |
| **District of Columbia Public Schools** | ) | |
| | ) | |
| **and** | ) | |
| | ) | **Date Issued: January 11, 2021** |
| **The District of Columbia Office of the** | ) | |
| **State Superintendent of Education,** | ) | |
| | ) | **Terry Michael Banks,** |
| **Respondents** | ) | **Hearing Officer** |

## HEARING OFFICER DETERMINATION

### INTRODUCTION

Petitioner is an X-year-old student ("Student") who is currently attending School A in District of Columbia ("D.C.") Jail.  On October 16, 2020, Petitioner filed a *Due Process Complaint Notice* ("*Complaint*") alleging, *inter alia*, that the District of Columbia Public Education ("OSSE") denied the student a free appropriate public education ("FAPE"), *inter alia*, by failing to implement Student's Individualized Education Program ("IEP"). On October 26, 2020, DCPS and OSSE filed responses to the *Complaint* denying that they had failed any legal obligation to Petitioner.

### SUBJECT MATTER JURISDICTION

This due process hearing was held, and a decision in this matter is being rendered, pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA") and its

---

[1] Personally identifiable information is attached in the Appendix and must be removed prior to public distribution.

implementing regulations,[2] 34 C.F.R. Sect. 300 *et seq*., Title38 of the D.C. Code, Subtitle VII, Chapter 25, and the District of Columbia Municipal Regulations.[3]

## PROCEDURAL HISTORY

Petitioner is an X-year-old student who is currently attending School A in District of Columbia ("D.C.") Jail.  On October 16, 2020, Petitioner filed the *Complaint* through counsel alleging, *inter alia*, that (1) DCPS, which operated School A within the D.C. Jail, failed to implement Student's IEP after the inception of COVID-19 restrictions on March 24, 2020 by utilizing work packets instead of providing specialized instruction, and by not providing Student devices to access virtual instruction and services, (2)  OSSE  failed adequately to monitor and provide appropriate oversight of DCPS' provision of special education services at School A, (3) DCPS denied all special education students attending School A a FAPE by failing to implement their IEPs and by not providing them devices to access virtual instruction and services, and (4) DCPS and OSSE violated the Rehabilitation Act by failing to provide specialized instruction to Student after March 24, 2020.

On October 16, 2020, Petitioner filed a *Motion for Expedited Due Process Hearing*. Petitioner argued that expedition was justified because the denial of services had persisted since March 2020, the violations affect all other detained students with disabilities, and Petitioner lacked the ability to access alternative services due to her/his incarceration. "Without addressing this matter quickly, these vulnerable students will suffer severe and irreparable educational harm." On October 26, 2020, DCPS filed *District of Columbia Public Schools' Reply in Opposition to Petitioner's Motion for an Expedited Hearing* ("*DCPS' Opposition*"). DCPS argued that Petitioner failed to allege facts that would trigger entitlement to an expedited hearing. On November 6, 2020, I issued an Order denying Petitioner's *Motion for Expedited Due Process Hearing*.

On October 26, 2020, OSSE filed the *OSSE Response*, asserting that (1) local education agencies ("LEA"), not state education agencies ("SEA"), are directly responsible for FAPE, and that it ensures FAPE primarily through the adoption of policies and procedures and through a system of supervision and monitoring of LEAs, (2) the Hearing Officer does not have jurisdiction to address alleged systemic failures, and (3) the Hearing Officer does not have jurisdiction to adjudicate claims under the Rehabilitation Act.

On October 26, 2020, DCPS filed the *DCPS Response.* DCPS conceded that Student's October 10, 2019 IEP prescribes 10 hours per week of specialized instruction and 180 minutes per month of behavior support services outside general education, and 30 minutes per month of speech and language pathology consultation services. It further averred that (1) once the Mayor of the District of Columbia imposed COVID-19 restrictions in March 2020, the District of Columbia Department of Corrections ("DOC"), which operates the D.C Jail, notified DCPS that its staff would be denied access  to the facility, (2) DCPS developed a plan with DOC to provide instruction to School A students using work packets, (3) DCPS was not authorized to provide technology to School A students due to security concerns, (4) Student has received work packets, with an opportunity for feedback from instructors, since

---
[2] 20 U.S.C. Section 1400 *et seq*., and its implementing regulations.
[3] Title 5E, Chapter 30.

April 16, 2020, when DCPS first confirmed by email to Petitioner's counsel, that Petitioner was provided work packets, (5) DCPS has provided Student all supports and services to the extent possible under the current circumstances, (6) Student's access to technology is restricted as a result of her/his classification, (7) Department of Education Guidance provides that LEAs can create distance learning plans for special education students but are not required to, and LEAs should consider what services, if any, are required to be made up when normal school operations resume, (8) the Hearing Officer does not have jurisdiction over Rehabilitation Act claims, and (9) Petitioner does not have standing to raise allegations of systemic violations of IDEA, and the Hearing Officer does not have jurisdiction over such claims.

The parties participated in a resolution meeting on November 2, 2020 that did not result in a settlement. A prehearing conference was conducted by conference call on November 15, 2020. The Hearing Officer advised Petitioner's counsel that the Hearing Officer does not have the authority to award attorneys' fees. On the issues of systemic relief and violation of the Rehabilitation Act, the Hearing Officer advised Petitioner's counsel that the Hearing Officer does not believe he has authority to adjudicate such claims. As for the request for compensatory education services, the Hearing Officer stated that Petitioner has the burden of establishing entitlement to any requested relief, including the type and amount of compensatory education services that would compensate the student for the services that were allegedly denied. Petitioner's counsel were invited to file a Memorandum of Points and Authorities to support the issues as to which the Hearing Officer raised questions, on or before November 20, 2020. The Prehearing Order was issued on November 10, 2020. At Petitioner's request, the Hearing Officer issued an Amended Prehearing Order on November 18, 2020, modifying language in the paragraph entitled "Issues and Defenses Presented, and Relief Requested." On November 19, 2020, Petitioner filed *Petitioner's Memorandum of Points and Authorities in Support of the Hearing Officer's Jurisdiction to Adjudicate Systemic IDEA Claims and Section 504 Rehabilitation Act Claims*.

On November 20, 2020, OSSE filed *Office of the State Superintendent of Education's Motion to Dismiss Complaint.* OSSE argued that as the SEA, it was not responsible for providing Student FAPE under IDEA or District of Columbia law.  OSSE also argued that the Hearing Officer did not have the authority to adjudicate class claims under IDEA or under the Rehabilitation Act. On November 23, 2020, Petitioner filed *Petitioner's Opposition to Office of the State Superintendent of Education's Motion to Dismiss Complaint.*

The due process hearing was conducted on November 30 – December 1, 2020 by video conference, and was closed to the public at Petitioner's request. I informed the parties that I would not adjudicate claims of systemic violations or claims under the Rehabilitation Act. I also indicated that I would defer ruling on OSSE's *Motion to Dismiss* until the issuance of the HOD.

On November 20, 2020, Petitioner's counsel disclosed Exhibits P1-P34. DCPS and OSSE filed objections to Petitioner's disclosures on November 25, 2020. Both respondents filed objections to Petitioner's expert witness designations, but neither provided reasons for the objections as required in the Amended Prehearing Order. Both respondents objected to P22, and DCPS also objected to P19-P30 and P35-37. I overruled objections to P23-P30,

sustained objections to P35-P37, and deferred ruling on P19-P22. At the conclusion of the hearing, I admitted P19-P22 into evidence. In addition, my decision to exclude P36 and P37 prior to taking testimony was based on my determination that these documents were related solely to Petitioner's class claims. However, in analyzing OSSE's role in this claim, I concluded that the extent to which OSSE was on notice as to possible violations of IDEA with respect to DCPS' provision of FAPE within DOC facilities was relevant even in a claim of the violation by a single individual. Thus, I have reversed my ruling as to P36 and P37, and P1 - P34 and P36-P37 were admitted into evidence.

Respondent DCPS disclosed Exhibits R1-R10 ("RD"). Petitioner objected to DCPS' proposed expert witnesses, but did not object to any exhibits. DCPS' attorney deferred offering her exhibits into evidence. During the hearing, Exhibits RD 1- RD9 were offered and admitted into evidence. Respondent OSSE disclosed Exhibits RR1-R11 ("RO"). Petitioner objected to OSSE's proposed expert witnesses, but did not object to any exhibits. Exhibits RO1-RO11 were admitted into evidence.

