UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHARLES H. AND ISRAEL F., on behalf of themselves and all others similarly situated,<br>        *Plaintiffs*,<br><br>   v.<br><br>THE DISTRICT OF COLUMBIA, *et al.*,<br><br>        *Defendants*. | Civil Action No. 1:21-cv-00997 (CJN) |

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**

**Table of Contents**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . ii

INTRODUCTION…………………………………………………………….. 1

INTEREST OF THE UNITED STATES………………………………………….. . .. . . . . . . 2

BACKGROUND……………………………………………….. . . . . . . . . . . . . . . . . . . .. . . . .3

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .…....4

    A. Students with Disabilities in Adult Correctional Facilities Are Entitled to Special Education and Related Services under the IDEA. . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . .4

    B. The Responsibility to Provide Special Education and Related Services Exists During the COVID-19 Pandemic. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1. State and Local Educational Agencies can use Federal IDEA Allocations to Support the Purchase of the Enhancements Necessary for Remote-based Instruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . …..9

        2. Special Education and Related Services Must Be Designed to Meet a Student's Unique Needs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        3. Compensatory Education May Be Required When A School District Denies Special Education and Related Services, Including During COVID-19. . . . . . . . . .12

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ... …….... 13

## Table of Authorities

**Cases**

*Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*,
   137 S. Ct. 988 (2017) .................................................................................................. 10

*Johnson v. D.C.*,
   962 F. Supp. 2d 263 (D.D.C. 2013) ............................................................................ 10

*Williams v. Conway*,
   236 F. Supp. 3d 554 (N.D.N.Y. 2017) ........................................................................ 11

*Buckley v. State Corr. Inst.-Pine Grove*,
   98 F. Supp. 3d 704 (M.D. Pa. 2015) ........................................................................... 11

*Handberry v. Thompson*,
   219 F. Supp. 2d 525 (S.D.N.Y. 2002) ........................................................................ 12

*Reid v. District of Columbia*,
   401 F. 3d 516 (D.C. Cir. 2005) ............................................................................ 12, 13

*Maine Sch. Admin. Dist. No. 35 v. R.*,
   321 F.3d 9 (1st Cir. 2003) ........................................................................................... 12

*G. v. Ft. Bragg Dependent Schs.*,
   343 F.3d 295 (4th Cir. 2003) ...................................................................................... 12

*Draper v. Atlanta Indep. Sch. Sys.*,
   518 F.3d 1275 (11th Cir. 2008) .................................................................................. 12

**Statutes**

20 U.S.C. §§ 1400–1482 ................................................................................................ 1, 5
29 U.S.C. § 794 ................................................................................................................... 1
42 U.S.C. § 12132 .............................................................................................................. 1
28 U.S.C. § 517 .................................................................................................................. 2
34 U.S.C. § 12601 .............................................................................................................. 2
42 U.S.C. § 1997 ................................................................................................................ 2
20 U.S.C. § 1401 ............................................................................................................ 4, 5
20 U.S.C. § 1412 .................................................................................................... 4, 8, 10
20 U.S.C. § 1400 ................................................................................................................ 6

**Regulations**

34 C.F.R. § 300.2 ............................................................................................................... 6
34 C.F.R. § 300.102 ........................................................................................................... 6

34 C.F.R. § 300.324 ............................................................................................................... 6

34 C.F.R. § 300.101 ............................................................................................................... 8

34 C.F.R. § 300.201 ............................................................................................................... 8

34 C.F.R. § 300.202 ............................................................................................................... 9

34 C.F.R. § 300.704 ............................................................................................................... 9

34 C.F.R. § 300.718 ............................................................................................................... 9

## I.     Introduction

The COVID-19 pandemic created undeniable challenges for school districts. Districts across the country faced challenges offering educational services while maintaining the safety of students and staff. Those challenges have been particularly acute in providing students with special education and related services under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400–1482. The Plaintiffs, students in the Inspiring Youth Program (IYP students) at the District of Columbia's Correctional Treatment Facility and the Central Detention Facility (collectively, the DC Jail), allege that the Defendants denied them the special education and related services that they are entitled to under the IDEA.[1] Specifically, the Plaintiffs allege that the Defendants stopped providing them with teacher-led instruction on March 14, 2020, and instead provided them with sporadic work packets that were difficult to understand and were presented without any instruction. In response, the Defendants assert that they provided special education and related services to the greatest extent possible during the pandemic. The Defendants acknowledge that internet service prohibitions and other structural concerns in the DC Jail impacted their ability to provide educational services, but argue that they individualized the work packets to address the educational needs of each student.

