**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CHARLES H.,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 21-997 (CJN)** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

<u>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES**</u>
<u>**IN SUPPORT OF MOTION TO DISMISS IN PART PLAINTIFFS'**</u>
<u>**SECOND AMENDED COMPLAINT**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 2

    I.    The IDEA Framework ................................................................................................ 2

    II.   The Inspiring Youth Program ..................................................................................... 3

    III.  The District's Response to COVID-19 ....................................................................... 4

    IV.  Education at IYP During the COVID Pandemic ........................................................ 5

    V.   Plaintiffs' Complaint and Procedural History ........................................................... 6

LEGAL STANDARD ................................................................................................................. 8

ARGUMENT .............................................................................................................................. 9

    I.    All Claims Against DCPS and OSSE Should Be Dismissed Because Both Agencies Are *Non Sui Juris.* ..................................................................................................................... 9

    II.   Plaintiffs Fail To State a Claim Against OSSE for Violating the IDEA (Counts 1 and 2). ................................................................................................................................................ 9

        A.   Plaintiffs Do Not Allege That They Have Exhausted Their Administrative Remedies Against OSSE with Regard to Their Failure to Implement Claim. ............................... 10

        B.   Plaintiffs Fail To Allege That the IDEA Requires the SEA To Directly Implement an IEP Anytime the LEA Does Not Fully Implement It. ................................................. 11

        C.   Plaintiffs Fail To Allege That OSSE Did Not Satisfy Its Monitoring Obligations Under the IDEA. ............................................................................................................. 14

    III.  Plaintiffs Fail To Allege a Violation of Section 504, the ADA, and the DCHRA Because They Do Not Allege That Their Disabilities Were a Reason Why They Did Not Receive FAPE (Counts 3-5). ........................................................................................................... 16

        A.   Plaintiffs Fail To Allege That Their Disabilities Caused the Alleged Discrimination. . 17

        B.   Plaintiffs Fail To Allege That Any Delay in Implementation of Their IEPs Was The Result of Bad Faith or Gross Misconduct. ..................................................................... 20

    IV.  Plaintiffs Cannot Assert a Claim for an Alleged Violation of the District's Regulations Implementing the IDEA (Count 6) ................................................................................ 22

    V.   Israel F.'s Claims Are Moot in Light of His Administrative Settlement. ....................... 23

    VI.  Malik Z. Has Not Exhausted His Administrative Remedies. ......................................... 25

CONCLUSION ........................................................................................................................... 26

i

# TABLE OF AUTHORITIES

**Cases**

*A.A. ex rel. J.A. v. Philips*, 386 F.3d 455 (2d Cir. 2004) ............................................................ 12

*A.D. v. Creative Minds Int'l Pub. Charter Sch.*, Civil Action No. 18-2430 (CRC) (DAR), 2020
    WL 6373329 (D.D.C. Sept. 28, 2020) ......................................................................................... 9

*Ascent: a School for Individuals with Autism v. New York State Educ. Dep't*, Civil Action No.
    17-6866, 2019 WL 2439431 (E.D.N.Y. Mar. 4, 2019) ............................................................ 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..................................................................................... 8

*B.R. ex rel. Rempson v. District of Columbia*, 524 F. Supp. 2d 35 (D.D.C. 2007) ..................... 21

*Beard v. Teska*, 31 F.3d 942 (10th Cir. 1994) ............................................................................. 15

*Blue v. District of Columbia*, 850 F. Supp. 2d 16 (D.D.C. 2012) ............................................... 9

*Bynum v. District of Columbia*, 424 F. Supp. 3d 122 (D.D.C. 2020) ......................................... 9

*Carnwath v. Grasmick*, 115 F. Supp. 2d 577 (D. Md. 2000) ...................................................... 14

*L.L. By & Through B.L. v. Tennessee Department of Education* Civil Action No. 18-754, 2019
    WL 653079 (M.D. Tenn. Feb. 15, 2019) .................................................................................. 15

*Clark v. State Farm. Mut. Auto. Ins. Co.*, 590 F.3d 1134 (10th Cir. 2009) ................................. 24

*Clarke v. United States*, 915 F.2d 699 (D.C. Cir. 1990) .............................................................. 23

*Conyers v. Reagan*, 765 F.2d 1124 (D.C. Cir. 1985) ................................................................... 24

*Dewitt v. Proctor Hosp.*, 517 F.3d 944 (7th Cir. 2008) ............................................................... 19

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997) .............................. 8

*Frederick v. Hillyer*, 82 F. Supp. 3d 435 (D.D.C. 2015) ............................................................. 22

*Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743 (2017) .................................................................. 10

*Gadsby by Gadsby v. Grasmick*, 109 F.3d 940 (4th Cir. 1997) ................................................... 11

*Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672 (6th Cir. 2016) ......................................... 18

*H.P. by and through W.P. v. Naperville Community Unit School District*, 910 F.3d 957 (7th Cir.
    2018) ......................................................................................................................................... 20

ii

*Honig v. Doe*, 484 U.S. 305 (1988) ...................................................................... 10

*Husain v. Smith*, Civil Action No. 15-708, 2016 WL 4435177 (D.D.C. Aug. 19, 2016)............. 23

*Indian River Cty. v. Rogoff*, 254 F.Supp. 3d 15 (D.D.C 2017) ........................................ 8

*Jackson v. District of Columbia*, 826 F. Supp. 2d 109 (D.D.C. 2011) ............................... 8

*Lejeune v. Khepera Charter Sch.*, 327 F. Supp. 3d 785 (E.D. Pa. 2018) ..................................... 13

*Lovell v. Chandler*, 303 F.3d 1039 (9th Cir. 2002)........................................................ 20

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ....................................................... 23

*M.J. by and through S.J. v. Akron City School District Board of Education*, 1 F.4th 436 (6th Cir. 2021)........................................................................................................... 18

*McClain v. Hanna*, 949 F.3d 266 (6th Cir. 2020) ....................................................... 24

*Mykonos v. United States*, 59 F.Supp. 3d 100 (D.D.C. 2014) ....................................... 8

*Nurriddin v. Bolden*, 818 F.3d 751 (D.C. Cir. 2016)................................................... 8

*O'Shea v. Littleton*, 414 U.S. 488 (1974) .............................................................. 24

*Potter v. Nw. Mortgage, Inc.*, 329 F.3d 608 (8th Cir. 2003) ........................................ 24

*Price v. Commonwealth Charter Acad. Cyber Sch.*, Civil Action No. 17-1922, 2018 WL 1693352 (E.D. Pa. Apr. 6, 2018)........................................................................ 14

*Randolph v. ING Life Ins. & Annuity Co.*, 486 F.Supp. 2d 1 (D.D.C. 2007) ................................ 8

*Reid-Witt on behalf of C.W. v. District of Columbia*, 486 F. Supp. 3d 1 (D.D.C. 2020).............. 16

*Ruhl v. Ohio Health Dep't*, 725 Fed. Appx. 324 (6th Cir. 2018) ................................... 19

*S.W. by J.W. v. Warren*, 528 F. Supp. 2d 282 (S.D.N.Y. 2007) .................................... 21

