UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHARLES H., *et. al.*,

    *Plaintiffs*,

v.

DISTRICT OF COLUMBIA, *et. al.*,

    *Defendants*.

Civil Action No. 1:21-cv-00997 (CJN)

## ORDER

Plaintiffs move to enforce the settlement agreement approved by the Court on January 15, 2024. For the reasons that follow, the Court grants their motion in part—declining to extend the duration of the settlement agreement itself, but ordering specific performance through as late as August 1, 2026 in order to rectify Defendants' material breaches of the agreement.

### I.     Background

The Individuals with Disabilities Act (IDEA), Rehabilitation Act, and District of Columbia law require that every public-school student in the District of Columbia must receive free education tailored to the student's specific needs. ECF 44-3 at 4. The universe of D.C. public school students includes young people incarcerated at D.C. jails who are enrolled in on-site academic classes through the "Inspiring Youth Program," or IYP—a D.C. Public Schools initiative. *Id.*, § 1412(a)(10)(A)(ii); 34 C.F.R. §§ 300.125, 300.45; 5 D.C.M.R. § 3002.2. And the universe of specific needs includes the special needs of students with learning disabilities. *Id.*

Plaintiffs reflect the overlap of those two sub-universes: they are a class of incarcerated individuals with learning disabilities who were enrolled in the IYP during the 2020–21 academic

1

year, at the height of the COVID-19 pandemic. *Id.* at 2. In early 2021, the class brought suit alleging that Defendants had failed to provide them with sufficient special education in accordance with its members' specific needs during the pandemic period. ECF 44-3 at 51–61.

The litigation ultimately lasted for three years. Early on, in June 2021, the Court granted a preliminary injunction requiring Defendants to comply in various ways with their obligations to provide class members with the individualized education to which they are entitled. *See* ECF 37; *see also* ECF 38. Later that year, the Court held Defendants in contempt for failure to comply with that preliminary injunction. ECF 101.

Thereafter, and consistent with the Court's Orders, Defendants submitted a series of status reports (and the Court held some status hearings) regarding Defendants' compliance. Beginning in July 2022, the parties also engaged in substantial mediation efforts with Magistrate Judge Harvey. After approximately eighteen months, the parties executed a proposed 69-page class settlement agreement; its operative duration was from September 22, 2023, until August 1, 2025. ECF 191-1, para. 145.

The agreement includes both retrospective and prospective relief. It requires Defendants to provide each class member with an "award letter" detailing how the IYP had failed in the past to provide the recipient with the education to which the student was entitled, and outlining the specific remedial benefits—including independent tutoring and private counseling—the recipient would receive. ECF 191-1, para. 82. The agreement also requires Defendants to "develop a system for tracking all award determinations and letters" to ensure that class members received their letters and, more vitally, received the specific remedies the letters detailed.

As for prospective relief, the agreement requires Defendants to provide all IYP students with specialized instruction and "related services," regardless of where in the D.C. jail system

2

those students are housed. ECF 191-1 para. 62, 67, 68. The agreement also requires Defendants, among other things, to equip all IYP premises with proper educational technology, such as tablets and internet access; to apply specific instructional techniques designed to optimize special needs learning; to escort students to designated education locations when necessary; and to hire additional teachers and staff to properly accommodate IYP students. *Id.*, paras. 59–79.

The Court granted preliminary approval to the proposed settlement in October 2023 (ECF 200), and final approval in January 2024 (ECF 212). Pursuant to paragraph 64(b), a third-party auditor, Grace Lopes, was authorized to perform quarterly reviews (and prepare corresponding reports) regarding Defendants' compliance. On February 16, 2024, the auditor submitted her first report. It showed that the percentage of all students who received the full hours of specialized instruction to which they were entitled was 67% in October 2023, 65% in November 2023, and 72% in December 2023. ECF 222-1 at 5. It also reflected that, during the last quarter of 2023, 53% of students confined in restrictive housing units were provided instruction consistent with their needs, compared with 74% confined in nonrestrictive housing units. *Id.* The report identified that certain IYP locations lacked proper internet capacities. *Id.* And Defendants' provision of related services was spotty and varied by service; while as many as 86% of the students received all of the behavioral services to which they were entitled during certain months, as few as 0% received all of the speech pathology services to which they were entitled during others. *Id.* at 8. The auditor's subsequent reports have identified similar (though certainly not identical) problems with Defendants' efforts. ECF 217, 221, 231, 235.