Petitioner presented as witnesses in chronological order: Petitioner, Witness A, Witness B, and Witness C. Petitioner offered Witness A as an expert in Special Education and Correctional Education. I overruled Respondents' objections to his testimony and permitted expert testimony in Special Education and Correctional Education.  Petitioner offered Witness B as an expert in Clinical Psychology and Cognitive Impairment. Respondent's offered no objection to expert testimony in Clinical Psychology, and opinion testimony in this field was permitted. Petitioner offered Witness C as an expert in Compensatory Education Plans. I overruled DCPS' objections and permitted expert testimony in the area of compensatory education plans. Respondent DCPS presented as witnesses in chronological order: Witness D, Witness E, and Witness F. DCPS offered Witness E as an expert in Special Education. I overruled Petitioner's objection and permitted Witness E to provide expert testimony in Special Education. Respondent OSSE offered no testimonial evidence.

Counsel for the parties agreed to provide written closing arguments. The parties agreed to extend the due date for the Hearing Officer Determination to January 11, 2021 to accommodate the filing schedule for the closing statements. Petitioner filed *Petitioner's Closing Brief* on December 9, 2020. On December 15, 2020, OSSE filed *Office of the State Superintendent of Education's Written Closing Statement* ("*OSSE Closing Statement*")*,* and DCPS filed *District of Columbia Public Schools' Closing Statement* ("*DCPS Closing Statement*")*.*

## ISSUES

As identified in the *Complaint* and the *Amended Prehearing Order*, the issues to be determined in this case are as follows:

1.      Whether DCPS denied Student a FAPE by failing to implement Student's IEP after the inception of COVID-19 restrictions on March 24, 2020 by utilizing work packets instead of providing specialized instruction, and by not providing Student devices to access virtual instruction and services.

2.      Whether DCPS provided Student a Prior Written Notice detailing and justifying the proposed change in placement that was implemented after the inception of COVID-19 restrictions on March 24, 2020.

3.      Whether OSSE monitored and provided appropriate oversight of DCPS' provision of special education services in School A.

4.      Whether DCPS denied all special education students attending School A a FAPE by failing to implement their IEPs and by not providing them devices to access virtual instruction and services.

5.      Whether DCPS and OSSE violated the Rehabilitation Act by failing to provide specialized instruction to Student.

## FINDINGS OF FACT

1.      Student is X-years-old, is currently in grade L, and is enrolled in School A.[4]

2.      School A and School B are operated by DCPS, providing special education services to eligible inmates in facilities operated by DOC. School B is for students age 18 and under, while School A is for students 19 and older.[5]

3.      During the 2018-19 school year at School A, Student earned the following final grades: English I: C-, English III: D, World History & Geography I: B-, World History and Geography II: C, Algebra I: B, Biology: B-, Employability Skills: B, Career Exploration: B, and Fitness & Lifetime Sports I: C-. During the 2019-20 school year, Student earned the following grades at School A: English II: A-, U.S. History & Geography: B, Algebra II & Trigonometry: B-, Chemistry: B-, and Financial Literacy: P.[6]

4.      On March 5, 2019, DCPS, OSSE, and the DOC entered into a Memorandum of Agreement "MOA").[7] In pertinent part, the Agreement provides as follows:

> The District of Columbia Office of the State Superintendent of Education ("OSSE"), the District of Columbia Department of Corrections ("DOC"), and the District of Columbia Public Schools ("DCPS") enter into this Memorandum of Agreement ("MOA") to ensure that general and special education services are provided for eligible pretrial detainees and/or sentenced inmates housed at DOC facilities with the goal of ensuring that required educational services are provided to these individuals pursuant to the Elementary and Secondary Education Act of 1965 ("ESEA"), (20 U.S.C. §6421 *et seq*.) as amended by the Every Student Succeeds Act (129 Stat. 1802)

---

[4] Petitioner's Exhibit ("P:") 10 at 1. The exhibit number and page are followed by the electronic page number in the disclosure in parentheses, i.e., P10:1 (40).
[5] Testimony of Witness E.
[6] P1:1 (1).
[7] P23:1 (214)

and the Individuals with Disabilities Education Act ("IDEA")(20 U.S.C. §1400 *et seq.*).

The purpose of this MOA is to improve educational outcomes by minimizing disruption in the provision of general and special education services during the detainment and/or incarceration of young adults beyond compulsory school age who are eligible to receive such services pursuant to IDEA and who are housed at the Central Detention Facility ("CDF") and the Correctional Treatment Facility ("CTF")("collectively, "DOC facilities"). Pre-trial detainees and/or sentenced inmates are entitled to the opportunity to receive special education services while at a DOC facility if they are between the ages of 18 and 22 and if they were identified as a child with a disability in accordance with IDEA and local law in their last educational placement prior to incarceration at a DOC facility...[8]

DCPS agrees, through this MOA to be the LEA for eligible pretrial detainees and/or sentenced inmates housed at a DOC facility who are enrolled in [School A]. The mission of [School A] is to provide education services, including general and special education services, to eligible pretrial detainees and/or sentenced inmates attending the program who have previously been identified as eligible pretrial detainees and/or sentenced inmates…

For purposes of special education, DOC is a public agency under the IDEA and its regulation. 34 C.F.R. §300.2(b)(1)(iv)…[9]

In accordance with Part B of the IDEA, OSSE is responsible for ensuring that a free appropriate public education (FAPE) is made available to eligible children with disabilities, and that all such programs administered by other District of Columbia agencies are under OSSE's general supervision and meet District of Columbia educational standards…[10]

**Responsibilities of OSSE**

OSSE shall:

Ensure education services are delivered in accordance with the IDEA, ESEA and applicable local law, to eligible pretrial detainees and /or sentenced inmates at DOC facilities by:

> Scheduling meetings with DCPS and DOC not less than once a year, and more often as needed, to discuss the delivery of special education services and coordination of activities consistent with this MOA.

---

[8] P23:1 (214).
[9] *Id*. at 2 (215).
[10] *Id*. at 3 (216), *citing* 20 U.S.C. §1412(a)(11).

Incorporating [School A] into OSSE's system of IDEA Part B monitoring of LEAs. For IDEA reporting purposed, eligible pretrial detainees and/or sentenced inmates committed to DOC and enrolled at [School A] will be reported under the compliance rates for DCPS.

Take appropriate action, as needed, when issues arise with regard to special education service delivery at DOC facilities, if a matter is not resolved by DCPS and DOC.[11]

**Responsibilities of DCPS**

DCPS shall:

Be responsible for the development and provision of education services to eligible pretrial detainees and/or sentenced inmates at DOC facilities. This includes, but is not limited to:

Providing general and special education services to eligible pretrial detainees and/or sentenced inmates in accordance with their Individualized Education Plans (IEPs), to the maximum extent possible, in a manner that affords all eligible pretrial detainees and/or sentenced inmates the opportunity to obtain a standard DCPS diploma or IEP certificate of completion…[12]

Assisting DOC in planning for the provision of education services to students unable to attend [School A] classes due to security concerns or hospitalization…[13]

**Responsibilities of DOC**

For the purposes of this MOA, DOC shall work collaboratively with DCPS to ensure the provision of education services to eligible pretrial detainees and/or sentenced inmates housed at DOC facilities and attending [School A] pursuant to their IEPs. This includes, but is not limited to:

Ensuring that students attending [School A] are escorted to their educational program in accordance with their prescribed schedule…

Providing designated classroom(s) for the [School A] program, including providing designated classrooms for general and special education instruction of pretrial detainees and/or sentenced inmates in restrictive housing. DOC shall also provide an area for instruction of any pretrial detainees and/or sentenced inmates housed in special medical or disability units located in DOC Facilities.

---

[11] P23:3 (216).
[12] *Id*. at 4 (217).
[13] *Id*. at 5 (218).