The United States submits this Statement of Interest to explain the protections afforded to students with disabilities by the IDEA and its implementing regulations. Specifically, state or local entities responsible for providing special education and related services to youth in correctional facilities must continue to do so to the greatest extent possible during the COVID-19

---

[1] The Plaintiffs also allege that denial of educational services constitutes a violation of the Americans with Disabilities Act (42 U.S.C. § 12132), Section 504 of the Rehabilitation Act (29 U.S.C. § 794(a)), and various District of Columbia statutes. This Statement of Interest addresses only Plaintiffs' IDEA claims. The United States' silence on other issues presented in this litigation is not intended to express any view or assessment of those issues.

1

pandemic, and the failure to provide those services where possible violates the IDEA. The United States does not opine on the weight to give each parties' alleged facts in this case, nor does it opine on the merits of the arguments made by the Plaintiffs or the Defendants.

## II.     Interest of the United States

The United States files this Statement of Interest pursuant to 28 U.S.C. § 517 (2012), which authorizes the Attorney General "to attend to the interests of the United States" in any case pending in federal court.[2] The United States enforces the IDEA for children with disabilities in juvenile and adult detention and correctional facilities pursuant to the Attorney General's authority under 34 U.S.C. § 12601 and the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 (CRIPA), and thus has an interest in ensuring the appropriate and consistent interpretation of the IDEA and its implementing regulations.[3] The United States also

---

[2] The full text of 28 U.S.C. § 517 is as follows: "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

[3] The United States has investigated violations of the IDEA and/or enforced IDEA remedies in agreements with other jurisdictions. For example, in our investigations, we have found reasonable cause to believe that juvenile justice facilities violated student's rights to special education services and related services under the IDEA. *See* Letter from Vanita Gupta to Phil Bryant & Jim Hood (Jan. 12, 2016), https://www.justice.gov/crt/file/812646/download; Letter from Thomas E. Perez to Mitch Daniels (Aug. 22, 2012), https://www.justice.gov/sites/default/files/crt/legacy/2012/08/23/pendleton_findings_8-22-12.pdf; Letter from Thomas E. Perez to Mitch Daniels (Jan. 10, 2010), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/Indianapolis_findlet_01-29-10.pdf. We also have entered Settlement Agreements requiring juvenile and adult facilities to comply with the IDEA. Settlement Agreement at 312-13, *United States v. Puerto Rico*, No. 94-cv-2080 (D.P.R. December 12, 1997), ECF No. 25; Settlement Agreement at 36, *United States v. Hinds County*, No. 3:16-cv-00489-WHB (S.D. Miss. July 19, 2016), ECF No. 8-1. The United States has also submitted Statements of Interest in cases involving the special education rights of youth in restrictive housing in both juvenile and adult correctional facilities. *See* Statement of Interest of the United States, *G.F. v. Contra Costa County*, Civ. No. 3:13-cv-03667 (N.D. Ca. Feb. 13, 2014); Statement of Interest of the United States, *H.C. v. Bradshaw*, Civ. No. 18-cv-80810 (S.D. Fl. Oct. 1, 2018).

has an interest in ensuring that the IDEA protections continue to apply during emergencies such as the COVID-19 pandemic. Accordingly, the United States believes that its views regarding the application of the IDEA to children with disabilities at the DC Jail during the COVID-19 pandemic will be of interest to the Court in resolving the IDEA issues presented in this case.

### III.    Background

Plaintiffs' Complaint alleges that during the COVID-19 pandemic the Defendants have violated their rights under the Individuals with Disabilities Education Act. Plaintiffs have filed a Motion for Preliminary Injunction requesting that Defendants immediately provide a free appropriate public education to all students in the IYP. They also request that this Court order the Defendants to immediately determine the IYP students' eligibility for compensatory education for services denied during the pandemic.