*Saenz on behalf of V.S. v. Board of Education of Silver Consolidated Schools*, Civil Action No. 18-954, 2019 WL 1795539 (D.N.M. Apr. 24, 2019) .............................................. 13

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .............................................................. 8

*Torrence v. District of Columbia*, 669 F. Supp. 2d 68 (D.D.C. 2009) ......................... 18

*Toth v. Wells Fargo Bank, N.A.*, 82 F.Supp. 3d 373 (D.D.C. 2015) ................................................ 9

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ........................................................................... 9

*U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980) ............................................................ 24

*Watkins v. Hawley*, Civil Action No. 12-54, 2013 WL 5965725 (S.D. Miss. Nov. 8, 2013) ....... 19

*WMI Liquidating Tr. v. Fed. Deposit Ins. Corp.*, 110 F. Supp. 3d 44 (D.D.C. 2015) ................. 23

## Statutes

20 U.S.C. § 1401 ................................................................................................................ 2, 4

20 U.S.C. § 1412 ................................................................................................................ 2, 3

20 U.S.C. § 1413 .............................................................................................................. 3, 13

20 U.S.C. § 1415 .................................................................................................................. 10

D.C. Code § 38-171 ............................................................................................................... 9

D.C. Code § 38-2601 ............................................................................................................. 9

## Regulations

5-E DCMR § 3002.1(a) ...................................................................................................... 3, 22

5-E DCMR § 3002.2(b) ........................................................................................................... 3

34 CFR § 300.102 .................................................................................................................. 3

34 CFR § 300.149 ................................................................................................................. 12

34 CFR § 300.600 ................................................................................................................. 12

## INTRODUCTION

Plaintiffs are high school students with disabilities and special education needs who were (or are) enrolled in the Inspiring Youth Program (IYP) at the D.C. Jail during the COVID-19 public health emergency.[1] Under the Individuals with Disabilities in Education Act (IDEA), plaintiffs have the right to a free, appropriate public education (FAPE). To facilitate the provision of FAPE, every special education student, including plaintiffs, has an Individualized Education Program (IEP) that sets forth the hours of specialized instruction and related services that student needs to participate in and benefit from the general education curriculum. Implementation of IYP students' IEPs is the responsibility of the District of Columbia Public Schools (DCPS), which currently serves as the IYP education provider.[2] Plaintiffs allege that, since the beginning of the COVID-19 pandemic in March 2020, defendants have failed to implement their IEPs in violation of the IDEA, Section 504 of the Rehabilitation Act, the Americans with Disabilities Act (ADA), and the D.C. Human Rights Act (DCHRA). Plaintiffs' claims against the Office of the State Superintendent of Education (OSSE) and DCPS should be dismissed in full, and plaintiffs' claims against the District should be dismissed in part.

First, both OSSE and DCPS are *non sui juris* and cannot be sued as defendants separate and apart from the District. In addition, plaintiffs' IDEA claim against OSSE based on OSSE's purported failure to implement their IEPs (Count 1) should be dismissed because no plaintiff has

---

[1]      Israel F. was released from the custody of the D.C. Department of Corrections (DOC) on May 14, 2021. According to plaintiffs, Israel F. returned to the custody of DOC on August 2, 2021, and requested re-enrollment in IYP. *See* Notice of Recent Development Concerning Plaintiff Israel F. [54]. Because the Second Amended Complaint does not include any allegations concerning Israel F.'s return to DOC custody and anticipated re-enrollment in IYP, the District does not address the facts alleged in plaintiffs' subsequent notice to the Court.

[2]      Although DCPS currently operates IYP, DCPS will no longer be the IYP provider as of October 1, 2021. *See* Defs.' July 1, 2021 Status Report [41].

exhausted his administrative remedies with respect to that claim and because OSSE has no obligation under the IDEA to ensure implementation of IEPs on a student-by-student basis in real-time. Count 2 should be dismissed because plaintiffs have not alleged a systemic failure of OSSE to satisfy its monitoring obligations under the IDEA.

Second, as to all defendants, plaintiffs' claims under Section 504, the ADA, and the DCHRA (Counts 3-5) should be dismissed because plaintiffs fail to allege that the District's purported failure to implement their IEPs was related to their disabilities, as opposed to their detainment at the D.C. Jail, or that the alleged violations of the IDEA were caused by bad faith or gross misconduct. In Count 6, plaintiffs allege a violation of District regulations implementing the IDEA's IEP requirement. Because no independent cause of action exists for an alleged violation of the implementing regulations, Count 6 should be dismissed as well.

Third, the claims of Israel F. should be dismissed because he settled his claims against the District and therefore his claims are moot.

And finally, the claims of Malik Z. should be dismissed because he has failed to exhaust his administrative remedies.

## BACKGROUND

## I.     The IDEA Framework

The IDEA requires that states provide FAPE to students with disabilities as a condition of receiving federal education funding. 20 U.S.C. § 1412.[3] A State must submit a plan of compliance to the U.S. Secretary of Education, who then distributes funding directly to each state's designated State Education Agency (SEA). The SEA then allocates those funds to Local Education Agencies

---

[3]     The IDEA includes the District of Columbia within the definition of a "state." *See* 20 U.S.C. § 1401(31).

(LEAs). While the SEA (here, OSSE) is responsible for monitoring LEAs and ensuring that "all educational programs for children with disabilities in the State … meet the educational standards of the State educational agency," *id.* § 1412(a)(11), the LEA (here, DCPS currently) is responsible for the direct provision of services to children with disabilities, including implementation of the students' IEPs, 5-E DCMR § 3002.1(a) ("The LEA shall make a free appropriate education (FAPE) available to each child … .").

The IDEA also provides that the SEA may use the funds that would have otherwise been available to an LEA to provide services directly to children with disabilities in one of four situations. 20 U.S.C. § 1413(g)(1)(A)–(D). Relevant here, the SEA may use funds allocated to an LEA to provide services directly if the LEA "is unable to establish and maintain programs of free appropriate public education that meet the requirements of [the IDEA]." *Id.* § 1413(g)(1)(B). However, the IDEA imposes limits on the SEA's ability to deprive LEAs of their allocated funding. Before the SEA can divert funds from an LEA for failing to comply with the IDEA, the SEA must provide the LEA with "reasonable notice and an opportunity for a hearing." *Id.* § 1413(d)(1).