Accordingly, with the expiration date of the settlement agreement (August 1, 2025) fast approaching, Plaintiffs are not satisfied with Defendants' compliance. They therefore have moved to enforce the settlement agreement, and in particular for the Court to extend its expiration by

3

another year, until August 1, 2026.

## II.   Analysis

### A.   Material Breach

The Court begins with the question of whether Plaintiffs (relying primarily on the auditor's findings) have established a material breach of the settlement agreement. The relevant provisions are quite plain. Paragraph 62 mandates that "Defendants shall ensure that instruction is provided to *all* students *in accordance with* their [specific needs] regardless of housing placement at the DOC Facilities." ECF 191-1, para. 62 (emphasis added). Paragraph 67 similarly requires that "Defendants shall ensure that related services are provided to *all* students *in accordance with* their [specific needs] regardless of housing placement at the DOC Facilities." *Id.,* para. 67 (emphasis added).

The record reflects that Defendants have failed to comply with both of these obligations. As for the first, the auditor's reports show that all students did not receive their required education with the required consistency—indeed, the reports show sustained periods in which more than a quarter of IYP students did not receive all of the specialized instruction to which they were entitled. In the last quarter of 2023, for instance, the monthly mean percentage of IYP students who received their required hours of specialized education was 68%; in the first quarter of 2024, that monthly average percentage dipped to 67%. ECF 222-1 at 5. This monthly average percentage rose to 75% in the second quarter and then 83% in the last quarter of 2024. ECF 235-1 at 8. The settlement agreement, however, provides no mechanism by which this gradual improvement can constructively cure past deficiencies.

The auditor's reports reflect that housing placement has been a substantial determinant of contract performance, in spite of Defendants' express obligations under the settlement agreement.

4

During the last calendar quarter of 2023, for example, only 53% of students confined in restrictive housing units received all of the specialized instruction to which they were entitled; that number for students confined in nonrestrictive housing units was 74%. ECF 222-1 at 5. In the first quarter of 2024, only 60% of students confined in restrictive housing units received all of the specialized instruction to which they were entitled, while 69% of students confined in both nonrestrictive housing units received all of the instruction to which they were entitled. *Id.* The following quarter, 82% of students in nonrestrictive housing received all of the specialized instruction to which they were entitled, while the number was only 58% for those in restrictive housing.[1] ECF 235-1 at 20, 22. At the start of the academic year in September 2024, the disparity between students in nonrestrictive and restrictive housing was 82% to 30%—the same high disparity as in January 2024. *Id.* at 20. But in 2024's last quarter, after Plaintiffs had filed the motion to enforce, Defendants had narrowed the gap: 87% to 75%. *Id.*

As to Defendants' second obligation, the auditor's reports show that their provision of related services was inconsistent and varied substantially depending on the type of service at issue. For example, in the last quarter of 2023, the monthly average percentage of qualifying students who received all of the behavioral support services to which they were entitled was 84%; but the monthly average percentage of qualifying students who received all of the speech pathology services to which they were entitled during that same quarter was 12%. ECF 222-1. at 7. The disparity between behavioral services and speech pathology improved in the first quarter of 2024, but remained stark: The respective monthly averages for each service were 80% and 57%. *Id.* But unlike the performance discussed above, Defendants' provision of related services has not

---

[1] That latter figure reflects a strong May (where students in both housing types received 81% of their required education), but in April and June, the percentages for students in restrictive housing were 40% and 50% respectively.

improved with time, including after Plaintiffs moved to enforce the settlement agreement. For example, in the final quarter of 2024, while 86% of eligible students received all of the behavioral support services to which they were entitled, only 27% received all of the speech pathology services to which they were entitled. ECF 235-1 at 19. And when it came to occupational therapy—another related service—Defendants' performance has gotten worse over time: The percentage of qualified students who received all of the occupational therapy to which they were entitled in the last quarter of 2023 was 72%; that same figure in the first quarter of 2024 was 62%. ECF 235-1 at 19. In the last quarter of 2024, that same percentage dropped to 33%. *Id.*