Ensuring, to the extent feasible, that appropriate educational services are delivered to all enrolled pretrial detainees and/or sentenced inmates in restrictive housing that are unable to attend the designated classroom areas due to security concerns…[14]

**Resolution of Disputes**

Disputes which arise among the Parties regarding their responsibilities under or interpretation of this agreement will be brought to the attention of the agency directors of DCPS, DOC, and OSSE to resolve. Each Involved Party shall designate a representative to engage in fact-finding. When necessary, the Involved Parties will schedule a meeting with the Parties to discuss the issues in dispute and to review the facts. The Parties will work cooperatively to resolve the dispute. If the Parties cannot resolve the dispute, the matter shall be referred to the City Administrator in writing for resolution.[15]

The duration of the MOA has been extended through September 30, 2021.[16]

5.        On September 10, 2019, DCPS developed an Amended IEP for Student.[17] Student was classified with multiple disabilities: Specific Learning Disability/Other Health Impairment. S/he has been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and Cognitive Disorder, NOS, Mixed Expressive-Receptive Language Disorder, Adjustment Disorder with Mixed Disturbance of Emotions, and Conduct and Learning Disorder, NOS. The IEP indicated that Student had not been enrolled in school since November 2017.[18] In the Mathematics Present Levels of Academic Achievement and Functional Performance ("PLOPs"), it was noted that Student had not attended school since the spring of 2016. On an August 2, 2018 Woodcock-Johnson Test of Academic Achievement (WJ-IV), Student scored 70 in Broad Math, in the Low range. In Mathematical Operations, s/he scored in the Very Low range, and in Applied Problems, s/he scored in the Low range.[19] From the Reading PLOPs, Student scored 59 in Broad Reading, in the Very Low range, as were her/his scores for Reading Identification (50) and Reading Comprehension (60). On an October 2017 Wechsler Individual Achievement Test, s/he scored 56, in the first percentile, in Word Reading.[20] In Written Expression, Student was unable to complete the Written Expression portion of the WJ-IV.[21] On a June 12, 2018 Speech and Language Evaluation,[22] Student standard scores were as follows: Synonyms – 69, Sentence Expression – 77, Nonliteral Language – 73, Meaning from Content – 73, Pragmatic Language – 88, Receptive Vocabulary - <45, Expressive Vocabulary - <45.[23] In Emotional,

---

[14] *Id*. at 6-7 (219-20).
[15] *Id*. at 10 (223).
[16] P24:1
[17] P11:1 (62).
[18] *Id*. at 2 (63).
[19] *Id*. at 3 (64).
[20] *Id.* at 5 (66).
[21] *Id.* at 7 (68).
[22] P17 (115).
[23] P11: 9 (70).

Social and Behavioral Development, the results of a September 14, 2017 Comprehensive Psychological Evaluation were reported. Examiner A diagnosed Student with Unspecified Disruptive, Impulse-Control, and Conduct Disorder, Major Depressive Disorder – Recurrent Episode, Adjustment Disorder with Anxiety, and Cannabis Use Disorder, Severe. Based on Student's mother's responses, Student's overall adaptive behavior was scored in the Low Average range as were her/his scores for Conceptual, Social and Practical Composites. S/he was deemed a "moderate risk" for violence in the community, and at risk for substance abuse.[24] The IEP Team prescribed 10 hours per week of specialized instruction outside of general education, three hours per month of behavioral support services ("BSS"), thirty minutes per month of speech-language consultation series, and thirty minutes per month of transition services.[25]

6.      On March 16, 2020,[26] due to COVID-19 restrictions imposed by the Mayor of the District of Columbia, DCPS announced that all instruction would be performed remotely. DOC terminated access to its facilities to family visitation and volunteers. However, School A staff were deemed contractors, not volunteers, and were never precluded by DOC from entering DOC facilities.[27] Some School A teachers volunteered to visit School A students despite the remote-only mandate, but they were limited to visits of no more than one hour per student, at the front of students' cells, because DOC imposed a 23-hour per day "lock-down" of inmates and detainees to combat COVID-19.[28]

7.      On March 17, 2020, Attorney A inquired of Witness F, School A's principal, by email, "What is the plan for students at [School A] and [School B] once 'distance learning' begins next week?"[29] Witness F indicated that students would be provided instructional work packets, to be completed by the students on their own. Work packets were to be developed by each of the students' teachers and delivered to students every other week.[30] Attorney A inquired how School A students would get individualized assistance to complete the work packets. Witness F replied, "Teachers included the appropriate scaffolds and supports for the students to access the materials provided. Students will not be penalized. We want them to do the best that they can. Does this make sense?"[31]

8.      DOC does not permit internet access to detainees and inmates. DOC offered DCPS the use of Android tablets designed for use within DOC facilities, but without internet access. DCPS declined the offer and elected to use work packets to provide instruction to students in School A.[32]

9.      Students in School B have access to tablets that are used to provide contact between students and their teachers that is monitored by DOC.[33]

---

[24] Id. at 10 (71).
[25] Id. at 13, 18 (74, 79).
[26] P37:1 (363).
[27] Testimony of Witness D.
[28] Testimony of Witness D.
[29] P31:4 (321).
[30] Testimony of Witness E.
[31] P31:4 (321).
[32] Testimony of Witness D.
[33] Testimony of Witness F.

10.      On April 24, 2020, the DOC Education Administrator A notified School A students that she would "provide you with your [School A] paper based learning, collect the work, and answer any questions you may have" every other week. "If you have any specific questions about your work, I want you to make a star next to it. This will let your teacher know you need assistance."[34]

11.      From the inception of restrictions on March 13, 2020 until October 23, 2020, School A provided Student work packets on five occasions.[35]

12.      Student testified that before COVID restrictions were imposed, s/he had daily classes in School A from 8:45-11:10 a.m., and 12:15-2:30 p.m.. Since COVID restrictions were imposed, s/he has been confined to her/his cell 23 hours per day, can spend one hour outside the cell for personal time, and has had no classes. When restrictions were imposed, s/he received no indication as to what would happen with respect to her/his classes. S/he often had no work to do. Beginning in the spring of 2020, his/her teachers began to drop off work packets at her/his cell. The packets contained two weeks of work assignments. While s/he received packets, s/he often could not do the work because s/he did not understand what to do. S/he sent messages to his/her teacher, but received no responses. Student last talked to her/his teacher, Teacher A, about two months before the hearing. Since the imposition of restrictions, s/he ordinarily saw Teacher A one to two times each week for five to ten minutes. Student has seen Teacher B, his/her Science teacher, two times since the imposition of restrictions, but Teacher B only dropped off work packets. Student has seen her/his social worker, Social Worker A, for BSS three times since the imposition of sanctions; the last was three weeks before the hearing, and that was the only time Social Worker A provided BSS since the imposition of COVID restrictions. The first two times Social Worker visited, she only dropped off work packets. School A has issued Student a tablet, but the tablet is not loaded with educational material from School A.[36]

13.      At the time of the hearing, Student was in "restrictive housing," a punitive measure. In restrictive housing, Student is always handcuffed. S/he had been placed in restricted housing four times since March 2020, once for two months. S/he expected to be released from restrictive housing within 14 days. Student anticipated being released from incarceration in two years.[37]

14.      On June 17, 2020, Assistant Principal A notified Attorney A that while students in DOC's School B would receive laptops "by the end of the week" and would begin receiving instruction through the Microsoft Teams platform, students in School A would receive instruction through the "learning packets," and there was no information concerning tablets for School A students.[38]

---

[34] DCPS Exhibit ("RD:") 2 at 5. The exhibit number is followed by the electronic page number in the disclosure in parentheses, i.e., RD2 (5). RD Exhibits RD2-RD7 document the delivery and return of the work packets.
[35] Testimony of Witness D; RD3-RD7.
[36] Testimony of Petitioner. *See also,* P13:1 (84) and P14:1 (86), Service Trackers that confirm that Student is not receiving prescribed related services "due to 'lock-down' for COVID-19 and inability to provide virtual consultation services at [School A]." P14:1 (86). Witness F also testified that BSS are not provided in lock-down conditions.
[37] Testimony of Petitioner.
[38] P33:1 (330).

15.     On August 20, 2020, Petitioner's counsel, along with several civil rights organizations and a law firm representing inmates and detainees notified OSSE and DCPS of alleged violation of IDEA within DOC, particularly that

> …[t]he detained students did not receive appropriately differentiate work packets nor any accommodations to allow them to meaningfully access their education. The detained students did not interact, virtually, telephonically, or in person, with educational staff, therapists, or other trained professionals to assist them in accessing their education.[39]

16.     On August 31, 2020, Witness F issued a letter to School A students. The letter enclosed a handbook of information about the 2020-21 school year. The handbook provided, *inter alia*,

> In the interest of the health, safety, and well-being of students, staff, families, and community, the following decision was made:
>
> Term One will begin on Monday, August 31 and be all virtual for students in Pre-K through 12th grade.
>
> **What does this look like at [School A]?**
>
> All Students will have access to a DOC-provided tablet when available for virtual instruction. Students will use these tablets to participate in virtual instruction with their teachers via the Microsoft Teams platform… If there are persistent technological issues, students will receive learning packets to engage with academic content on a bi-weekly basis.[40]
>
> **Relevant Components of the Virtual Attendance Guidance Policy**
>
> It is important to note that virtual instruction days will be **compulsory**, and daily attendance will be **required**. During virtual learning periods, the curriculum will be accessed via Canvas, DCPS' online learning management system, which allows for a more user-friendly, efficient and organized approach to virtual learning.[41]

Witness F testified that when she provided this information to School A students, she was unaware that there was no internet access.