The named Plaintiffs, Charles H. and Israel F., are two IYP students. Both students receive special education and related services through Individualized Education Programs (IEPs). Charles H. has a specific learning disability and attention deficit/hyperactivity disorder that affects his progress in math and English. Charles H. IEP Pls.' Ex. 21, at 1–7. Charles H's IEP entitles him to 20 hours of specialized instruction outside the general education classroom per week, three hours of behavioral support services per month, and 30 minutes of speech language pathology intervention per month. Charles H. IEP Pls.' Ex. 21 at 14. Israel F. has an emotional disturbance disability that makes him easily distracted and makes it hard for him to focus on his schoolwork. Israel F. Decl. Pls.' Ex. 12 ¶ 5. Israel F.'s IEP entitles him to 26.5 hours per week of specialized instruction and two hours of behavioral support services per month. Israel F. Decl. Pls.' Ex. 12 ¶ 6. The members of the putative class include all students detained at the DC Jail as of March 24, 2020, or those who will be detained in the future, and

were, are, or will be, entitled to special education and related services and denied those services. Compl. ¶ 19.

The Defendants are three District of Columbia agencies that share responsibility for educating IYP students. Compl. ¶¶ 16–18. These agencies signed a memorandum of agreement that outlines their respective and joint responsibilities. MOA Pls.' Ex. 2. Defendant District of Columbia Public Schools (DCPS) is the local educational agency. Compl. ¶ 17. DCPS provides educational services to IYP youth, including special education and related services. MOA Pls.' Exh. 2 at 4–5. Defendant Office of the State Superintendent of Education (OSSE) is the state educational agency. Compl. ¶ 16. OSSE supervises all public schools to ensure that they comply with IDEA requirements. 20 U.S.C. § 1401 (32); MOA Pls.' Ex. 2 at 3. Defendant District of Columbia is a "state" within the meaning of the IDEA. *Id.* § 1401(31); Compl. ¶ 16. The District of Columbia receives federal special education funds and therefore must comply with the IDEA. *Id.* § 1412(a); Compl. ¶ 16. The Department of Corrections (DOC) is a District of Columbia agency and is responsible for operating the DC Jail. Compl. ¶ 16. DOC collaborates with the other Defendants to ensure the provision of education services to IYP youth. MOA Pls.' Ex. 2 at 6–7.

Plaintiffs allege that the Defendants have violated the IDEA by failing to provide them with a free appropriate public education during the pandemic. Compl. ¶¶ 11–12. The Plaintiffs assert that the Defendants used packet-based instruction (i.e., a collection of educational assignments and worksheets without accompanying teacher-led instruction) to satisfy the requirements of their IEPs, even while youth in DCPS community schools received teacher-led, virtual instruction. Compl. ¶¶ 63–69, 78–80; Pls.' Prelim. Injunct. Mem 17, 19. The Plaintiffs allege that the work packets do not address the goals or offer the services required in their IEPs.

Compl. ¶¶ 63–69, 78–80; Pls.' Prelim. Injunct. Mem. 17, 19. They also allege that the Defendants deliver the work packets sporadically. Charles H. Decl. 2 ¶10. For example, an administrative hearing officer concluded that Charles H. only received work packets five times during the 33-week period from March 13, 2020 through October 23, 2020. Hearing Officer Determ.10 ¶ 12–14 Pls' Ex. 25. The Plaintiffs also allege that the work packets are difficult to complete and there is no meaningful opportunity to ask questions and receive assistance from a teacher. Compl. ¶ 125; Pls.' Prelim. Injunct. Mem 19. They assert that they do not receive feedback after they turn in the work packets. Charles H. Decl. 2 Pls' Ex.15. As a result, they assert that many students do not turn in their work packets. Pls.' Prelim. Injunct. Mem. 21–22; Israel F. Decl. 3 ¶17 Pls' Ex. 12. The plaintiffs also allege that related services[4] have occurred sporadically during the pandemic. Compl. ¶ 63, 76, 89. Without this Court's intervention, the Plaintiffs allege that the IYP students will suffer irreparable educational and social-emotional harm. Pls.' Prelim. Injunct. Mem. 45.