## II.     **The Inspiring Youth Program**

IYP is an alternative high school at the D.C. Jail which provides adult students with disabilities the opportunity to earn credits toward their high school diplomas during their incarceration. Mem. Op. Granting Pls.' Mot. for Prelim. Inj. [38] at 5; Second Am. Compl. [44-3] ¶ 2. All students enrolled in IYP are between the ages of 18 and 22 and have previously been identified as students with disabilities. *See* Mem. Op. Granting Pls.' Mot. for Prelim. Inj. at 5; *see also* 5-E § 3002.2(b). Each IYP student has an IEP that details the student's present level of performance, identifies goals for the student, and outlines services and accommodations the student may need. *See* Second Am. Compl. ¶¶ 5, 49; *see also* 34 CFR § 300.102(a)(2)(B). Each

3

student's IEP also identifies the "related services," such as counseling and speech-language pathology, among others, that a student needs to meet their IEP goals. *See* Second Am. Compl. ¶¶ 31–32; 20 U.S.C. § 1401(26)(A) (defining "related services" as "transportation, and such developmental, corrective, and other supportive services … as may be required to assist a child with a disability to benefit from special education … ."). Prior to the pandemic, IYP held in-person classes for students housed in the jail's general population from 8:45 a.m to 11:10 a.m and 12:15 p.m. to 2:30 p.m. Second Am. Compl. ¶ 55. Students in restrictive housing units would receive one-on-one instruction from teachers either at their cell doors or in a separate space on the unit. *Id.*

## III.    The District's Response to COVID-19

In early 2020, the United States saw its first cases of COVID-19. *See* Centers for Disease Control and Prevention Press Release, *First Travel-related Case of 2019 Novel Coronavirus Detected in United States*, Jan. 21, 2020, available at https://bit.ly/2QcPLg0. As the pandemic unfolded nationwide, the District had to respond quickly to the many challenges it posed. On March 11, 2020, just four days after the District recorded its first known case, Mayor Muriel Bowser issued a declaration of emergency and declaration of public health emergency. *See* Mayor's Order 2020-046, March 11, 2020, available at https://bit.ly/3bdgMaa. The District quickly implemented restrictions in line with recommendations from the Centers for Disease Control and Prevention (CDC) and the District of Columbia Department of Health (DOH). From March 30, 2020 to May 29, 2020, for example, the Mayor ordered all District residents to remain in their homes except for limited outings in an effort to enforce the CDC and DOH recommendations on social distancing, which called for people from different households to remain at least six feet apart. Mayor's Order No. 2020-054, March 30, 2020, at 3, 7–8, available at https://bit.ly/3bg2Goy; Mayor's Order No. 2020-067, May 27, 2020, at 3, available at https://bit.ly/33rIhZv.

In accordance with the Mayor's declaration and orders, both the D.C. Department of Corrections (DOC) and DCPS responded by imposing measures to protect the health and safety of the residents at the D.C. Jail. Among other things, DOC began prohibiting many outside visitors, suspended small-group programming, issued a medical stay-in-place order that limited each resident to 30 minutes of time out of cell each day, and capped the total number of residents allowed out of their cells at any given time. *See* Dep't of Corrections, Coronavirus Protection, https://doc.dc.gov/page/coronavirus-prevention (last accessed August 24, 2021). Similarly, on March 13, 2020, the Chancellor of DCPS, Lewis D. Ferebee, announced that DCPS would modify operations, including a shift to distance learning, from March 16 to April 1, 2020. *See* Mar. 13, 2020 Letter from Chancellor Ferebee, available at https://bit.ly/3hgQE20 (last accessed August 24, 2021). Mayor Bowser then extended distance learning through the end of the school year, *see* Gov't of the District of Columbia, *Mayor Bowser Announces Learning at Home at DC Schools to Continue Through Rest of School Year*, Apr. 17, 2020, available at https://bit.ly/3eCdDmr (last accessed August 24, 2021), and again into the 2020-2021 school year, *see* Gov't of the District of Columbia, *School Year 2020-2021*, July 30, 2020, available at https://bit.ly/3hCsHRz (last accessed August 24, 2021).

## IV.      Education at IYP During the COVID Pandemic

Plaintiffs allege that in response to the COVID-19 pandemic, in-person classes were halted at IYP, and around March 25, 2020, students instead began receiving paper-based work packets. Second Am. Compl. ¶¶ 56–62. Students also received paper-based work packets for their related services, such as counseling. *Id.* ¶ 67. The packets were designed to contain two weeks' worth of work, *id.* ¶ 59, and although plaintiffs generally allege students only received the work packets sporadically, *id.* ¶ 70, plaintiff Malik Z. admits he received "work packets for each class every week," *id.* ¶ 190.

Beginning in the fall of 2020, a limited number of IYP teachers returned to the jail in person to drop off the paper-based work packets and check in with students through their cell doors. *See id.* ¶ 86 (science teacher visited students "twice a month on the days of work packet delivery and pickup"); *id.* ¶ 87 (special education English teacher "began visiting the students throughout the week and continues to visit them"); *id.* ¶ 198 (Malik Z.'s English teacher "has offered to answer questions about the work packets"). At least one social worker also visited the D.C. Jail over the winter. *Id.* ¶ 90. Around November 2020, DCPS began providing students with educational material on electronic tablets, which students could also use to communicate with their teachers. *See id.* ¶¶ 80, 82, 197. In the spring of 2021, modifications and restrictions necessitated by the pandemic were gradually eased throughout the District as positive cases decreased and vaccinations increased. *See, e.g.*, Mayor's Order No. 2021-038, March 17, 2021, available at https://coronavirus.dc.gov/page/stay-home; Mayor's Order No. 2021-060, April 26, 2021, available at https://coronavirus.dc.gov/page/stay-home; Dep't of Corrections, Coronavirus Protection, https://doc.dc.gov/page/coronavirus-prevention. By May 2021, the District had resumed some in-person classroom instruction and related services at IYP. Second Am. Compl. ¶¶ 93–94.

## V.       Plaintiffs' Complaint and Procedural History

As alleged in the Second Amended Complaint, plaintiffs Charles H. and Malik Z. are IYP students currently housed at the D.C. Jail, and plaintiff Israel F. is a former IYP student who was released from custody on May 14, 2021.[4] *See* Second Am. Compl. ¶¶ 2, 14–16. Charles H. has been enrolled in IYP since February 26, 2019. *Id.* ¶ 123. On October 16, 2020, he filed an

---

[4]       All three plaintiffs have been permitted to proceed with this lawsuit using pseudonyms. The District refers to them here by their chosen pseudonyms throughout.

administrative due process complaint with OSSE concerning educational services during the pandemic and received a decision from an OSSE Office of Dispute Resolution Administrative Hearing Officer on January 11, 2021. Second Am. Compl. ¶¶ 136, 140. Israel F. enrolled at IYP on December 1, 2020. *Id.* ¶ 162. He filed an administrative due process complaint with OSSE on February 4, 2021, which he settled with DCPS and OSSE on May 14, 2021, the same day he was released from DOC custody. *Id.* ¶¶ 15, 182. Malik Z. enrolled in IYP in early March 2021, and filed a due process complaint with OSSE on May 20, 2021. *Id*. ¶¶ 184, 190, 207. To date, he has not received a decision. *Id.* ¶¶ 16, 207.

Plaintiffs filed their lawsuit on April 9, 2021. Compl. [4]. Plaintiffs moved to amend their complaint on June 1, 2021 [31], and the Court granted their motion on June 16, 2021, *see* Minute order of June 16, 2021. Plaintiffs again moved to amend their complaint on July 21, 2021 [44], and the Court granted their motion on August 5, 2021, *see* Minute Order of August 5, 2021.