The record thus certainly illustrates some degree of breach. But to warrant the relief sought here, Defendants' breaches must be material rather than trivial; small errors made despite substantial, good faith compliance are not material. In particular, Defendants argue that Plaintiffs are imposing an unfair "all or nothing approach" by which only 100% compliance for the full agreement duration is acceptable. ECF 227 at 9. For example, Defendants note that, while 39% of students did not receive all of the specialized instruction hours to which they were entitled in January 2024, four of those students (of twenty-two) received "at least 90% of the hours called for" and "in fact, two of them received 98% of the required hours." ECF 227 at 9. Likewise, Defendants note that in February 2024, although 33% of students did not receive all of the specialized education to which they were entitled, five of those students (out of eighteen) received 90% of their required hours. *Id.* And in April 2024, although 29% of students did not receive all of the specialized instruction to which they were entitled, seven (of eighteen) received 90% or more of their required hours—and one student received 99% of his required hours. *Id.* at 9–10. Defendants also argue that "high compliance" is an opaque standard—questioning, for instance, whether months of providing roughly 80% of students with all (or close to all) of the services to

6

which they are entitled constitute "high compliance" and evince a good faith effort. *Id.* at 6.

Defendants certainly have a point; if the record reflected that they were typically very close to full compliance, then perhaps their non-compliance would be immaterial. (Or had Defendants' compliance rate remained at a steady 80% for the duration of the agreement period, the "high compliance" standard would matter.) But the record reflects that Defendants simply have not been very close to full compliance. Take January 2024 as an example. In that month only fifty-seven students were enrolled in the program; leaving twenty-two underserved is a substantial dearth. *Id.* at 9. If all or even a majority of those twenty-two students had received 90% instruction in that month, the Court might be inclined to credit a good faith effort. But that was true of only four of the twenty-two. Similarly, the number of students who received "basically enough" special instruction in February 2024 was five out of eighteen; in April, the number was seven out of eighteen. *Id.* at 9–10. It is not an "all or nothing" approach to conclude that these figures don't pass muster.

Lastly, Defendants list a series of on-the-ground logistical hurdles to suggest that the auditor's reports do not tell the full story. For instance, in defense of the disparate statistics between restricted and nonrestricted housing, they note the dangerous nature of individuals placed in restrictive housing—and emphasize the need for a balance between educating those individuals and keeping the rest of the jail ecosystem safe. ECF *Id.* at 11. The Court certainly recognizes the importance of this balance, but also notes that it is not reflected as a priority in the settlement agreement, pursuant to which Defendants bear the contractual responsibility of adjusting prison practices as necessary for compliance and safety to coexist.

In defense of both specialized instruction and related service disparities, Defendants also note that part of the auditor's findings owe to the fact that several students dropped out of the IYP

7

program prematurely instead of receiving instruction for a full term—which is forty days. *Id.* at 14. But the auditor's methodology does, in fact, account for dropout rates: "[I]f a student was enrolled for only one day during a month with twenty school days… [the auditor adjusted] the required hours for that student… to five percent." ECF 230-1 at 2. The auditor's statistics thus reflect that an unacceptable portion of students who eventually dropped out of the program did not receive the necessary related services during their short time enrolled.

**B.     Remedy**

The standard remedy for breach of a contract (like the settlement agreement) is money damages. But Plaintiffs do not seek damages, and the Court does not see how an award of damages would be an appropriate remedy. In fact, it is difficult to see how an award of damages would achieve the goals of the settlement: A program of lasting relief for the current IYP students who are entitled to education and related services at the DOC Facilities and an effective program for delivering compensatory education to the class-member plaintiffs. In short, Plaintiffs don't seek the traditional remedy for breach of contract, and the Court doesn't see how that remedy would work in any event.