17.     On September 11, 2020, OSSE notified DCPS of its intent to conduct a "desktop review of student files for District of Columbia students enrolled in the District of

---

[39] P36:3 (360).
[40] P25:5 (233).
[41] *Id.* at 9 (237).

Columbia Public School (DCPS) and receiving education at [School B] and [School A]. The review will begin on November 16, 2020."[42]

18.    On October 20, 2020, DCPS issued a Progress Report for Student for the 2020-21 school year. The Report indicated that Student was failing five of her/his courses: English IV, Principles of U.S. Government, Spanish I, Geometry, and Health Education, and was earning a D one course, Concepts of Physical Education. While teacher comments indicated that s/he participated well in class, in Government, Geometry, and Health Education, teachers noted that s/he does not complete class assignments.[43]

19.    Witness C has been the Owner and Director of Operations of Facility A since 1998. Facility A provides literacy services, and special education consultation and related services. Facility A provides services both in-person and virtually. Witness A opined that Student had the ability to meet the IEP goal of 1.5 years of growth in Reading grade equivalency.[44] He noted that while Student was currently failing all of his/her courses, Student's academic record reveals an ability to make progress with adequate instruction. Witness C testified that the COVID restrictions caused Student to miss approximately 260 hours of specialized instruction, 15 hours of BSS, and 3 hours of consultation services. Witness C opined that the progress Student lost through deprivation of these services could be restored with compensatory education services of 200 hours of tutoring, 15 hours of BSS, and 3 hours of consultation services.[45]

## CONCLUSIONS OF LAW

Based upon the above Findings of Fact, the arguments of counsel, and this Hearing Officer's legal research, the Conclusions of Law are as follows:

The burden of proof in District of Columbia special education cases was changed by the local legislature through the District of Columbia Special Education Student Rights Act of 2014. That burden is expressed in statute as the following:

> Where there is a dispute about the appropriateness of the child's individual educational program or placement, or of the program or placement proposed by the public agency, the public agency shall hold the burden of persuasion on the appropriateness of the existing or proposed program or placement; provided, that the party requesting the due process hearing shall retain the burden of production and shall establish a prima facie case before the burden of persuasion falls on the public agency. The burden of persuasion shall be met by a preponderance of the evidence.[46]

---

[42] OSSE Exhibit ("RO:") 4 at 1, electronic page 339. The exhibit number is followed by the exhibit page number with the electronic page number in the disclosure in parentheses, i.e., RO4:1 (339).
[43] P8: 1-2 (19-20).
[44] P11:6 (67).
[45] Testimony of Witness C.
[46] D.C. Code Sect. 38-2571.03(6)(A)(i).

In this case, the issues do not involve the appropriateness of IEPs or placement. Therefore, under District of Columbia law, Petitioner bears the burden of persuasion on all issues. The burden of persuasion shall be met by a preponderance of the evidence.[47]

> **Whether DCPS denied Student a FAPE by failing to implement Student's IEP after the inception of COVID-19 restrictions on March 24, 2020 by utilizing work packets instead of providing specialized instruction, and by not providing Student devices to access virtual instruction and services.**

The Supreme Court's first opportunity to interpret the predecessor to IDEA, The Education of the Handicapped Act ("EHA"), came in *Board of Education of the Hendrick Hudson Central School District v. Rowley*.[48] The Court noted that the EHA did not require that states "maximize the potential of handicapped children 'commensurate with the opportunity provided to other children.'"[49] Rather, the Court ruled that "Implicit in the congressional purpose of providing access to a 'free appropriate public education' is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child…[50] Insofar as a State is required to provide a handicapped child with a 'free appropriate public education,' we hold that it satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction… In addition, the IEP, and therefore the personalized instruction should be formulated in accordance with the requirements of the Act and, if the child is being educated in the regular classrooms of the public school system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade."[51]

More recently, the Court considered the case of an autistic child under IDEA who, unlike the student in *Rowley* was not in a general education setting.[52] The Tenth Circuit had denied relief, interpreting *Rowley* "to mean that a child's IEP is adequate as long as it is calculated to confer an 'educational benefit [that is] merely… more than *de minimis*."[53] The Court rejected the Tenth Circuit's interpretation of the state's obligation under IDEA. Even if it is not reasonable to expect a child to achieve grade level performance,

> … [h]is educational program must be appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives… It cannot be the case that the Act typically aims for grade-level advancement for children with disabilities who can be educated in the regular classroom, but is satisfied with barely more than *de minimis* progress for those who cannot.[54]

---

[47] *Schaffer v. Weast*, 546 U.S. 49 (2005).
[48] 458 U.S. 176, 187 (1982).
[49] *Id*. at 189-90, 200
[50] *Id*. at 200.
[51] *Id*. at 203-04.
[52] *Endrew F. ex rel. Joseph F. v. Douglas County School District RE-1*, 137 S.Ct. 988 (2017).
[53] *Id*. at 997.
[54] *Id*. at 1000-01 (citations omitted).

In *Endrew*, the Supreme Court held that an IEP must be designed to produce more than minimal progress in a student's performance from year to year:

> When all is said and done, a student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to 'sitting idly… awaiting the time when they were old enough to drop out…' The IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."[55]

On March 21, 2020, the U.S. Department of Education ("DOE") issued a *Supplemental Fact Sheet Addressing the Risk of COVID-19 in Preschool, Elementary and Secondary Schools While Serving Children with Disabilities.*[56] The DOE provided the following guidance to school districts in *Questions and Answers on Providing Services to Children with Disabilities During a COVID-19 Outbreak*:

> If an LEA closes its schools to slow or stop the spread of COVID-19, and does not provide any educational services to the general student population, then an LEA would not be required to provide services to students with disabilities during that same period of time. Once school resumes, the LEA must make every effort to provide special education and related services to the child in accordance with the child's Individualized Education Program ("IEP") … If an LEA continues to provide educational opportunities to the general student population during a school closure, the school must ensure that students with disabilities also have equal access to the same opportunities, including the provision of FAPE…[57] SEAs, LEAs, and school must ensure that, to the greatest extent possible, each student with a disability can be provided the special education and related services identified in the student's IEP developed under IDEA, or a plan developed under Section 504…[58]

> If a public school for children with disabilities is closed solely because the children are at high risk of severe illness and death, the LEA must determine whether each dismissed child could benefit from online or virtual instruction, instructional telephone calls, and other curriculum-based instructional activities, to the extent available. In so doing, school personnel should follow appropriate health guidelines to assess and address the risk of transmission in the provision of such services… If a child does not receive services during a closure, a child's IEP team… must make an individualized determination whether and to what extent compensatory services may be needed, consistent

---

[55] 137 S.Ct. at 1000-01.
[56] P28:1 (278).
[57] P29:2 (284).
[58] *Id.*, *citing*, 34 C.F.R §300.101 and 300.201 (IDEA), and 34 C.F.R. §10§4.33 (Section 504)).

with applicable requirements, including to make up for any skills that may have been lost.[59]

OSSE issued the *IDEA, Part B Provision of FAPE: Guidance Related to Remote and Blended Learning.* ("*OSSE Guidance*") on July 21, 2020.[60] The *Guidance* was issued to address the school system's response to the pandemic. The *Guidance* noted that the pandemic had caused school closures, but assured parents that "An LEA continues to have the obligation to provide FAPE to a student with a disability during extended closures resulting in distance or blended-learning models arising from a local or national emergency. LEAs should continue to provide, to the greatest extent possible, the special education and related services identified in students' individualized education programs (IEPs) and any needed modifications or alternatives to make the curriculum and services accessible to students with disabilities. LEAs should continue to consider the availability of remote learning materials through multiple modalities…[61]

DCPS issued a *Special Education Programs & Resources Guide for Families* ("*Resources Guide*") for School Year 2020-2021.[62] The *Guide* cited the *OSSE Guidance*[63] and provided, *inter alia*, the following:

**School Year 20-21 Shifts Due to Virtual Learning**
What does and does not change as a result of virtual learning?

DCPS will continue to provide supports and services to students with disabilities during virtual learning. We will continue to find children eligible for IEP supports and services, conduct assessments and evaluations and provide regular progress reports. Special education teachers and related service providers will continue to provide instruction and intervention, and implement each child's IEP.[64]

Then, on August 31, 2020, School A's principal notified the School A student body that "All Students will have access to a DOC-provided tablet when available for virtual instruction."[65]

To meet its obligations to Student under IDEA, DCPS developed an IEP on September 10, 2019, the appropriateness of which is not in dispute. As was documented in paragraph three above, up until the 2019-20 school year, student was making satisfactory progress, and was advancing from grade to grade. The IEP Team prescribed 10 hours per week of specialized instruction outside of general education, three hours per month of behavioral support services ("BSS"), thirty minutes per month of speech-language consultation series, and thirty minutes per month of transition services.