   In response, the Defendants contend that they complied with the IDEA to the greatest extent possible during the COVID-19 pandemic. Defs.' Opp'n. Mem. 20. They acknowledge that they have a responsibility to provide special education and related services to eligible youth in the DC Jail, but they assert that a DOC policy that prevented internet access in the DC Jail precluded them from providing virtual instruction to the IYP students, as they provided for students enrolled in other DCPS schools during the pandemic. Defs.' Opp'n Mem. at 11, 17. They also assert that structural issues in the DC Jail prevented students from being able to use tablets to communicate with their teachers. Defs.' Opp'n. Mem. 8. Notwithstanding these

---

[4] Related services are "developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. §1401(26)(A). These services include "speech-language pathology," "psychological services," "physical and occupational therapy," "counseling services," and "medical services." *Id*.

5

limitations, the Defendants maintain that they individualized the IYP students' work packets to still provide the services required by the student's IEPs. Defs.' Opp'n. Mem. 6. In addition, the Defendants assert that there remains no further risk of irreparable harm because they have begun offering "limited in-person" instruction to IYP youth as of May 5, 2021. Defs.' Opp'n. Mem. 9.

## IV.   Discussion

### A. Students with Disabilities in Adult Correctional Facilities Are Entitled to Special Education and Related Services under the IDEA

Congress enacted the Individuals with Disabilities Education Act (IDEA) to ensure that students with disabilities have access to a "free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. §§ 1400(d)(1)(A) and 1412(a)(1)(A). The IDEA explicitly applies to "state and local juvenile and adult correctional facilities." 34 C.F.R. § 300.2(b)(1)(iv). [5] The Department of Education has emphasized that "[p]roviding the students with disabilities in [correctional] facilities the free appropriate public education (FAPE) to which they are entitled under the IDEA should facilitate their successful reentry into the school, community, and home, and enable them to ultimately lead successful adult lives." Office of Special Educ. and Rehab. Serv., U.S. Dep't of Educ. 1

---

[5] The IDEA provides certain limited exceptions for older youth and youth convicted as adults and incarcerated in adult prisons. For example, the IDEA allows the IEP team of a youth *convicted as an adult* and *incarcerated in an adult prison* to modify the student's IEP or placement if the State can demonstrate "a bona fide security or compelling penological interest that cannot otherwise be accommodated." 34 C.F.R. § 300.324(d)(2)(i). For this category of youth, the IDEA provides additional exceptions, including requirements regarding statewide or districtwide testing and requirements regarding transition planning if the youth will be incarcerated when their eligibility for such services ends. 34 C.F.R. § 300.324(d)(1)(i). The IDEA also provides exceptions for youth ages 18 through 21 incarcerated in adult correctional facilities if, prior to their placement at the adult correctional facility, the youth were not identified as having a disability and did not have an IEP, unless special education services are required by state law. *Id.* § 300.102(a)(2)(ii).

(Dec. 5, 2014), https://www2.ed.gov/policy/gen/guid/correctional-education/idea-letter.pdf.

Special education services can be especially important for students with disabilities in correctional facilities.[6] Youth with disabilities are overrepresented in correctional facilities, with an estimated thirty to eighty percent of incarcerated youth having disabilities, which is far higher than the approximately thirteen percent of youth with disabilities in public schools.[7] Compared to youth without disabilities, youth with disabilities in correctional facilities have poor education and employment outcomes after their release.[8] Quality educational services can be an important intervention that can enable youth to successfully transition to their communities with the tools and skills that they need to successfully pursue employment and continued educational opportunities, while decreasing the likelihood of recidivism.[9] Special education services for

---

[6] The term "correctional facilities" is used here to describe facilities housing students with disabilities, including juvenile and adult detention and correctional facilities.