Plaintiffs bring six causes of action on behalf of themselves and all others similarly situated, against the District of Columbia, DCPS, and OSSE, alleging that the District's use of paper-based work packets during the pandemic, instead of in-person or synchronous remote instruction, resulted in a failure to materially implement students' IEPs because they did not provide specialized instruction and related services. Second Am. Compl. ¶ 6. Plaintiffs allege violations of the Individuals with Disabilities Education Act (IDEA) (Counts 1 and 2), the Americans with Disabilities Act (ADA) (Count 3), Section 504 of the Rehabilitation Act (Section 504) (Count 4), the D.C. Human Rights Act (Count 5), and the D.C. regulations that implement that IDEA (Count 6). *Id*. ¶¶ 216–258. All six counts allege the failure to provide them with FAPE. *See id*. On April 12, 2021, plaintiffs moved for a preliminary injunction, which was granted on July 16, 2021 [37].

## LEGAL STANDARD

A case must be dismissed when a party fails to set forth "a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although well-pleaded factual allegations must be taken as true, a plaintiff must offer "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see Jackson v. District of Columbia*, 826 F. Supp. 2d 109, 120 (D.D.C. 2011). Courts need not accept as true conclusory "assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 679, and "need not … accept inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (alterations adopted) (internal quotation marks omitted).

In evaluating a motion under Rule 12(b)(6), the Court "may consider … the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

Under Rule 12(b)(1), "[a] court must dismiss a case when it lacks subject matter jurisdiction." *Mykonos v. United States*, 59 F. Supp. 3d 100, 103 (D.D.C. 2014) (quoting *Randolph v. ING Life Ins. & Annuity Co.*, 486 F. Supp. 2d 1, 4 (D.D.C. 2007)). "A motion to dismiss for mootness is properly brought under Rule 12(b)(1) because mootness itself deprives the court of jurisdiction." *Indian River Cnty. v. Rogoff*, 254 F. Supp. 3d 15, 18 (D.D.C 2017). In resolving a motion to dismiss for lack of subject matter jurisdiction, "the factual allegations must be presumed true, and plaintiffs must be given every favorable inference that can be drawn from them." *Mykonos*, 59 F. Supp. 3d at 103 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "The court

need not, however, accept as true 'a legal conclusion couched as a factual allegation' or make inferences that are unsupported by the facts set out in the complaint." *Id*. (citations omitted) (quoting *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006)). Also, "in deciding a 12(b)(1) motion, a court need not limit itself to the complaint; rather, it 'may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction in the case.'" *Toth v. Wells Fargo Bank, N.A.*, 82 F. Supp. 3d 373, 376 (D.D.C. 2015) (citations omitted).

## ARGUMENT

### I. All Claims Against DCPS and OSSE Should Be Dismissed Because Both Agencies Are *Non Sui Juris*.

Plaintiffs have named DCPS and OSSE as defendants in this lawsuit. It is well settled, however, "that a department or agency of the District of Columbia cannot sue or be sued in its own name in the absence of a statutory provision to that effect." *Bynum v. District of Columbia*, 424 F. Supp. 3d 122, 128 (D.D.C. 2020) (quoting *Whitehead v. District of Columbia Child Support Servs. Div.*, 892 F. Supp. 2d 315, 319 (D.D.C. 2012)). Both DCPS and OSSE are District agencies and thus cannot sue or be sued. *See* D.C. Code §§ 38-171, 38-2601; *Blue v. District of Columbia*, 850 F. Supp. 2d 16, 22–23 (D.D.C. 2012) (collecting cases and concluding "that DCPS is *non sui juris*—that is, non-suable as an entity separate from the District of Columbia"); *A.D. v. Creative Minds Int'l Pub. Charter Sch.*, Civil Action No. 18-2430 (CRC) (DAR), 2020 WL 6373329, at *3 (D.D.C. Sept. 28, 2020) (noting magistrate's conclusion that OSSE is *non sui juris*). Accordingly, all claims against DCPS and OSSE should be dismissed.

### II. Plaintiffs Fail To State a Claim Against OSSE for Violating the IDEA (Counts 1 and 2).

Plaintiffs have failed to state a claim against OSSE for violating the IDEA. Plaintiffs allege that OSSE violated the IDEA in two ways—by failing to implement plaintiffs' IEPs ("failure to

implement" claim) and by failing to monitor DCPS's implementation of their IEPs ("failure to monitor" claim). Neither claim has merit.

### A.    Plaintiffs Do Not Allege That They Have Exhausted Their Administrative Remedies Against OSSE with Regard to Their Failure to Implement Claim.

A plaintiff must exhaust all administrative remedies before filing suit under the IDEA— and before filing suit under the ADA, Section 504, or state-level laws such as the DCHRA if the suit alleges a failure to provide FAPE. 20 U.S.C. § 1415(*l*); *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 754 (2017). Plaintiffs' claims against OSSE primarily allege a failure to provide FAPE. *See* Second Am. Compl. ¶¶ 219, 224, 232, 243.

Before bringing such a claim, "a plaintiff must first submit her case to an IDEA hearing officer" via a due process complaint. *Fry*, 137 S. Ct. at 754; 20 U.S.C. § 1415(f). This exhaustion requirement applies in all circumstances except "where exhaustion would be futile or inadequate." *Honig v. Doe*, 484 U.S. 305, 326–27 (1988). That exception is "narrowly construed," and exhaustion under the IDEA "may be waived only in the most exceptional circumstances." *Douglass v. District of Columbia*, 750 F. Supp. 2d 54, 61 (D.D.C. 2010) (internal quotation marks omitted) (citing *Commc'ns Workers of Am. v. AT&T*, 40 F.3d 426, 432 (D.C. Cir. 1994)). The plaintiff bears the burden of showing that futility or inadequacy applies. *Id.* (citing *Honig*, 484 U.S. at 326–27). In particular, no *per se* exception exists for claims alleging systemic violations. *Id.* at 61–62. Even as to such claims, the question is simply whether exhaustion of administrative remedies would be futile or inadequate given the allegations raised. *Id.* at 62.

As explained below in Section VI, Malik Z. has not exhausted his administrative remedies as to any claims against defendants, and Charles H. and Israel F. have not exhausted their failure to implement claim as alleged against OSSE. Neither Charles H. nor Israel F. raised a failure to implement claim against OSSE in their administrative complaints, *see* Administrative Due Process

Complaint of Charles H. at 14–18 [12-26]; Administrative Due Process Complaint of Israel F. at 14–18 [12-29], and with respect to Charles H., the hearing officer did not identify it as an issue brought before him. Hearing Officer Determination at 4–5, 12–26 [12-27]. Plaintiffs' failure to exhaust should not be excused.

**B.**     **The IDEA Does Not Require the SEA To Directly Implement a Student IEP Anytime the LEA Fails To Do So.**

Plaintiffs allege that it was the responsibility of DCPS, as the LEA, to implement plaintiffs' IEPs, not the responsibility of OSSE as the SEA. Second Am. Compl. ¶ 42. Plaintiffs nevertheless allege that OSSE should be held responsible for DCPS's alleged failure to implement their IEPs. *Id*. ¶¶ 216–21. Plaintiffs seem to assume that because OSSE has a statutory obligation to ensure that students receive FAPE, *see id*. ¶ 221 (citing 20 U.S.C. § 1412(a)(1)(A)), it follows that OSSE has a statutory obligation to monitor DCPS's implementation of individual student IEPs and ensure compliance with the IDEA, *see id*. ¶ 62. Plaintiffs are wrong.