Instead, Plaintiffs request that the Court extend (by up to a year) the date on which the settlement agreement will expire. But Defendants argue, and the Court agrees, that it does not have authority to unilaterally amend the terms of a contract. A settlement agreement is a contract, and any change to the duration provision must arise from the parties themselves. *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 956 (D.C. Cir. 2024) ("A settlement agreement is a contract…."); *2301 M St. Coop. Ass'n v. Chromium*, 2019 A.3d 82, 88 (D.C. 2019) ("Although parties are free to modify a contract at any time, modification requires mutual consent.")

But money damages and a contract modification are not the only possible remedies.

Instead, as Plaintiffs recognize, another contract remedy is specific performance. The equitable authority to award specific performance arises both from traditional contract law and the IDEA itself. *See* 17B C.J.S. Contracts § 838 ("Equitable principles can be applied to contract law."); *D.L. v. D.C.*, 860 F.3d 713, 731 (D.C. Cir. 2017) ("[The IDEA Act] implicat[es] broad discretion and equitable considerations… [and] vests the court with all the authority it needs to remedy those violations through injunctive relief."). And Paragraph 147 of the Settlement Agreement stipulates that the Court has explicit and broad authority to "make any necessary orders enforcing or construing the settlement agreement" and to "order appropriate relief." ECF 191-1.

The Court concludes that specific performance is warranted in this case because Plaintiffs contracted for a particular slate of actions on Defendants' part (to which Defendants expressly agreed). Absent monetary relief, ordering specific performance is the only way to put Plaintiffs, and the other beneficiaries of the settlement agreement, in the position they would have been in absent Defendants' material breach. And specific performance would not be "inequitable, oppressive, or unconscionable"—as Defendants have already consented to perform the acts in question and offer no grounds for why such action would be impractical or burdensome. 65 A.L.R. 7. Likewise, the Court envisions no "undue hardship" that would flow from the specific performance remedy. *Id.*

But what is the appropriate specific performance here? In one sense, Plaintiffs seek broad relief: full, good faith compliance with all obligations in the settlement agreement for an extra year. ECF 223-1 at 25. But Plaintiffs have also proposed that this period could be shorter if Defendants can demonstrate that they have "met certain benchmarks laid out in the Third-Party Auditor's recommendation." *Id.* Those benchmarks are, in relevant part,[2] that Defendants meet

---

[2] The first benchmark was, initially, that Defendants send out amended compensatory award letters to all class members who had previously received incorrect letters. ECF 191-1 at 22. Since Defendants have since taken this

"the requirements in Paragraphs 45, 62, 67, and 68 regarding the delivery of specialized instruction and related services" such that "90% of all students receive the specialized instruction and related services" to which they are entitled—and that Defendants sustain that level of performance for a sufficient timespan. ECF 222-1 at 28. Plaintiffs propose that, if the Court finds that Defendants have performed at that level throughout the period between the signing of this order and January 31, 2026, the period of specific performance could end at that time. ECF 223-1 at 25.

The Court agrees with this approach. Accordingly, the Court concludes that it is appropriate to order specific performance of the settlement agreement's terms (all of them) for a duration beginning on the day of this order's issuance and terminating on August 1, 2026. That period can be shortened in the event that Defendants demonstrate that, during this period, they have provided all IYP students with at least 90% of the special instruction and related services to which they are entitled under Paragraphs 45, 62, 67, and 68 of the Settlement Agreement.

### III.    Conclusion

For the foregoing reasons, it is ORDERED that Plaintiffs' Motion to Enforce the Settlement Agreement, ECF 223, is GRANTED IN PART and DENIED IN PART; and it is

FURTHER ORDERED that the Defendants shall comply with all terms of the Settlement Agreement until August 1, 2026; and it is

FURTHER ORDERED that if, on January 31, 2026, Defendants can demonstrate that they have provided all IYP students with at least 90% of the special instruction and related services to which they are entitled for the period March 14, 2025, through January 31, 2026, then this Order shall terminate on January 31, 2026.

---

action of their own volition (ECF 223-1 at 7, fn 7.), the Court does not believe it necessary to award specific performance as to it. The same is true for the second benchmark, which was that Defendants establish the necessary tracking system to ensure the delivery of the services promised in the letters. ECF 191-1 at 22.

DATE: March 14, 2025

_____
CARL J. NICHOLS
United States District Judge