[59] *Id*. at 4 (286).
[60] P26:1 (244).
[61] *Id*. at 4 (247).
[62] P30:1 (292).
[63] *Id*. at 6 (297).
[64] *Id*. at 4 (295).
[65] P25:5 (233).

The only issue to be determined is whether the work packets DCPS distributed to Student beginning in March 2020 satisfied its obligation to provide 10 hours per week of specialized instruction outside of general education, three hours per month of behavioral support services ("BSS"), thirty minutes per month of speech-language consultation series, and thirty minutes per month of transition services. Neither DCPS nor OSSE asserted that the pandemic absolved them of their obligations under IDEA, though DCPS argued that DOC's rules "prevent DCPS from implementing Student's IEP as written."[66] The DOE guidance was clear that once schools reopened, school districts were obligated to provide disabled students services commensurate with general education students, and that IEPs should be implemented "to the greatest extent possible," language identical to that of OSSE in its *Guidance*. From the *OSSE Guidance*, DCPS' *Resources Guide*, and Witness F's August 31, 2020 correspondence, it is apparent that DCPS believed that virtual instruction was the appropriate methodology to provide services to its disabled population, including specialized instruction. However, for students at School A, this methodology was abandoned no later than March 17, 2020, when DCPS informed Attorney A that DCPS would use work packets to provide service to Student.

Instead, DCPS implemented a plan to provide Student and all students in School A work packets every other week. These packets would be prepared by each of the students' teachers, the students would complete assignments in the work packets, and the students would then turn them in two weeks later when new packets would be delivered. The record reveals that there was minimal interaction between Student and her/his teachers. As previously discussed, DCPS teachers are prohibited from providing in-person instruction due to the Mayor's COVID-19 restrictions. However, some teachers have volunteered to visit School A students to deliver work packets and to have conversations of no more than one hour with each student.

According to the DOE guidance, once DCPS implemented COVID-19 restrictions, it had an obligation to "ensure that students with disabilities also have equal access to the same opportunities." DCPS' plan for providing services during the pandemic was to provide virtual instruction. The record does not include specific documentation of the implementation of virtual instruction throughout DCPS' general education environment. However, the July 21, 2020 *OSSE Guidance* indicated that services during school closures would continue to be provided through "distance or blended-learning" modalities. DCPS explicitly specified virtual instruction as the preferred modality in the DCPS *Resources Guide* and in Witness F's August 31, 2020 correspondence to the students in School A.

DCPS argued that the U.S. District Court for the District of Columbia ordered DOC to take measures to ensure the health and safety of residents and staff at D.C. Jail during the pandemic that precluded its ability to provide more intensive services to Student.[67] The court ordered DOC to "reduce the extent to which common spaces encourages to congregate in close quarters" and to "consistently apply their stated policy of allowing no more than small groups of inmates out of their cells at any given time."[68] DOC apparently determined that it could best meet these mandates by imposing a 23-hour per day lockdown. Thus, this policy

---

[66] *DCPS Closing Statement* at 7.
[67] *DCPS Closing Statement* at 4 and 7; *Banks v. Booth*, Civil Action No. 20-849 (CKK) (D.D.C. April 19, 2020).
[68] *DCPS Closing Statement* at 4.

was devised and implemented by DOC, and was not specifically ordered by the court. Moreover, DOC's policy regarding internet access appears to be totally unrelated to the issues of unsafe conditions in the inmate population due to COVID-19 that were the subject of the dispute in *Banks*. As such, under the MOA, the opportunity existed for OSSE and DCPS to negotiate an exception to DOC's rules to facilitate DCPS' obligation to provide education to eligible inmates and detainees.

DCPS' consistent policy for Student's age group since the inception of COVID-19 restrictions has been to close its facilities and provide instruction remotely. DCPS argues that it is precluded from offering instruction remotely in School A due to DOC's policies over which it has no control and as to which it has no influence to change. This ignores DOC's obligation under the MOA to "work collaboratively with DCPS to ensure the provision of services to eligible pretrial detainees and/or sentenced inmates housed at DOC facilities and attending [School A] pursuant to their IEPs."

DCPS described its response to DOC's policies as follows:

In the Spring of 2020 DCPS engaged in conversations with DOC regarding the provision of virtual instruction to [School A] students. Testimony of [Witness F]. It was made clear that DCPS would not be permitted to provide technological devices to students. *Id*. DOC offered to provide agency issued and approved tablets. Testimony of [Witnesses D and F]. The tablets had to be ordered and were not available to students until they arrived in the fall of 2020. Id.[69]

Thus, DCPS concedes that it discussed with DOC the impact its policies would have on DCPS' ability to provide education services to inmates and detainees, but when DOC "made clear" it would not relent on technological issues, likely access to the internet, DCPS immediately accepted this decision and elected, no later than March 17, 2020, to provide instruction to School A students through work packets. The record indicates that work packets were first delivered on or about March 30, 2020, two weeks after DCPS imposed restrictions. Witness D testified that DOC offered DCPS the use of tablets used by School B inmates and detainees, but DCPS expressed a preference for a "paper-base" solution. DCPS offered no testimony that it ever objected to DOC's restrictions pursuant to the MOA's Resolution of Disputes provision that requires the parties to work cooperatively to resolve any disputes, and to escalate matters that cannot be resolved to the City Administrator. DCPS also did not offer evidence that it advised OSSE that DOC's policies would prevent DCPS from providing virtual instruction to School A students. The failure to object to DOC's policies, and the failure to advise OSSE that it could not provide instruction remotely, suggests that DCPS believed that the work packets were a satisfactory alternative to remote instruction.

If DCPS believed that virtual instruction was a requirement for appropriate delivery of services, it was obligated "to the greatest extent possible" to challenge DOC's internet restrictions. Moreover, the record indicates that DCPS turned down DOC's offer of tablets that apparently allow students in School B to interact with their teachers. As of the time of

_____

[69] *DCPS Closing Statement* at 3-4.

the hearing, and contrary to the assurance in Witness F's August 31, 2020 correspondence to School A students, Student had not been provided a tablet that could facilitate virtual instruction.

Caselaw in this jurisdiction confirms that LEAs are not absolved of their FAPE obligations when IDEA-eligible student are incarcerated and beyond LEA control. In *Brown v. District of Columbia*,[70] the plaintiff was an IDEA-eligible, District of Columbia student who was incarcerated by the U.S. Bureau of Prisons ("BOP") in Hazleton, West Virginia. Like the student herein, Brown's IEP called for ten hours of specialized instruction. However, during his tenure with the BOP, Brown received no special education services. Brown filed a Due Process Complaint against DCPS, OSSE, and the BOP alleging a denial of FAPE for the failure to provide the prescribed services. The Hearing Officer dismissed BOP for lack of jurisdiction, because IDEA applies only to state education agencies. The Hearing Officer then dismissed the claims against DCPS and OSSE, ruling that IDEA imposes no FAPE responsibilities on SEAs and LEAs for individuals incarcerated in federal correctional facilities. On appeal, the District argued that under IDEA, it is "required to ensure that its *own* facilities comply with the IDEA,"[71] but it has no authority over the BOP. The court ruled that despite a provision in the National Capitol Revitalization and Self Government Improvement Act of 1997[72] making the BOP responsible for the education of individuals in its custody, "there is no basis for concluding that the Revitalization Act impliedly repeals, or, in the District's words, 'carve[s] out' an exception to the District's obligations under IDEA."[73] The court reasoned that such would occur only if there were an "irreconcilable conflict" between IDEA and the Revitalization Act. It stated that the two statutes could co-exist as to the provision of special education services, because the District could meet its obligation under IDEA by a "funding agreement with a contractor to BOP to provide [the] FAPE, or post-incarceration compensatory education services… These pragmatic solutions undermine the District's bald assertion that fulfilling its IDEA obligations in this circumstance would be impracticable."[74]