[7] National Evaluation and Technical Assistance Center for Children and Youth Who Are Neglected, Delinquent, or At-Risk, *NDTAC Fact Sheet: Youth with Special Education Needs in Justice Settings* 1 (Dec. 2014), https://files.eric.ed.gov/fulltext/ED594440.pdf.

[8] *See* Michael Bullis et al., *The Importance of Getting Started Right: Further Examination of the Facility-to-Community Transition of Formerly Incarcerated Youth*, 38 J. SPECIAL ED. 80, 91 (2004), https://journals.sagepub.com/doi/pdf/10.1177/00224669040380020201; Matthew Saleh & LaWanda Cook, VOCATIONAL REHAB. YOUTH TECH. ASSISTANCE CENT. 2, 3 (2020), https://y-tac.org/wp-content/uploads/2020/06/YTAC-Serving-Justice-Involved-Youth-with-Disabilities.pdf; Heather Griller Clark et al., *Transition Toolkit 3.0: Meeting the Educational Needs of Youth Exposed to the Juvenile Justice System*, NAT'L EVALUATION TECH. ASSISTANCE CENT. CHILD. YOUTH NEGLECTED, DELINQ., AT-RISK, 6 (Dec. 1, 2016), https://www2.ed.gov/students/prep/juvenile-justice-transition/transition-toolkit-3.pdf.

[9] *See* Regina M. Foley, *Academic Characteristics of Incarcerated Youth and Correctional Education Programs: A literature Review*, 9 J. EMOTIONAL AND BEHAV. DISORDERS, 248, 248–49 (2001); Lois M. Davis et al., *Evaluating the Effectiveness of Correction Education: A Meta-analysis of Programs that Provide Education to Incarcerated Adults,* RAND CORP. xvi-xvii. (2003), https://www.rand.org/content/dam/rand/pubs/research_reports/RR200/RR266/RAND_RR266.sum.pdf.

older youth with disabilities in correctional facilities may be especially important, as these educational programs may be the youth's last opportunity to receive the special education and related services that enable them to progress academically before they "age out" of IDEA coverage, typically when they turn 22.

### B. The Responsibility to Provide Special Education and Related Services Exists During the COVID-19 Pandemic

Despite the challenges faced by agencies responsible for providing special education, the COVID-19 pandemic did not relieve the agencies' IDEA requirements.[10] *See* 20 U.S.C. § 1412 (a)(1)(A)–(B) (general requirement that free appropriate public education be provided to children with disabilities from 3 to 22); 34 C.F.R. § 300.101 (states must ensure that "a free appropriate public education [is] available to all children residing in the State between the ages of 3 and 21, inclusive"); 34 C.F.R. § 300.201 (requiring local educational agencies to develop policies to ensure the provision of free appropriate public education consistent with 34 C.F.R. § 300.101). While the IDEA does not specifically address the responsibility of local educational agencies to provide special education and related services when schools close as a result of exceptional circumstances, if a local educational agency continues to provide education services to students in the regular curriculum during the pandemic (even during a school closure), it "must ensure that, to the greatest extent possible, each student with a disability can be provided the special education and related services identified in the student's IEP."[11]

---

[10] U.S. DEP'T OF EDUC., *Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak* 1 (March 2020), https://sites.ed.gov/idea/files/qa-covid-19-03-12-2020.pdf [hereinafter *USDOE COVID-19 Document*].

[11] *USDOE COVID-19 Document, supra* note 10. The "greatest extent possible" standard is undefined in the IDEA. However, the United States presents several considerations below that a

1. **State and Local Educational Agencies can use Federal IDEA Allocations to Support the Purchase of the Enhancements Necessary for Remote-based Instruction**