First, while plaintiffs acknowledge the separate responsibilities of LEAs and SEAs under the IDEA, *id*. ¶ 42, they ignore that distinction in Count 1 and seemingly conflate an SEA's responsibility to ensure the provision of FAPE with the LEA's responsibility to ensure implementation of the IEP, *id*. ¶¶ 216–21. Implementation of IEPs is one element related to the provision of FAPE, but the requirement to ensure the provision of FAPE does not in turn make the SEA liable for any failure to implement an IEP by the LEA. As the Fourth Circuit explained in *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 954 (4th Cir. 1997):

> Congress carefully delineated responsibilities under IDEA, delegating specific duties to the SEA and specific duties to the LEA, while placing ultimate responsibility for compliance with the SEA. Within this scheme, the SEA has supervisory authority and is responsible, for example, for administering federal IDEA funds and establishing policies and procedures to ensure local compliance with IDEA. … By contrast, the LEA applies to the SEA for IDEA funds, and the LEA is responsible for the direct provision

11

of services under IDEA, including the development of an IEP for each disabled student.

The District is aware of no authority for the proposition that the SEA's requirement to ensure students receive FAPE includes a requirement that the SEA also monitor the implementation of every student's IEP. *See Ascent: a School for Individuals with Autism v. New York State Educ. Dep't*, Civil Action No. 17-6866, 2019 WL 2439431, at *9 (E.D.N.Y. Mar. 4, 2019) (explaining that "courts have consistently held that the IDEA's private right of action does not authorize claims against State agencies that are rooted in the State's general supervisory role under the IDEA"); *see also Gadsby*, 109 F.3d at 955 (disagreeing with plaintiffs' contention that "an SEA should always be held liable for an LEA's failure to provide a free appropriate public education, regardless of the particular circumstances of the case").

That conclusion is entirely consistent with the Second Circuit's explanation that

> Section 1412(a)(11) gives the SEA "general" supervisory responsibilities. … "[W]hile the IDEA clearly places a supervisory and monitoring role on the SEA, the specific requirements of that role (with the exception of requiring the formulation of policies and procedures), are not set forth in the statute. Instead, the SEA has discretion to work with the LEA to ensure compliance with the IDEA.

*A.A. ex rel. J.A. v. Philips*, 386 F.3d 455, 459 (2d Cir. 2004). Federal regulations also confirm that the responsibilities of the SEA are focused on high-level monitoring and policies and procedures and *not* on monitoring whether individual students are having their IEPs fully implemented with the expectation that the SEA will provide services directly anytime it receives notice of less than complete implementation of an IEP. *See, e.g.*, 34 C.F.R. § 300.149 ("The SEA is responsible for ensuring … [t]hat each educational program for children with disabilities in the State … [m]eets the educational standards of the SEA"); *id*. § 300.600 ("The primary focus of the State's

monitoring activities must be on … [i]mproving educational results and functional outcomes for all children with disabilities.").

If plaintiffs were correct that the IDEA requires an SEA to directly implement IEPs anytime it has notice of a lack of compliance, Section 1413(g) of the IDEA would be rendered largely superfluous. The IDEA imposes strict limits on the SEA's ability to step into the shoes of the LEA and provide services directly. The LEA must be "unable" to provide the required services, 20 U.S.C. § 1413(g); *see, e.g.*, *Lejeune v. Khepera Charter Sch.*, 327 F. Supp. 3d 785, 800 (E.D. Pa. 2018), aff'd sub nom. *LeJeune G. v. Khepera Charter Sch.*, 779 F. App'x 984 (3d Cir. 2019) (finding school was "unable" to satisfy its obligation to student when it lacked any funding), and the SEA must follow certain procedures before removing funds from an LEA so that the SEA can provide services directly. *Id*. Plaintiffs' attempt to assert a failure to implement claim against OSSE is simply an attempt to perform an end run around the limitations of Section 1413(g). *Saenz on behalf of V.S. v. Board of Education of Silver Consolidated Schools*, Civil Action No. 18-954, 2019 WL 1795539, at *7 (D.N.M. Apr. 24, 2019) (explaining that "the sole avenue by which a plaintiff can establish the liability of an SEA under the IDEA" is to prove that the SEA was responsible under Section 1413(g)(1) to provide services directly to the plaintiff).

Here, plaintiffs do not allege that DCPS was unable to implement their IEPs under 1413(g), *e.g.*, they do not allege that DCPS is insolvent or no longer operating as an LEA. Accordingly, to the extent a failure to implement claim exists against the District, it should be limited to the conduct of DCPS, as the LEA responsible for implementing plaintiffs' IEPs. Absent an allegation that OSSE was required to provide services directly to plaintiffs because DCPS was "unable" to implement their IEPs under Section 1413(g), plaintiffs cannot bootstrap a failure to implement

claim to their failure to monitor claim. Therefore, the Court should find that plaintiffs' allegations regarding OSSE's alleged conduct do not state a claim against OSSE or the District.

**C.    Plaintiffs Fail To Allege That OSSE Did Not Satisfy Its Monitoring Obligations Under the IDEA.**

Plaintiffs have alleged, at most, that they are part of a small group of students who were uniquely situated compared to all other students and that, as a result of that unique status, implementation of their IEPs was delayed during the pandemic. Even assuming that the alleged delay in fully implementing their IEPs states a claim under the IDEA, plaintiffs have not identified any systemic issues that caused their IEPs to not be implemented, and therefore, Count 2 should be dismissed.

First, plaintiffs effectively allege that the SEA's monitoring responsibilities under the IDEA include the responsibility to ensure implementation of IEPs on a student-by-student basis. Second Am. Compl. ¶¶ 216–21. For the reasons stated above, OSSE, as the SEA, has no obligation to monitor individual implementation of IEPs across the District such that any failure to fully implement an IEP by an LEA also constitutes a failure to monitor by OSSE.

Second, plaintiffs allege that they have identified a systemic violation of the IDEA by OSSE. *Id.* ¶¶ 62, 94, 222–28. Plaintiffs are mistaken on that point as well. "A systemic claim is one which implicates the integrity of the IDEA's dispute resolution procedures themselves, or requires restructuring of the education system itself in order to comply with the dictates of the [IDEA]." *Price v. Commonwealth Charter Acad. Cyber Sch.*, Civil Action No. 17-1922, 2018 WL 1693352, at \*7 (E.D. Pa. Apr. 6, 2018); *see also Easter v. District of Columbia*, 128 F. Supp. 3d 173, 178 (D.D.C. 2015). The IDEA "does not create a type of respondeat superior liability, imputing liability to SEAs for every local deviation from the State-created standards." *Carnwath v. Grasmick*, 115 F. Supp. 2d 577 (D. Md. 2000); *Beard v. Teska*, 31 F.3d 942, 954 (10th Cir.

1994) (noting that SEA responsibility under the IDEA "does not turn every 'local educational agency' under the statute ... into the agent of the 'State educational agency' as a matter of federal law, so that the latter automatically becomes liable for all transgressions of the former").

>As explained in *L.L. By & Through B.L. v. Tennessee Department of Education*,

>>The distinction between systemic and non-systemic allegations is a meaningful one, but the term, if deployed too freely, can confuse more than it illuminates. Public schools are a system. The IDEA is a system. Every problem that arises under either is likely to have, in some sense, systemic roots.