The District requested reconsideration of this decision arguing that, (1) § 1415(k)(6) of IDEA precludes the court's interpretation "because the Court's interpretation would… conflict with the legitimate law enforcement aims of the BOP and the Superior Court… (2) the Court misconstrued the District's argument as positing that the Revitalization Act impliedly repealed the IDEA as applied to D.C. felons incarcerated by the BOP… and (3) in any event, the Revitalization Act did, in fact, shift responsibility from the District to the BOP for the education of D.C. felons incarcerated by the BOP…"[75] The court denied reconsideration, reiterating that there was no irreconcilable conflict between IDEA and the Revitalization Act. The court's interpretation of IDEA "imposes an obligation on *the District* to work with the BOP to provide qualifying individuals a FAPE and, if that is not possible, to provide compensatory education post-incarceration or other appropriate benefits."[76] Just as DCPS here notes the impact of DOC's no-internet policy on the provision of virtual

---

[70] 324 F.Supp.3d 154 (D.D.C. 2018).
[71] 20 U.S.C. §1412(a)(11)(C).
[72] Pub. L. No. 10§5-33, §11201, 111 Stat. 251, 734 (1997).
[73] 324 F.Supp.3d at 160-61.
[74] *Id*. at 162.
[75] *Brown v. District of Columbia*, Civil Action No. 17-348, 2019 WL 1924245 at 1 (D.D.C. April 30, 2019).
[76] *Id*. at 4.

instruction, in *Brown,* the District complained that BOP's telephone restrictions on inmates would preclude inmates' participation in IEP Team meetings. And just as there is no evidence that DCPS ever sought an exception to the no-internet policy in the instant matter, "the District provides no evidence that the BOP would refuse to provide any accommodations to those who qualify for special education service under the IDEA… In any event, nothing in §1415(k)(6) or in any other provision of law that the District cites precludes the District from making efforts to work cooperatively with the BOP to provide children with disabilities who are serving D.C. sentences with the benefits to which they are entitled under IDEA and, if necessary, from providing incarcerated children compensatory education after they are released."[77]

The District relied on *Hester v. District of Columbia*,[78] in the *Brown* litigation. Hester was an IDEA-eligible District student incarcerated in a Maryland prison. Hester filed a Due Process Complaint to ensure special education services during his incarceration. The parties reached a settlement in which DCPS agreed to fund services by a contractor. However, once Hester was incarcerated, Maryland prison officials denied the contractor access to prison facilities. Instead, Maryland assumed responsibility for Hester's education. Hester sued for compensatory education services for the District's failure to provide services to him while he was incarcerated, despite receiving such services from Maryland. The Hearing Officer ruled that the District did not breach the settlement agreement. On appeal, the district court reversed in favor of Hester. On appeal to the D.C. Circuit, the Court agreed with the Hearing Officer that "Because Maryland officials made it impracticable for D.C. to provide special education services in the prison, D.C. did not breach its 2001 agreement with Hester: 'Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.'"[79] The Court ruled that the District's efforts to secure the contractor's access "went well beyond what the agreement required, albeit ultimately to no avail… the Maryland officials repeatedly and definitively stated that D.C.'s designated education providers would not be allowed into the prison, in part because of security concerns."[80]

*Hester* is distinguishable because DCPS did all it could "to the greatest extent possible" to comply with the settlement agreement. The parties had agreed that the District's obligation would be fulfilled through a contractor. Despite the District's best efforts, that contractor was not allowed access to the prison to provide the services. Thus, the issue was whether the District fulfilled its obligations under the contract. First, in *Hester*, the prison was operated by another state. Here, there is one government involved and there is an interagency agreement that provides for dispute resolution.  Second, the D.C. Circuit found that in *Hester*, the District made concerted efforts to gain access for the contractors. Here, there is no evidence that DCPS raised any objection or requested exception to DOC's rules and regulations that impaired the provision of special education services, pursuant to the MOA's provision on Dispute Resolution. Third, Maryland provided Hester special education

---

[77] *Id.*
[78] 505 F.3d 1283 (D.C. Cir. 2007).
[79] *Id*. at 1286, citing RESTATEMENT (SECOND) OF CONTRACTS § 264.
[80] 505 F.3d. at 1287.

services throughout his incarceration. Here, Petitioner alleges that s/he has not had appropriate services since March 24, 2020. Fourth, the *Brown* court distinguished *Hester*, noting that the District's unsuccessful effort to gain access in Maryland would have "no bearing, however, on whether *the BOP* will permit the District access to D.C. offenders like Brown. In any event, the decision does not excuse the District from attempting to work with the BOP to provide special education services."[81] Here, DCPS had the advantage of operating within the same government as DOC, rather than the State of Maryland or the U.S. BOP, under an MOA that would permit disputes between agencies to be resolved in the Mayor's office. DCPS either believed that work packets satisfied their obligation to provide specialized instruction, or that it did not want insist on its rights under the MOA: negotiations with DOC to ensure a technological solution to its obligation to provide virtual instruction. If DCPS could not avoid its obligation to provide FAPE to inmates in federal and Maryland prison facilities, it certainly cannot escape responsibility for incarcerated eligible students in the District's facilities.

The record is clear that Petitioner has not received specialized instruction or related services since the inception of COVID-19 restrictions. Based on DCPS' *Resource Guide*, the *OSSE Guidance*, and School A's August 31, 2020 correspondence, DCPS' policy was to provide virtual instruction to meet the needs of its disabled population. Work packets, delivered every other week, with no scheduled interaction with any teacher, do not constitute specialized instruction or virtual instruction. Moreover, Witness D conceded that since the inception of restrictions, Student received only five of the work packets that were to be delivered every other week. There is also no evidence that Student has received more than one visit from her/his social worker since March 2020 that could be interpreted as BSS. Therefore, I conclude that Petitioner has met his/her burden of proving that DCPS failed to implement his/her IEP since March 16, 2020. [82]

> **Whether DCPS provided Student a Prior Written Notice detailing and justifying the proposed change in placement that was implemented after the inception of COVID-19 restrictions on March 24, 2020.**

The failure to provide Student a Prior Written Notice ("PWN") constitutes a procedural violation. A recovery for such a violation requires a showing of educational harm. In matters alleging a procedural violation, a Hearing Officer may find that a child did not receive a FAPE only if the procedural inadequacies (i) impeded the child's right to a FAPE; (ii) significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or (iii) caused a deprivation of educational benefit.[83] In other words, an IDEA claim is viable only if those procedural violations affected the child's substantive rights.[84]

---

[81] 2019 WL 19242452019 WL 1924245 at 6, n.1.

[82] DCPS offered no evidence of the date virtual instruction was first initiated in its general education population once schools were closed on March 16, 2020.

[83] 34 C.F.R. §300.513(a).

[84] *Brown v. District of Columbia*, 179 F. Supp. 3d 15, 25-26 (D.D.C. 2016), quoting *N.S. ex rel. Stein v. Dist. of Columbia*, 709 F. Supp. 2d 57, 67 (D.D.C. 2010).

The regulations require an LEA to provide written notice a reasonable time before the public agency proposes to initiate or change the educational placement of the child or the provision of FAPE to the child.[85] DCPS concedes that it did not issue a PWN when schools were closed, thereby changing the provision of FAPE to Student. DCPS argues that such notice was unnecessary, as school closures were common knowledge once the Mayor imposed pandemic restrictions. "Despite DCPS not being afforded the opportunity to issue a PWN before the abrupt school closure, Student was on notice immediately following the issuance of the public health emergency."[86]

In this case, DCPS changed its delivery of FAPE when it began delivering work packets to Petitioner in March 2020. Under his/her unique circumstances, being an inmate, on 23-hour lockdown, with no internet access, and no cell phone access, Petitioner was at a distinct disadvantage in advocating his rights under IDEA. However, s/he did not suffer any additional educational harm as a result of DCPS' failure to issue a PWN. The educational harm, discussed in the previous section, was DCPS' failure to provide the specialized instruction and related services prescribed in Petitioner's IEP. Issuing Petitioner a PWN, giving him/her advance notice of its intent to use work packets to provide specialized instruction and related services, would have had no effect on DCPS' decision, as its decision was made unilaterally, not in an IEP Team meeting convened specifically for Petitioner. Therefore, while I find that DCPS violated its obligation to issue a PWN reflecting the change in the delivery of FAPE, Petitioner suffered no additional educational harm as a result.