Though providing remote learning tools in a correctional setting poses challenges, the Department of Education has emphasized that educational agencies have "considerable flexibility" in how they use federal IDEA funds during the COVID-19 pandemic, including the ability to use funds to purchase technology.  U.S. DEP'T OF EDUC., *IDEA Part B Use of Funds in the COVID-19 Environment Q & A Document* 2 (June 25, 2020) [hereinafter *USDOE Part B Use of Funds Document*].[12]  For example, a state educational agency can use a portion of its special education allocation to fund the excess costs (costs above the average annual per student expenditure) necessary to provide special education and related services.  34 C.F.R. § 300.202(a)(2).  These funds can be used to enhance the state educational agency's ability to purchase laptops, software, mobile hotspots, and other computer equipment necessary to educate students through virtual education.[13]  State and local educational agencies can also use a portion of their IDEA funds for excess costs necessary to train staff and students to use technology and to hire staff to deliver the instruction and related services necessary to ensure a free, appropriate public education in a virtual environment.  34 C.F.R. § 300.704(b)(4)(vii)–(viii).  Additionally, a state educational agency can request approval to use a portion of its IDEA funds to enhance its ability to "alter existing facilities" if it would improve the State's ability to comply with its IDEA requirements.  34 C.F.R. § 300.718(a).

---

Court should heed in assessing the efforts by a state or local educational agency to comply with the IDEA during the COVID-19 pandemic.  These considerations are not exhaustive, and may vary from case to case.

[12] Available at:  https://sites.ed.gov/idea/files/qa-part-b-use-of-funds-06-25-2020.pdf.

[13] *USDOE Part B Use of Funds Document, supra* note 12 at 3.

### 2. Special Education and Related Services Must Be Designed to Meet a Student's Unique Needs

Under the IDEA, students with disabilities, including IYP students, must receive a "free appropriate public education" consisting of the "special education and related services" required in their individualized education programs. 20 U.S.C. § 1412(a)(1)(A)–(B). The special education and related services must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). The IDEA contemplates specifically tailored, individualized services, supports, and interventions because "[a] focus on the particular child is at the core of the IDEA." *Id*. at 992. Similarly, "[t]he instruction must be '*specially* designed' to meet a child's '*unique* needs' through an '[*i*]*ndividualized* education program.'" *Id*. (internal citation omitted) (emphasis in original). Just as "[a]n IEP is not a form document," special education services and instruction similarly must be individually tailored and specially designed for each student. *Id*. at 999.

The Supreme Court has cautioned that an educational program "providing 'merely more than *de minimis*' progress from year to year . . . would be tantamount to 'sitting idly . . . awaiting the time when [the children with disabilities] were old enough to "drop out."'" *Id*. at 1001 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)). "In order to provide a student with a free appropriate public education, the student's education must be 'provided in conformity with the IEP' developed for her, and therefore, the educational agency must place the student in a setting that is capable of fulfilling the student's IEP." *Johnson v. D.C.,* 962 F. Supp. 2d 263, 267 (D.D.C. 2013); *see* 20 U.S.C. § 1412(a)(10)(C)(ii).

When assessing whether provided special education and related services comply with the

10

IDEA, courts must consider whether the services are tailored to an individual student's unique needs. This individualized analysis also applies when assessing whether packet-based instruction for students with disabilities complies with the IDEA. In applying this analysis, some courts have found packet-based instruction to be insufficient under the IDEA, particularly when it is the sole method of instruction.[14] For example, a court issued a preliminary injunction when youth in an adult facility received "cell packets" that were "sometimes modified" for youth with disabilities, distributed sporadically, rarely returned, and presented without any instruction. *V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 567 (N.D.N.Y. 2017). The court noted that those "cell packets . . . are wholly insufficient for . . . the members of the subclass who qualify for additional educational support under the IDEA." *Id.* at 589.

Another court found a "cell study program, as implemented, offered no more than a *de minimis* educational benefit" where a teacher would provide "self study packets" to a student with disabilities that were not individualized to the student. *Buckley v. State Corr. Inst.-Pine Grove*, 98 F. Supp. 3d 704, 708, 719 (M.D. Pa. 2015). Though the teacher would remain outside the closed cell door to answer any questions, the student was not required to complete the packets and "seldom spoke with the teacher," the noise level on the unit was "so loud as to impede any attempt at instruction," and "[n]o additional educational or related services were provided." *Id.* at 709. Similarly, a court described a defendant's actions as "particularly