Civil Action No. 18-754, 2019 WL 653079, at *4 (M.D. Tenn. Feb. 15, 2019). When drawing a distinction between the two, "[t]he court should ask whether the plaintiffs … have presented a broad, policy level problem … or whether they have presented what is, at its core, a context-dependent, student-specific problem that is better addressed by … the experts on the ground, even if there may be other students suffering from similar alleged deprivations." *Id*. Evidence that a student was able to resolve his issues through the IDEA's administrative proceeding would indicate a lack of a systemic problem. *Id*. (emphasizing that "resorting to the administrative complaint process plainly was not futile here, given that L.L., unlike Br.R., did avail himself of the administrative process, and it worked—or at least worked well enough that L.L. was willing to release his claims").

Here, plaintiffs fail to identify any broad, structural issues that caused their alleged injury. Plaintiffs do not allege that either DCPS or OSSE fail, as a categorical matter, to implement the IEPs of IYP students. Rather, at most, they allege that DCPS struggled to materially implement IEPs for IYP students during the height of the pandemic. Second Am. Compl. ¶¶ 56–89. Any failure to implement was not driven by a structural problem that existed before the pandemic or will persist after the pandemic. *See id*. ¶ 55 (describing standard IYP schedule pre-pandemic); *id*.

¶¶ 93–94 (acknowledging resumption and increase of direction instruction in 2021). Rather, any failure to implement student IEPs was driven by DCPS's struggles to adapt to unprecedented and constantly changing conditions in the correctional setting. Any shortcomings with the work packets distributed to IYP students or with the prompt implementation of virtual technologies were not the result of deficient policies and procedures.

Plaintiffs' challenge here is not to the structure of the IYP program itself but rather to the substantive implementation of that program by DCPS during the pandemic—not every decision made by a teacher at IYP rises to the level of a "policy." Plaintiffs allege that DCPS should have done more, for example, to provide direct instruction. Second Am. Compl. ¶¶ 104–08. But plaintiffs do not allege that DCPS's purported failure to offer direct instruction was the result of an institutional policy against offering it. Similarly, plaintiffs do not allege that OSSE or DCPS were opposed to using virtual, direct instruction; they allege that not enough was done to install Wi-Fi and offer virtual instruction. *Id.* Plaintiffs have identified individual decisions made by a small number of individuals who were responsible for creating a remote instructional model on the fly in a jail setting where the student population is transient, technical capacity is limited, and many students spend the school day in restrictive housing.

Because plaintiffs have failed to allege that OSSE is systemically failing to ensure compliance with the IDEA, Count 2 should be dismissed.

### III.     Plaintiffs Fail To Allege a Violation of Section 504, the ADA, and the DCHRA Because They Do Not Allege That Their Disabilities Were a Reason They Did Not Receive FAPE (Counts 3-5).

In addition to the IDEA, plaintiffs assert claims under Section 504, the ADA, and the DCHRA. *See* Second Am. Compl. ¶¶ 229–52. "Unlike the IDEA, the Rehabilitation Act, ADA, and DCHRA may permit recovery of compensatory damages and other remedies." *Reid-Witt on behalf of C.W. v. District of Columbia*, 486 F. Supp. 3d 1, 6 (D.D.C. 2020). "While the IDEA

addresses incorrect or erroneous special education treatment, the ADA, Rehabilitation Act, and DCHRA address discrimination against the disabled student." *Id*. "Because the IDEA's administrative process is the primary vehicle for adjudicating educational disputes, courts require plaintiffs to show something more than a mere failure to provide the free and appropriate education required by the IDEA to state a claim under the other statutes." *Id.* "Only in the rarest of cases will a plaintiff be able to prove that a school system's conduct is so persistent and egregious as to warrant such a unique remedy not otherwise provided for by the IDEA itself." *Id.* at 9. This is not such a case. Counts 3 through 5 should be dismissed because plaintiffs fail to allege either that any failure to implement their IEPs was (1) related to, or caused by, their disabilities or (2) the result of bad faith or gross misconduct on the part of the District.

### A.    Plaintiffs Fail To Allege That Their Disabilities Caused the Alleged Discrimination.

To state a violation of Section 504, the ADA, or the DCHRA, plaintiffs must allege that, at a minimum, their disabilities were "a motivating factor" in the decision to not implement their IEPs.[5] In the absence of direct allegations of animus towards them because of their disabilities, plaintiffs must allege that they were treated differently from similarly situated, non-disabled persons. "The comparator requirement is the be all and end all of the circumstantial-evidence test. If there are no comparators, there is no way to deploy it." *Gohl v. Livonia Pub. Schs. Sch. Dist.*,

---

[5]    Section 504 requires a higher showing of causation than the ADA. Under Section 504, plaintiffs must show that they were discriminated against "solely by reason of" their disabilities. *Reid-Witt*, 486 F. Supp. 3d at 10–11. Under the ADA, "the disability must simply be a motivating factor in the alleged discrimination." *Id*. As explained below, given that plaintiffs cannot meet the ADA's standard, they also cannot meet Section 504's higher causation standard.

836 F.3d 672, 683 (6th Cir. 2016) (explaining the plaintiff could not prove disability discrimination "[i]n the absence of evidence of a well-treated comparator").[6]

In the Second Amended Complaint, plaintiffs do not allege that any employee of the District has any animosity or ill will towards any disabled students, and there is no basis to draw reasonable inferences that such animus does exist. As the Seventh Circuit explained when faced with similar facts,

> [Plaintiff]'s theory also requires considerable conjecture: to suppose that Turbiak chose to become a special education teacher in order to help disabled kids, to suppose that she stood by this objective for over a decade, and to suppose that in year twelve she began discriminating against the same sorts of disabled students she had committed her career to teaching. That's a lot of supposing.

*Id*. at 684. Therefore, to avoid dismissal of their discrimination claims, plaintiffs must allege facts showing that they were treated differently from non-disabled persons because of their disability.

However, plaintiffs allege only that the District discriminated against them because of their disabilities by "denying them special education and related services in conformity with their IEPs … that are designed to meet their needs as adequately as the needs of non-disabled students." Second Am. Compl. ¶ 236. Under that logic, *every* failure to implement an IEP would be caused by the student's disability because, but for the student's disability, the student would not have an

---

[6]     *Accord M.J. by and through S.J. v. Akron City School District Board of Education*, 1 F.4th 436, 453 (6th Cir. 2021) ("At any rate, under each Act, plaintiffs must present evidence of how the school treated comparable, non-disabled students. … And in the absence of evidence of a well-treated comparator, plaintiffs cannot prove that discrimination against the disabled was the reason for their mistreatment."); *Jackson v. District of Columbia*, 826 F. Supp. 2d 109, 122–23 (D.D.C. 2011) (dismissing Section 504 claim when plaintiff "did not allege that AJP was treated differently from non-disabled students solely because of his disabilities"); *Torrence v. District of Columbia*, 669 F. Supp. 2d 68, 72 (D.D.C. 2009) ("FAPE under IDEA and the Rehab Act are not identical. 'FAPE under § 504 is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the design of a child's educational program.'" (quoting *Mark H. v. Lemahieu*, 513 F.3d 922, 929 (9th Cir. 2008))).