### Whether OSSE monitored and provided appropriate oversight of DCPS' provision of special education services in School A.

Under local law, OSSE is the designated State Education Agency ("SEA"):

All operational authority for state-level functions, except that delegated to the State Board of Education in §38-2652, shall vest in the Office of the State Superintendent of Education under the supervision of the State Superintendent of Education.[87]

The Office of the State Superintendent of Education shall serve as the state education agency and perform the functions of a state education agency for the District of Columbia under applicable federal law, including grant-making, oversight, and state educational agency functions for standards, assessments, and federal accountability requirements for elementary and secondary education.[88]

Under IDEA, SEAs are responsible for ensuring local education agency ("LEA") compliance with IDEA.[89] This means ensuring "that FAPE is available to any individual child

---

[85] 34 C.F.R. §300.503(a)(1).
[86] *DCPS Closing Statement* at 9.
[87] D.C. Code §38-2601(d).
[88] D.C. Code §38-2601.01.
[89] 20 U.S.C. §1412(a)(11)(A). *See also,* 34 C.F.R. §300.149(a) and (b).

with a disability who needs special education and related services, even though the child has not failed or been retained in a course or grade, and is advancing grade to grade."[90]

**(g)** Direct services by the State educational agency
**(1)** In general
A State educational agency shall use the payments that would otherwise have been available to a local educational agency or to a State agency to provide special education and related services directly to children with disabilities residing in the area served by that local educational agency, or for whom that State agency is responsible, if the State educational agency determines that the local educational agency or State agency, as the case may be--
(A) has not provided the information needed to establish the eligibility of such local educational agency or State agency under this section;
(B) is unable to establish and maintain programs of free appropriate public education that meet the requirements of subsection (a);
(C) is unable or unwilling to be consolidated with 1 or more local educational agencies in order to establish and maintain such programs; or
(D) has 1 or more children with disabilities who can best be served by a regional or State program or service delivery system designed to meet the needs of such children.
(2) **Manner and location of education and services**
The State educational agency may provide special education and related services under paragraph (1) in such manner and at such locations (including regional or State centers) as the State educational agency considers appropriate. Such education and services shall be provided in accordance with this subchapter.[91]

Each state must ensure that FAPE is available to every child who needs special education.[92]

The primary focus of the State's monitoring activities must be on—
(1) Improving educational results and functional outcomes for all children with disabilities; and
(2) Ensuring that public agencies meet the program requirements under Part B of the Act, with a particular emphasis on those requirements that are most closely related to improving educational results for children with disabilities.[93]

The statute specifies that its protections apply to children with disabilities who are convicted as adults and are incarcerated in adult prisons.[94]

OSSE argues that under local law and regulations, DCPS, as the local education agency ("LEA"), is responsible for providing FAPE to eligible students.[95] However, if DCPS

---

[90] 34 C.F.R. §300.101(c)(2).
[91] 20 U.S.C. §1413(g).
[92] 34 C.F.R. §300.101(c)(1).
[93] 34 C.F.R. §300.600(b).
[94] 20 U.S.C. §1412(a)(11)(C).
[95] 5E DCMR §§3011.1 and 3013.1.

determines that it is unable to implement a student's IEP, it is required to notify OSSE, which is then required to cooperate with the LEA to resolve the matter:

> If an LEA anticipates that it may be unable to implement a student's IEP or provide a student with an appropriate special education placement in accordance with the IDEA and other applicable laws or regulations, the LEA shall notify OSSE. Subject to its policies for placement review, OSSE shall cooperate with the LEA to provide a placement in a more restrictive setting in conformity with the IDEA, and any other applicable laws or regulations.[96]

OSSE argues that none of the criteria required under IDEA for an SEA to be required to perform LEA functions exist in this case.[97] However, IDEA requires an SEA to intercede if the LEA "is unable to establish and maintain programs of free appropriate public education that meet the requirements of …[IDEA]."[98] OSSE's argument ignores the fact under the MOA, it committed to schedule meetings with DCPS and DOC as needed, to discuss the delivery of special education services and coordination of activities consistent with the MOA, and to take appropriate action, as needed, when issues arise with regard to special education service delivery at DOC facilities, if a matter is not resolved by DCPS and DOC. Thus, OSSE committed to taking an active role in ensuring DCPS' compliance with IDEA within DOC facilities. Nevertheless, OSSE offered no documentary or testimonial evidence of any involvement on its part to ensure DCPS' provision of FAPE within DOC. DCPS offered no evidence that it notified OSSE that it was unable to provide remote instruction to Student. Thus, there is no evidence that OSSE ever monitored the provision of FAPE within DOC facilities once DCPS imposed COVID-19 restrictions by converting to virtual instruction. Nevertheless, OSSE was put on notice of the alleged denial of FAPE no later than August 20, 2020 by Petitioner's counsel letter objecting to DCPS' use of work packets and its failure to provide virtual instruction to School A students.

In *D.L. v. District of Columbia*,[99] the court favorably cited language from *Cordero by Bates v. Pennsylvania Department of Education*,[100] rejecting the state agency's argument that its duty was adequately discharged by "providing funds, promulgating regulations and reviewing individual complaints:"

> As defined by the IDEA, the state's role amounts to more than creating and publishing some procedures and then waiting for the phone to ring. The IDEA imposes on the state an overarching responsibility to ensure that the rights created by the statute are protected, regardless of the actions of local school districts.... The state must assure that in fact the requirements of the IDEA are being fulfilled.[101]

---

[96] 5E DCMR §3011.2.
[97] 20 U.S.C. §1413(g)(1); 34 C.F.R. §300.227(a).
[98] 20 U.S.C. §1413(g)(1)(B).
[99] 194 F.Supp.3d 30 (D.D.C. 2016), *affirmed*, 860 F.3d 713 (D.C. Cir. 2017).
[100] 795 F.Supp. 1352, 1361-62 (M.D. Pa. 1992).
[101] 194 F.Supp.3d at 84.

Here, OSSE offered no evidence that it performed even the minimal monitoring and supervising functions that it concedes are its responsibility. OSSE offered no testimonial evidence during the hearing. It disclosed eleven exhibits, but none of those exhibits indicate OSSE ever monitored the provision of services within DOC facilities once COVID-19 restrictions were imposed. If OSSE responded to Petitioner's counsel's letter of August 20, 2020, complaining of undifferentiated work packets and a lack of virtual instruction, it did not disclose its response in this proceeding. The only evidence of even an attempt to monitor is its letter to DCPS on September 11, 2020, six months after the imposition of restrictions, indicating its plan to conduct a "desktop review of student files" at School A beginning on November 16, 2020.

I conclude that Petitioner has met his/her burden of proving that OSSE has failed to meet its obligation to ensure DCPS' compliance with IDEA within School A by failing to exert its authority to monitor and supervise DCPS' compliance with IDEA within School A,[102] and by failing to intervene upon notice of an alleged failure of DCPS to provide appropriate special education services within School A.[103]

**Whether DCPS denied all special education students attending School A a FAPE by failing to implement their IEPs and by not providing them devices to access virtual instruction and services.**

**Whether DCPS and OSSE violated the Rehabilitation Act by failing to provide specialized instruction to Student.**

The Hearing Officer notified Petitioner during the prehearing conference that the Hearing Officer did not believe he had the authority under IDEA to adjudicate claims of systemic violations within DOC or claims under the Rehabilitation Act. I invited counsel to file a memorandum of points and authorities supporting my jurisdiction, which they did on November 19, 2020. OSSE addressed these issues in its *Motion to Dismiss*, filed on November 20, 2020.