---

[14] Plaintiffs allege, and Defendants do not dispute, that the Defendants provided students with disabilities with work packets that were provided in paper form and/or loaded onto tablets without any live, interactive instruction. Pls.' Prelim. Inj. Mem. 9–10. Plaintiffs further allege that the students did not know when they would receive paper work packets and often had difficulty accessing the work loaded onto the tablets. Pls.' Prelim. Inj. Mem. 21. Plaintiffs allege that the students would not receive any response when they asked for help, and many students did not turn in completed packets on time, if at all. Pls.' Prelim. Inj. Mem. 21–22. Defendants contend that the work packets were tailored to meet the students' individual needs. Defs.' Opp'n Mem. 23.

abysmal" where students in restrictive housing cells only received "generic, photocopied materials combined with occasional, woefully brief telephone instruction sessions, only when the telephones were actually working" with "[n]o special education or related services." *Handberry v. Thompson*, 219 F. Supp. 2d 525, 545 (S.D.N.Y. 2002), *vacated and remanded* (Nov. 27, 2002), *order reinstated*, No. 96 CIV. 6161 (CBM), 2003 WL 194205 (S.D.N.Y. Jan. 28, 2003), *aff'd in relevant part, vacated in part, remanded*, 436 F.3d 52 (2d Cir. 2006), *opinion amended on reh'g*, 446 F.3d 335 (2d Cir. 2006), *aff'd in relevant part, vacated in part, remanded*, 446 F.3d 335 (2d Cir. 2006). While instructional packets may be a helpful learning tool for some students with disabilities, especially when combined with other modes of instruction, courts must assess whether the instructional method and content is uniquely tailored to the individual needs of a student with disabilities.

### 3. Compensatory Education May Be Required When A School District Denies Special Education and Related Services, Including During COVID-19

When a school district deprives a student with a disability of a free appropriate public education, an appropriate remedy to correct the denial may be to provide additional education services to compensate the youth for the deprivation. *Reid v. District of Columbia*, 401 F. 3d 516, 518 (D.C. Cir. 2005). *See also Maine Sch. Admin. Dist. No. 35 v. R*, 321 F.3d 9 (1st Cir. 2003); *G. v. Ft. Bragg Dependent Schs.*, 343 F.3d 295 (4th Cir. 2003); *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1280 (11th Cir. 2008). The aim of compensatory education is "to compensate for a past deficient program." *Draper*, 518 F.3d at 1280 (11th Cir. 2008). The award of compensatory education must be individually assessed and "should place children in the position they would have been in but for the violation of the Act." *Reid,* 401 F.3d at 518.

The Department of Education has issued guidance to local educational agencies reminding them to "make an individualized determination whether and to what extent

compensatory services may be needed" to make up for lost educational services during the pandemic.[15]  The Department of Education gave three examples of when compensatory services should be considered:  1) when a local education agency closed to stop the spread of COVID-19 and provided no educational services; 2) when a local education agency continued to provide services but needed to alter how a particular educational or related service was provided; and 3) when a student missed school for an extended period as a result of COVID.[16]  While there is no timeline for when a student's IEP team must consider and award compensatory education services, the Department of Education has recommended that individualized determinations should occur once school resumes.[17]

## V.     Conclusion

Students with disabilities do not forfeit their right to special education and related services when they are in a correctional facility.  Similarly, students with disabilities do not forfeit their right to special education and related services because of the COVID-19 pandemic.  This Court should consider the Defendant' efforts to comply with the IDEA rights of the IYP students balanced against the available resources.  Accordingly, the United States respectfully requests consideration of this Statement of Interest.

---

[15] *U.S. DOE Covid-19 Document, supra* note 10 at 2-4.
[16] *Id.*
[17] *Id.* at 2.

Dated:  May 26, 2021

Respectfully Submitted,

Counsel for the United States:

PAMELA S. KARLAN
Principal Deputy Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief
Special Litigation Section

WINSOME G. GAYLE
Special Counsel
Special Litigation Section

/s/ *Ryan C. Wilson*
RYAN C. WILSON (DC Bar No. 1013907)
EMILY C. KELLER
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel: (202) 305-9937
Fax: (202) 514-4883
ryan.wilson@usdoj.gov