IEP and there would be no opportunity to fail to implement it. Several courts have rejected such strained reasoning. *See, e.g.*, *Watkins v. Hawley*, Civil Action No. 12-54, 2013 WL 5965725, at *3 (S.D. Miss. Nov. 8, 2013) (rejecting as "absurd sophistry" causation argument premised on the idea that "Defendants would not have been able to deny any disability benefits but for the existence of the minor Plaintiffs' disabilities.").[7] Actions taken for motives other than disability discrimination do not amount to disability discrimination. *See Dewitt v. Proctor Hosp.*, 517 F.3d 944, 953 (7th Cir. 2008) (Posner, J., concurring) ("So far as the record reveals, the defendant fired the plaintiff not because her husband was disabled but because his medical expenses … were costing the defendant an amount of money that it was unwilling to spend. … If cost was indeed, as appears to be the case, the defendant's only motive for the action complained of, the defendant was not guilty of disability discrimination.").

Here, the proper comparator for IYP students would be non-disabled students detained at the D.C. Jail. But plaintiffs do not allege that any non-disabled individuals at the D.C. Jail are being treated differently, nor could they. Instead, plaintiffs focus on comparing the implementation of IEPs of two groups of disabled students—one group that is detained at the jail and another group that is not. *See* Second Am. Compl. ¶¶ 3, 71, 96. But the obvious cause of that different treatment (and the only cause that can be reasonably inferred from the Second Amended Complaint) is *detainment at the jail*, which cannot support a claim of discrimination based on disability. *See H.P. by and through W.P. v. Naperville Community Unit School District*, 910 F.3d 957, 961 (7th Cir.

---

[7]     *Accord Ruhl v. Ohio Health Dep't*, 725 Fed. Appx. 324, 338 (6th Cir. 2018) (rejecting argument "that disability discrimination occurred here because defendants did not allow W.R. to achieve the life goals of IDEA Part C" because "[a]lthough this argument potentially pleads an IDEA Part C violation, it does not articulate a disability-discrimination claim unless, but for W.R.'s having autism as opposed to another disability, the defendants would have so allowed him to achieve IDEA Part C's life goals").

2018) (rejecting a discrimination claim because, "[a]s the record makes clear, it is undisputed that the District disallowed H.P. from attending NCHS precisely because of its residency policy, and not because of H.P.'s alleged disability").

Courts that have allowed disability discrimination claims to proceed did so where the plaintiff's disability was directly related to the allegedly different treatment. *See, e.g.*, *Lovell v. Chandler*, 303 F.3d 1039, 1053 (9th Cir. 2002) (affirming finding of disability discrimination where "[i]t [was] undisputed that disabled people who, but for their disability, were eligible for healthcare benefits from the State under QUEST but could not qualify for the FFS program were denied coverage because of the categorical exclusion of the disabled from QUEST").

Because plaintiffs have failed to allege that their disabilities were a "motivating factor" in the alleged failure of the District to implement their IEPs, let alone the sole cause, Counts 3 through 5 should be dismissed.

**B.      Plaintiffs Fail To Allege That Any Delay in Implementation of Their IEPs Was The Result of Bad Faith or Gross Misconduct.**

In addition to alleging causation, to succeed on a disability discrimination claim, plaintiffs must also allege that the delay in implementing their IEPs involved either bad faith or gross misconduct on the part of the District. *Reid-Witt*, 486 F. Supp. 3d at 7–8. Plaintiffs seemingly attempt to allege gross misconduct three ways, but each, even if true, would be insufficient to show that the District was "completely indifferent" to implementing plaintiffs' IEPs.

First, plaintiffs allege that the District failed to meet accepted standards among educational professionals by not implementing IEPs at the jail during the pandemic. Second Am. Compl. ¶¶ 36–38, 214, 238, 239. While plaintiffs are correct that the U.S. Department of Education and OSSE issued guidance advising that DCPS and other LEAs should implement IEPs during the pandemic to the greatest extent possible, *id.* ¶¶ 36–37, it does not follow that every failure to

implement an IEP during the pandemic amounts to gross misconduct.[8] Even if plaintiffs have alleged negligence, Section 504 does not create general tort liability for educational malpractice. *Torrence*, 669 F. Supp. 2d at 71.

Second, plaintiffs allege that the District had several technological and logistical solutions available to it that would have solved pandemic-related obstacles but that its agencies did not cooperate sufficiently to implement those solutions. *See, e.g.*, Second Am. Compl. ¶¶ 100–10. But plaintiffs do not dispute (and could not reasonably dispute) that the pandemic created unprecedented and unpredictable obstacles to running a school for disabled students within an adult correctional facility. Acting out of necessity and out "complete indifference" are not the same.

Third, plaintiffs allege that the District was on notice of the problems with implementing IEPs at the jail but did not respond adequately. *Id*. ¶¶ 61–62, 73. But the notice alleged here is of a far different nature than the notice provided in cases that have allowed disability discrimination claims to proceed. For example, in *S.W. by J.W. v. Warren*, 528 F. Supp. 2d 282 (S.D.N.Y. 2007), the plaintiff identified specific policies that were in place that impeded implementation of IEPs. Among others, the plaintiff alleged that the defendants imposed onerous requirements on service providers as a condition of contracting with the county, which resulted in a shortage of service providers. *Id*. at 287–88. The plaintiffs also alleged that the defendants limited the number of hours of ABA services for autistic children and failed to properly train staff and personnel. *Id*. Similarly, in *B.R. ex rel. Rempson v. District of Columbia*, 524 F. Supp. 2d 35, 42 (D.D.C. 2007), the Court

---

[8]   Although plaintiffs allege that the District's conduct is not in accord with professional standards, plaintiffs do not allege that other adult correctional facilities that contain high schools for disabled students were more adept at overcoming pandemic-related obstacles to implementing IEPs.

explained that, "if the defendants conducted an IEP, assessed the plaintiff's child as needing full-time special services, and then placed her in a facility with no capacity to deliver special services … then the court would encounter no difficulty in characterizing such conduct as marked by gross misjudgment or bad faith."

Here, plaintiffs do not allege that IYP, as an institution, does not have the capacity to provide them with the necessary services. Unlike in *B.R.*, plaintiffs do not allege that the District placed them in the D.C. Jail despite knowing that IYP lacked any capacity to provide any of services mandated by their IEPs. Instead, implicit in plaintiffs' allegations is that IYP *does* have the capacity to provide the required services but that since the onset of the pandemic those services have not been delivered. Those allegations show a delay in implementation and not a program that was designed to fail from the outset as was apparently the case in *S.W.* and *B.R.*

Because plaintiffs' allegations do not allege bad faith or gross misconduct, plaintiffs have failed to state a claim for disability discrimination and Counts 3 through 5 should be dismissed for that reason as well.

## IV.   Plaintiffs Cannot Assert a Claim for an Alleged Violation of the District's Regulations Implementing the IDEA (Count 6).