IDEA authorizes parents to file Due Process Complaints to vindicate the rights of their own children under IDEA.[104] Nothing in Section 1415(b) authorizes a parent to seek relief for other than his or her own child. The regulations provide that "A parent or a public agency may file a due process complaint on any of the matters described in §300.503(a)(1) and (2) (relating to the identification, evaluation or educational placement of a child with a disability, or the provision of FAPE to the child)."[105] In *Easter v. District of Columbia*,[106] the court stated that systemic claims are "…precisely the type of issue that cannot be addressed on a student-by-student basis during Due Process Hearings, but is better addressed by seeking injunctive relief in federal court…"[107]

---

[102] 34 C.F.R. §300.600(b).
[103] 20 U.S.C. §1413(g)(1)(B).
[104] 20 U.S.C. § 1415(b).
[105] 34 C.F.R. §300.507(a)(1).
[106] 128 F.Supp.3d 173 (D.D.C. 2015).
[107] *Id*. at 178. *See also*, 34 C.F.R. §300.513(a)(1): "Subject to paragraph (a)(2) of this section, a hearing officer's determination of whether *a child* received FAPE must be based on substantive grounds," (emphasis added), and

As for the Rehabilitation Act, due process complaints are authorized for IDEA claims by 20 U.S.C. Section 1415(c)(2). Nothing in that provision authorizes claims under the Rehabilitation Act. Under IDEA, a parent may file a Due Process Complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."[108]

In his/her *Memorandum of Points and Authorities*, Petitioner cites *D.L. v. District of Columbia*,[109] in support of her/his Rehabilitation Act claims. However, the cited language in *D.L.* addresses the jurisdiction of the district court, not that of the Hearing Officer.[110] The Rehabilitation Act concerns the denial of access to any program or activity receiving federal assistance to a disabled person due to his or her disability. Petitioner was not denied access to a federally funded program due to her/his disability. Rather, s/he complains that the special education program in which s/he was enrolled *on account of her/his disability*, School A, did not provide adequate services. The validity of such claims, whether IDEA was properly followed in that program, is properly adjudicated under IDEA, not the Rehabilitation Act. I do not dispute Petitioner's need to exhaust her/his administrative remedy to preserve her/his right to present a Rehabilitation Act claim in federal court. However, the passage cited in Petitioner's *Memorandum* from *S.S. v. District of Columbia*[111] resolves this issue at this level: "… *[e]ven if a DCPS IDEA hearing officer does not have jurisdiction over an actual Section 504 claim,* the allegations related to a Section 504 claim still need to be raised before the IDEA hearing officer to the extent that they relate unmistakably to the evaluation and placement of the student.[112]

For these reasons, I informed the parties that I would not adjudicate class claims or claims under Section 504 of the Rehabilitation Act.

## RELIEF

For relief, Petitioner requested, *inter alia*:

1. Order DCPS and/or OSSE to provide Student access to in-person or live virtual specialized instruction by certified special education teachers;

2. Order DCPS and/or OSSE to provide Student access to in-person or live virtual related services "in a confidential space."

3. Order Respondents to provide any and all technology necessary to provide a FAPE and to correct any forthcoming issues with technology within two business days;

---

34 C.F.R. §300.507(a)(1): (1) A parent or a public agency may file a due process complaint on any of the matters described in § 300.503(a)(1) and (2) (relating to the identification, evaluation or educational placement of *a child* with a disability, or the provision of FAPE to *the child*). (emphasis added)
[108] 20 U.S.C. §1415(b)(6)(A); see also, 34 C.F.R. §300.507(a)(1).
[109] 194 F.Supp.3d 30 (D.D.C. 2016).
[110] *Id.* at 95-96.
[111] 71 F.Supp.3d 1 (D.D.C. 2014).
[112] *Id.* at 12, emphasis added, *citing M.T.V. v. DeKalb County School District,* 446 F.3d 1153, 1159 (11th Cir. 2017).

4.  Extend Student's special education eligibility for one year;

5.  Order an award of compensatory education services including tutoring, behavioral support services, and speech pathology;

6.  Systemic relief to address FAPE violations for all other students who are similarly situated to Student in including (1) a written plan for all students at School A including a description of how education will be provided during distance learning; (2) in-person or live virtual specialized instruction from certified special education teachers "in a confidential space;" (3) any and all technology necessary to provide a FAPE and to correct any forthcoming issues with technology within two business days; (4) an award of compensatory education services including tutoring and related services, (5) an order to hire a distance learning coordinator for School A students; (6) an order for Respondents to hire educational aides "for [School A] students who are designated as essential employees," (7) order OSSE to maintain oversight to ensure compliance with these requirements and require corresponding reporting by Respondent DCPS; and (8) order Respondents to hold quarterly meetings with incarcerated students to present educational plans and receive feedback on distance learning; and

7.  An award of attorneys' fees and expenses.

The *Brown* decision established that DCPS' inability to provide services in prison facilities due to rules beyond its control do not absolve its obligations to its disabled students in those institutions. If it is unable to negotiate a solution that allows it to provide appropriate services, DCPS must provide compensatory education post-incarceration or other appropriate benefits. To that end, I have adopted aspects of Witness C's proposed compensatory education plan. Witness C's testimony was credible due to his 20 years of professional experience providing educational services.

## ORDER

Upon consideration of the *Complaint, DCPS' Response, the OSSE Response, Petitioner's Memorandum of Points and Authorities in Support of the Hearing Officer's Jurisdiction to Adjudicate Systemic IDEA Claims and Section 504 Rehabilitation Act Claims, Office of the State Superintendent of Education's Motion to Dismiss Complaint, Petitioner's Opposition to Office of the State Superintendent of Education's Motion to Dismiss Complaint, Petitioner's Closing Brief, OSSE Closing Statement, DCPS Closing Statement,* the exhibits from the parties' disclosures that were admitted into evidence, and the testimony presented during the hearing, it is hereby

**ORDERED,** that

(1) DCPS shall fund 200 hours of independent tutoring in mathematics, reading, and/or written expression and 15 hours of independent BSS.  There is no deadline by which these services may be secured, and there is no limitation as to the time of day services may be provided;

(2) Petitioner's eligibility for special education services under IDEA is extended by one year beyond the statutory limitation;

(3) Within fifteen (15) days of the issuance of this Order, DCPS and OSSE shall initiate negotiations with DOC pursuant to the MOA to facilitate virtual instruction for Student within School A. In the event that DCPS and OSSE exhaust remedies under the MOA to reach a satisfactory resolution with DOC within sixty (60) days of the issuance of this Order, DCPS shall convene a Multidisciplinary Team meeting within thirty (30) days thereafter to determine appropriate compensatory education services, in addition to those awarded herein, for the continuing failure to provide the specializes instruction prescribed in Student's IEP.

(4) The OSSE *Motion to Dismiss* is **DENIED**.

## APPEAL RIGHTS

This decision is final except that either party aggrieved by the decision of the Impartial Hearing Officer shall have ninety (90) days from the date this decision is issued to file a civil action, with respect to the issues presented in the due process hearing, in a district court of the United States or the Superior Court of the District of Columbia as provided in 34 C.F.R. §303.448 (b).

*Terry Michael Banks*
Terry Michael Banks
Hearing Officer

Date: January 11, 2021

Copies to:    Attorney A
               Attorney B
               Attorney C
               OSSE Office of Dispute Resolution
               OSSE Division of Specialized Education
               Nicholas Weiler/DCPS
               Josh Wayne/DCPS

**APPEDIX**

**Parties:**

Student/Petitioner: ███ ████
X years old: █ ███ ███
Gender: ███

**Counsel:**

Attorney A: Rachel Russo, Esquire, Attorney for Petitioner
Attorney B: Ifetayo Belle, Esquire, Attorney for Petitioner
Attorney C: Maya L. Washington, Esquire, Attorney for Respondent

**Schools:**

School A: Inspiring Youth Program ("IYP")
School B: Youth Service Center ("YSC")

**Grade:**

Grade A: Kindergarten
Grade B: 1st Grade
Grace C: 2nd Grade
Grade D: 3rd Grade
Grade E: 4th Grade
Grade F: 5th Grade
Grade G: 6th Grade
Grade H: 7th Grade
Grade I : 8th Grade
Grade J: 9th Grade
Grade K: 10th Grade
Grade L: 11th Grade
Grade M: 12th Grade

**Witnesses:**

Witness A: Joseph Calvin Brojomohun-Gagnon, Ph.D.
Witness B: Sara Boyd, Ph.D., Clinical Psychologist
Witness C: Joshua Jay Michney, Owner, Educational Solutions
Witness D: Dr. Amy K. Lopez, Deputy Director, D.C. Department of Corrections
Witness E: Tarisai Lumumba-Umoja, Special Education Coordinator, IYP
Witness F: Dr. Tanya Roane, Principal, IYP

**Teachers:**

Teacher A: Mr. Ryan Alexander, IYP
Teacher B: Mr. Eppy, IYP

**Examiners:**

Examiner A: Eric J. Lane, Psy.D.

**Other:**

Assistant Principal A: Raymond Cummings, Jr., IYP
Education Administrator A: Ms. Tab, DOC Education Administrator
Social Worker A: Tina Allen, IYP
Facility A: Educational Solutions, LLC