Count 6 should also be dismissed. Plaintiffs allege that the District's failure to implement their IEPs violates 5-E DCMR § 3002.1(a). *See* Second Am. Compl. ¶¶ 248–252. Section 3002.1(a), however, does not create a cause of action separate from the relevant statutes. *Cf. Frederick v. Hillyer*, 82 F. Supp. 3d 435, 440 (D.D.C. 2015) ("[I]t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress."). Section 3002.1(a) merely states that "[t]he LEA shall make a free appropriate public education (FAPE) available to each child … ." Count 6 is also entirely duplicative of Count 1. "Claims are duplicative when they stem from identical allegations, that are

decided under identical legal standards, and for which identical relief is available." *WMI Liquidating Tr. v. Fed. Deposit Ins. Corp.*, 110 F. Supp. 3d 44, 59 (D.D.C. 2015) (dismissing count two because it "does not present any legal or factual theories that are not already subsumed in count one"); *accord Husain v. Smith*, Civil Action No. 15-708, 2016 WL 4435177, at \*5 (D.D.C. Aug. 19, 2016) (dismissing claim as duplicative of underlying discrimination claim). Even if Count 6 states a claim against the District and DCPS, as explained in Section II, it does not state a claim against OSSE because OSSE is not responsible under the relevant statutes or regulations for implementing plaintiffs' IEPs.

## V.       Israel F.'s Claims Are Moot in Light of His Administrative Settlement.

This action currently includes three named plaintiffs. However, Israel F. cannot continue as a plaintiff in this case because his claims are now moot based on an agreement that fully and finally settled his claims against the District.[9]

Every plaintiff in federal court must meet the constitutional minimum for Article III standing by showing an injury, causation and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Even when a plaintiff has standing at a case's outset, a claim may become moot whenever "events have so transpired that the [court's] decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (*en banc*) (internal quotation marks omitted); *see also Camreta v. Greene*, 563 U.S. 692, 701 (2011). A plaintiff must thus have an active case or controversy to seek any form of relief, including a declaratory judgment. *See Conyers v. Reagan*,

---

[9]       Subsequent to the filing of the Second Amended Complaint, plaintiffs informed the Court that Israel F. returned to the custody of DOC on August 2, 2021, and requested re-enrollment in IYP. [54]. Regardless of whether Israel F. re-enrolls in IYP now or in the future, it would not change the fact that he has settled any and all claims arising from his enrollment in IYP prior to his release from DOC custody on May 14, 2021.

765 F.2d 1124, 1127 (D.C. Cir. 1985) ("The Article III case or controversy requirement is as applicable to declaratory judgments as it is to other forms of relief.").

Plaintiff Israel F.'s claims are now moot because he settled the administrative claims underlying his claims here, was released from custody on May 14, 2021, and was no longer enrolled in IYP. *See* Second Am. Compl. ¶¶ 149, 182, 183; Israel F. Settlement Agreement [34-3]. Even assuming the allegations about Israel F.'s past incarceration are true, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); *see also Conyers*, 765 F.2d at 1127 (applicable also to declaratory relief). The allegations about Israel F. not receiving adequate instruction within IYP do not represent an ongoing controversy, as Israel F. settled his due process complaint and waived all claims arising from the facts alleged here. *See* Second Am. Compl. ¶ 182.

In general, a plaintiff's interest in a class action ceases to exist if he settles his individual claims before a class is certified. *Potter v. Nw. Mortgage, Inc.*, 329 F.3d 608, 611 (8th Cir. 2003) ("[A] federal court should normally dismiss an action as moot when the named plaintiff settles its individual claim, and the district court has not certified a class."); *Clark v. State Farm. Mut. Auto. Ins. Co.*, 590 F.3d 1134, 1138 (10th Cir. 2009) ("[A] suit brought as a class action must be dismissed for mootness when the personal claims of the named plaintiffs are satisfied and no class has been properly certified."); *cf. McClain v. Hanna*, 949 F.3d 266, 268 (6th Cir. 2020) (collecting cases for proposition that "[i]f a named plaintiff settles his case and does not expressly reserve any right to pursue his class claims, then he may not pursue those claims on appeal"). The critical inquiry is whether the putative class action representative retains a personal stake in the ongoing action despite settling his claims. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 402 (1980)

24

(when asking whether a plaintiff who has settled her claims retains an interest in pursuing class certification, courts "must look to the nature of the 'personal stake' in the class certification claim"). A plaintiff who releases "any and all claims" against a defendant through an individual settlement cannot continue to pursue class claims arising from the same facts. *Walsh v. Ford Motor Co.*, 945 F.2d 1188, 1191–92 (D.C. Cir. 1991) (Ginsburg, R.B., J.) (concluding named plaintiff could not represent class of defective automobile consumers on appeal when plaintiff reached individual settlement releasing "any and all … claims … whatsoever" arising from underlying facts).

Israel F. had started but not yet completed his administrative exhaustion process when this lawsuit was filed. He has now fully settled his administrative claims, which form the basis for his claims in this lawsuit. *See* Israel F. Settlement Agreement. Moreover, as alleged in the Second Amended Complaint, he was released from custody and no longer enrolled in IYP. Second Am. Compl. ¶ 15. The desire to represent others, without more, does not provide Israel F. with a "personal stake" in the outcome of this case. *See Walsh*, 945 F.2d at 1192 (holding individual settlement agreement releasing "any and all" claims against class-action defendant "include[ed] the claim to represent the class"). He should be dismissed.

## VI.     **Malik Z. Has Not Exhausted His Administrative Remedies.**

Requiring Malik Z. to exhaust his administrative remedies is not futile—as is made clear by the outcome of Israel F.'s administrative proceeding in this very case. Israel F. was able to settle his administrative due process complaint, and plaintiffs do not allege that the relief he received in that settlement was not adequate. *See* Second Am. Compl. ¶ 182. Malik Z.'s substantively similar claims may likewise get resolved through the administrative process, which he alleges he initiated on May 20, 2021. *Id*. ¶ 207. At the very least, Malik Z. cannot meet his burden to show that his administrative exhaustion would be futile or inadequate. *See Douglass*, 750 F. Supp. 2d at 61.

Malik Z.'s claims must therefore be dismissed until they are exhausted and raised properly to this

Court.

## CONCLUSION

For the foregoing reasons, the Court should dismiss in part plaintiffs' Second Amended

Complaint with prejudice.

Dated:  August 26, 2021.                     Respectfully submitted,

                                             KARL A. RACINE
                                             Attorney General for the District of Columbia

                                             CHAD COPELAND
                                             Deputy Attorney General
                                             Civil Litigation Division

                                             */s/ Fernando Amarillas*
                                             FERNANDO AMARILLAS [974858]
                                             Assistant Deputy Attorney General

                                             */s/ Richard P. Sobiecki*
                                             RICHARD P. SOBIECKI [500163]
                                             MICAH BLUMING [1618961]
                                             HONEY MORTON [1019878]
                                             Assistant Attorneys General
                                             Equity Section
                                             400 Sixth Street, N.W., Suite 10100
                                             Washington, D.C. 20001
                                             Phone: (202) 805-7512
                                             Fax: (202) 730-1470
                                             richard.sobiecki@dc.gov

                                             *Counsel for Defendants*